ORIGINAL

Philip Heller, PLC (CA Bar No. 113938)
Debi A. Ramos, Esq. (CA Bar No. 135373)
**FAGELBAUM & HELLER LLP**
2049 Century Park East, Suite 4250
Los Angeles, California 90067-3254
Telephone:   (310) 286-7666
Facsimile:   (310) 286-7086
Email:       ph@philipheller.com

Attorneys for Plaintiffs, Primarius Capital LLC;
Primarius China Fund LP; Primarius Focus LP;
Primarius Partners LP and Primarius Offshore
Partners Ltd.

FILED

MAR 3 0 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

EDL

|  |  |
|---|---|
| PRIMARIUS CAPITAL LLC; PRIMARIUS CHINA FUND LP; PRIMARIUS FOCUS LP; PRIMARIUS PARTNERS LP and PRIMARIUS OFFSHORE PARTNERS LTD., <br><br> Plaintiffs, <br><br> vs. <br><br> JAYHAWK CAPITAL MANAGEMENT, LLC; JAYHAWK CHINA FUND (CAYMAN) LTD.; JAYHAWK INVESTMENTS LP; JAYHAWK INSTITUTIONAL PARTNERS LP; KENT C. MCCARTHY and DOES 1 through 100, Inclusive, <br><br> Defendants. | Case No.: C 07 1804 <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Primarius Capital LLC, Primarius China Fund LP, Primarius Partners LP, Primarius Focus LP and Primarius Offshore Partners Ltd. allege:

## Jurisdiction and Venue

1.    This action arises under §§ 9 and 10(b) of the Securities Exchange Act of 1934, as Amended (the "Exchange Act"), 15 U.S.C. §§ 78i and 78j(b) respectively and § 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6(1) as hereinafter more fully appears. This Court therefore has subject matter jurisdiction under 28 U.S.C. § 1331. The Court should assume subject matter jurisdiction of Plaintiffs' state law claims under the doctrine of pendent jurisdiction because those claims and Plaintiffs' federal claims arise out of a common nucleus of operative fact.

2.    The acts and/or transactions that are the subject of this Complaint occurred in the Northern District of California and elsewhere. Moreover, Defendants each transact business and/or are found within this District. Accordingly, this Court has personal jurisdiction over each defendant, and venue is proper under § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(a) and (b).

3.    Additionally, Article XII, paragraph 12.1(o) of the Primarius China Fund Limited Partnership Agreement, which, along with the Primarius China Fund LP Confidential Private Placement Memorandum, determines the rights and duties of Primarius China's general and limited partners, provides in pertinent part:

**THE PARTNERS AND ASSIGNEES HEREBY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA AND THE FEDERAL COURTS OF THE UNITED STATES, IN EACH CASE SITTING IN SAN FRANCISCO COUNTY, CALIFORNIA, IN ANY PROCEEDING RELATING TO THIS AGREEMENT.**

**THE PARTNERS AND ASSIGNEES AGREE NOT TO RAISE ANY OBJECTION TO VENUE IN THE COURTS OF THE STATE OF CALIFORNIA AND THE FEDERAL COURTS OF THE UNITED STATES, IN EACH CASE SITTING IN SAN FRANCISCO COUNTY, CALIFORNIA, IN ANY PROCEEDING RELATING TO THIS AGREEMENT.** [Emphasis in original.]

4.    Jayhawk China has therefore consented to the personal and subject matter jurisdiction and venue of this Court with respect to all matters herein relating to the Primarius China Agreement.

2

**Case Overview**

5.    Defendant Kent C. McCarthy ("McCarthy") is the exclusive ruler of an investment empire that includes Defendants Jayhawk Capital Management, LLC ("Jayhawk"), Jayhawk China Fund (Cayman), Ltd. ("Jayhawk China"), Jayhawk Investments, LP ("Jayhawk Investments") and Jayhawk Institutional Partners, LP ("Jayhawk Institutional"), all hedge funds. According to a submission on hedgefund.net in January 2007, Jayhawk China had approximately $526 million under management, with total "firm assets," which included Jayhawk Investments and Jayhawk Institutional, totaling approximately $602 million. McCarthy treats the Jayhawk entities as his own private vehicles, deploying them as necessary to meet his personal ends.

6.    McCarthy has a history of luring smaller funds, like Plaintiffs here, and their managers into association with him by telling them that he is growing weary of the hedge fund business and is essentially looking for a successor. After the smaller funds have allied themselves with McCarthy, accepted often token investments from him and/or his funds, accepted McCarthy as an investment advisor and given him one-way, *i.e.*, non-reciprocal, complete access in real-time or near real-time to their positions and trading activities ("transparency") and also a cut of their earnings, he proceeds to use them shamelessly to advance his own financial goals, without regard for their well-being and to their great detriment.

7.    As explained in greater detail below, that is what happened here. In or around January 2003, McCarthy approached Patrick Lin ("Lin"), managing member and portfolio manager of Plaintiff Primarius Capital LLC ("Primarius"), and told Lin the story described in the preceding paragraph. McCarthy transferred control of one of his smaller funds, Lucky Henry, to Primarius, whereupon it was renamed Primarius Focus LP ("Focus") (a Plaintiff here) and also invested through the Jayhawk entitles in Plaintiffs Primarius China Fund LP ("Primarius China"), Primarius Partners LP ("Partners") and Focus. Defendants were granted complete one-way transparency in Primarius China, Partners and Focus (as explained below, Defendants' transparency into

3

**Complaint**

1    Partners and Focus was subsequently limited) and McCarthy became an investment

2    advisor to Primarius China, Partners and Focus.

3         8.     Between 2003 and 2006, Defendants breached their fiduciary duties to

4    Plaintiffs by, *inter alia*, deliberately providing misleading and fraudulent investment

5    advice, committed front-running against Plaintiffs, violated provisions of the securities

6    statutes, including without limitation Rule 10b-5 and committed common law fraud

7    against Plaintiffs, all as described below.

8                                **The Parties**

9         9.     Plaintiff Primarius Capital LLC ("Primarius") is a Delaware limited liability

10   company with its principal place of business at One Montgomery Street, San Francisco,

11   California. Primarius is in the business of managing private investment funds, including

12   Plaintiffs Primarius China Fund LP, Primarius Partners LP, Primarius Focus LP and

13   Primarius Offshore Partners Ltd.

14        10.    Plaintiff Primarius China Fund LP ("Primarius China") is a Delaware

15   limited partnership with its principal place of business at One Montgomery Street, San

16   Francisco, California. Primarius China is "hedge fund" that was in the business of

17   investing on behalf of its limited partners primarily in publicly-traded US, China-related,

18   Hong Kong and Taiwan securities. Primarius China was dissolved as of September 29,

19   2006, largely as a result of the wrongdoing described herein, and is currently in the

20   process of winding up its operations. Primarius is the sole general partner of Primarius

21   China.

22        11.    Plaintiff Primarius Focus LP ("Focus") is a Delaware limited partnership

23   with its principal place of business at One Montgomery Street, San Francisco, California.

24   Focus is a "hedge fund" in the business of investing on behalf of its limited partners in

25   a broad range of securities and other instruments including without limitation options,

26   preferred stock, debt instruments, cash equivalents and privately-placed securities of

27   public and private companies.

28        12.    Plaintiff Primarius Partners LP ("Partners") is a Delaware limited

                                        4

1    partnership with its principal place of business at One Montgomery Street, San

2    Francisco, California. Partners is a "hedge fund" in the business of investing on behalf

3    of its limited partners in a broad range of securities and other instruments including

4    without limitation options, preferred stock, debt instruments, cash equivalents and

5    privately-placed securities of public and private companies.

6        13.    Plaintiff Primarius Offshore Partners Ltd. ("Offshore Partners") is a British

7    Virgin Islands corporation with its principal place of business at One Montgomery

8    Street, San Francisco, California. Offshore Partners is a "hedge fund" in the business of

9    investing on behalf of its limited partners in a broad range of securities and other

10   instruments including without limitation options, preferred stock, debt instruments, cash

11   equivalents and privately-placed securities of public and private companies..

12       14.    Defendant Jayhawk Capital Management, LLC ("Jayhawk") is a Delaware

13   limited liability company with its principal place of business at 5410 West 61st Place,

14   Mission, Kansas. Plaintiffs are informed and believe, and on that basis allege, that

15   Jayhawk is in the business of managing and serving as investment advisor to private

16   investment funds, including Defendants Jayhawk China Fund (Cayman), Ltd., Jayhawk

17   Investments, LP and Jayhawk Institutional Partners, LP. Jayhawk is a member of

18   Primarius and a limited partner of Partners. Defendant Kent McCarthy is the manager

19   and sole member of Jayhawk.

20       15.    Plaintiffs are informed and believe, and on that basis allege, that Defendant

21   Jayhawk China Fund (Cayman), Ltd. ("Jayhawk China") is a Cayman Islands corporation

22   with its principal place of business at 5410 West 61st Place, Mission, Kansas. Jayhawk

23   China is in the business of investing in Chinese securities listed in Hong Kong, the US

24   and China and Jayhawk is the sole general partner and investment manager of Jayhawk

25   China. Jayhawk China was founded in 1995 and was federally registered as an

26   investment advisor with the SEC in 2004. According to Jayhawk China promotional

27   materials dated July 2005, Defendant Kent McCarthy is the "President" of Jayhawk

28   China. Jayhawk China is a limited partner of Primarius China.

16.    Plaintiffs are informed and believe, and on that basis allege, that Defendant Jayhawk Investments, LP ("Jayhawk Investments") is a Delaware limited partnership with its principal place of business at 5410 West 61st Place, Mission, Kansas. Plaintiffs are informed and believe, and on that basis allege, that Jayhawk Investments is in the business of investing in various securities and other interests on behalf of its limited partners and that Jayhawk is the sole general partner and investment manager of Jayhawk Investments. Jayhawk Investments is a member of Primarius and a limited partner of Partners and Focus.

17.    Plaintiffs are informed and believe, and on that basis allege, that Defendant Jayhawk Institutional Partners, LP ("Jayhawk Institutional") is a Delaware limited partnership with its principal place of business at 5410 West 61st Place, Mission, Kansas. Plaintiffs are informed and believe, and on that basis allege, that Jayhawk Institutional is in the business of investing in various securities and other interests on behalf of its limited partners and that Jayhawk is the sole general partner and investment manager of Jayhawk Institutional.

18.    Plaintiffs are informed and believe, and on that basis allege, that Kent McCarthy ("McCarthy") is, and at all relevant times was, a citizen of Kansas residing in Johnson County, Kansas, or a citizen of Nevada residing in Incline Village, Nevada. McCarthy is the principal of Jayhawk, Jayhawk China, Jayhawk Investments and Jayhawk Institutional.

19.    Plaintiffs are informed and believe and on that basis allege that McCarthy is the alter ego of Jayhawk, Jayhawk China, Jayhawk Investments and Jayhawk Institutional.

20.    Plaintiffs are ignorant of the true names and capacities of Defendants named herein as Does 1 through 100, inclusive, and therefore sue these Defendants by fictitious names. Plaintiffs will seek leave of court to amend this Complaint to allege their true names and capacities when they are ascertained.

6

## The Relevant Agreements and Fee Concessions

21.    In or around May 2003, Jayhawk and Primarius entered into a "Management Transfer Agreement" with an effective date of June 1, 2003, a copy of which is appended to this Complaint as Exhibit A, and which is incorporated in its entirety by this reference. The Management Transfer Agreement was the first step in McCarthy's plan to turn the Primarius funds to his own use.

22.    Pursuant to the Management Transfer Agreement, Jayhawk became a member of Primarius, and Jayhawk and Jayhawk Investments collectively obtained the right to receive 10% of certain fees payable by the Primarius funds' limited partners. In consideration of the payment of these fees, McCarthy was to provide investment advice to Partners and Focus and, as detailed below, the advice he provided was usually deceptive and misleading, with generally catastrophic results.

23.    As of September 15, 2003, Primarius, Primarius China, Jayhawk China and Jayhawk entered into a "Fee Sharing Agreement," a copy of which is appended to this Complaint as Exhibit B, and which is incorporated in its entirety by this reference. Through this agreement, Defendants gained full, one-way transparency into Primarius China (*i.e.*, Primarius China did not receive reciprocal transparency with respect to any Jayhawk entity) and Jayhawk China obtained the right to receive 10% of management fees paid by Primarius China's limited partners. In exchange, McCarthy was required to provide investment advice and consultation to Primarius and Primarius would be permitted to inform investors and potential investors in Primarius China that Jayhawk China was a significant "shareholder" in Primarius China and that McCarthy and Jayhawk had a participatory role in Primarius China's investment strategy as a consultant/analyst.

24.    Primarius China and Focus typically charged their limited partners a 2% management fee; Partners charged a 1.5% management fee. Primarius China, Focus and Partners also charged their limited partners a 20% incentive fee on all profits realized by such limited partners. Primarius China charged Jayhawk China only a 1% management

7

fee and no incentive fee, Focus charged Defendants no management or incentive fees, and Partners charged Defendants no management fee and only a partial incentive fee. Plaintiffs made these accommodations in consideration of and with the expectation of receiving honest, good faith advice from McCarthy.

25.    Plaintiffs have paid Defendants approximately $665,000 to date in profit sharing and have waived approximately $3.5 million in management and incentive fees for Defendants.

**The Jayhawk Entities' Positions in and**

**Duties to Primarius China, Partners and Focus**

26.    As of May 15, 2006, Jayhawk China had two capital accounts in Primarius China with a combined balance of approximately $32.5 million. The balance of Jayhawk China's accounts had appreciated by approximately $1.9 million over the preceding four months. As a limited partner of Primarius China, with full "transparency" into that fund's trading and holdings, and by virtue of McCarthy's role as an investment advisor to Primarius China, Jayhawk China was at all relevant times in a fiduciary relationship with Primarius China and owed that fund the full range of applicable fiduciary duties, including the duty not to engage in trades or take other actions harmful to Primarius China. Plaintiffs are informed and believe, and on that basis allege, that a substantial part of the funds invested through Jayhawk China in Primarius China are McCarthy's personal funds.

27.    As of June 30, 2006, Jayhawk had one capital account in Partners with a balance of $111,350 As a limited partner of Partners, with full "transparency" into that fund's trading and holdings initially, and later into that fund's "top five" holdings *i.e.,* the five securities in which the value of Partners' holdings were greatest, and by virtue of McCarthy's role as an investment advisor to Partners, Jayhawk was at all relevant times in a fiduciary relationship with Partners and owed that fund the full range of applicable fiduciary duties, including the duty not to engage in trades or take other actions harmful to Partners. Plaintiffs are informed and believe, and on that basis allege,

8

that a substantial part of the funds invested through Jayhawk in Partners are McCarthy's personal funds.

28.    As of June 30, 2006, Jayhawk Investments had two capital accounts in Partners with a balance of $1,376,000. As a limited partner of Partners, with full "transparency" into that fund's trading and holdings initially, and later into that fund's "top five" holdings, and by virtue of McCarthy's role as an investment advisor to, Jayhawk was at all relevant times in a fiduciary relationship with Partners and owed that fund the full range of applicable fiduciary duties, including the duty not to engage in trades or take other actions harmful to Partners. Plaintiffs are informed and believe, and on that basis allege, that a substantial part of the funds invested through Jayhawk Investments in Partners are McCarthy's personal funds.

29.    As of June 30, 2006, Jayhawk had two capital accounts in Focus with a combined balance of $948,000. As a limited partner of Focus, with full "transparency" into that fund's trading and holdings initially, and later into that fund's "top five" holdings, and by virtue of McCarthy's role as an investment advisor to Focus, Jayhawk was at all relevant times in a fiduciary relationship with Focus and owed that fund the full range of applicable fiduciary duties, including the duty not to engage in trades or take other actions harmful to Focus. Plaintiffs are informed and believe, and on that basis allege, that a substantial part of the funds invested through Jayhawk in Focus are McCarthy's personal funds.

30.    As of June 30, 2006, Jayhawk Investments had two capital accounts in Focus with a combined balance of $3,965,000. As a limited partner of Focus, with full "transparency" into that fund's trading and holdings initially, and later into that fund's "top five" holdings, and by virtue of McCarthy's role as an investment advisor to Focus, Jayhawk Investments was at all relevant times in a fiduciary relationship with Focus and owed that fund the full range of applicable fiduciary duties, including the duty not to engage in trades or take other actions harmful to Focus. Plaintiffs are informed and believe, and on that basis allege, that a substantial part of the funds invested through

9

1  Jayhawk Investments in Focus are McCarthy's personal funds.

2  ## The Jayhawk Entities' "Transparency"

3  ## in Primarius China, Partners and Focus

4  31.    As alleged above, under the Fee Sharing Agreement, Jayhawk China and
5  its employees, and hence McCarthy and the other Defendants and their employees, had
6  complete transparency with respect to Primarius China's portfolio and investment
7  activities beginning on or about September 15, 2003. Because of Defendants' abuse of
8  this right, described in detail below, Primarius terminated this transparency on or about
9  May 31, 2006 (and Primarius China's performance subsequently improved markedly).

10  32.    Bank of America was the prime broker for Partners and Focus from their
11  respective inceptions through approximately February 2004, when Goldman Sachs
12  became these funds' prime broker. During the period when Bank of America served as
13  prime broker for Partners and Focus, Defendants and their employees had complete
14  transparency with respect to Partners' and Focus' portfolios and investment activities
15  because Primarius and Defendants shared computer access to this information through
16  Bank of America. When Goldman Sachs became these funds' prime broker, Defendants
17  retained their transparency with respect to each fund's "top five, but no longer had access
18  to information concerning the funds' trading activities.

19  ## McCarthy's Role as Advisor to Plaintiffs

20  33.    As alleged above, pursuant to the Fee Sharing Agreement, McCarthy was
21  required to provide investment advice to Primarius China beginning on or about
22  September 15, 2003. McCarthy was, therefore, in a fiduciary relationship with Primarius
23  China at all relevant times and owed that fund the full range of applicable fiduciary
24  duties.

25  34.    As alleged above, in consideration of the 10% of Primarius' "Gross Fees"
26  paid to Jayhawk and Jayhawk Investments pursuant to the Management Transfer
27  Agreement, and the waiver of the standard  incentive fee and reduction of the standard
28  management fee, McCarthy was required to provide investment advice to Partners

1  beginning on or about June 1, 2003. McCarthy was, therefore, in a fiduciary relationship

2  with Partners at all relevant times and owed that fund the full range of applicable

3  fiduciary duties.

4      35.   As alleged above, in consideration of the 10% of Primarius' "Gross Fees"

5  paid to Jayhawk and Jayhawk Investments pursuant to the Management Transfer

6  Agreement, and the waiver of the standard  incentive fee and reduction of the standard

7  management fee, McCarthy was required to provide investment advice to Focus

8  beginning on or about June 1, 2003. McCarthy was, therefore, in a fiduciary relationship

9  with Focus at all relevant times and owed that fund the full range of applicable fiduciary

10  duties.

11  **Defendants' Improper Acts**

12      36.   Between mid-2005, at the latest, and into 2006, Defendants breached their

13  fiduciary duties to Plaintiffs, committed front-running against Plaintiffs, violated

14  provisions of the securities statutes, including without limitation Rule 10b-5 and

15  committed common law fraud against Plaintiffs, all as described below. The allegations

16  in this section of this Complaint are organized around four particular securities that

17  provide examples of Defendants' misconduct. They do not constitute a full and final

18  inventory of Defendants' wrongdoing.  Plaintiffs will amend and augment their

19  allegations as necessary once their investigation is completed.

20  **1.  LSB (LXU) - 10b-5, Fraud  and Breach of Fiduciary Duty**

21      37.   LSB Industries, Inc. ("LSB"), whose common stock is traded as LXU on the

22  American Stock Exchange, is a corporation based in Oklahoma and engaged in the

23  chemical and also air conditioning, heating and climate control businesses.

24      38.   As detailed below, McCarthy, fraudulently, in breach of Defendants'

25  fiduciary duties, and solely to benefit Defendants, advised Plaintiffs to hold their LXU

26  positions when LXU's price was falling, then advised Plaintiffs to sell LXU when its

27  price had bottomed out, all to Plaintiffs' great detriment.

28      39.   At all relevant times, Partners, Focus and Offshore Partners held substantial

1    positions in LXU.

2        40.    Plaintiffs are informed and believe, and on that basis allege, that, at all
3    relevant times, certain Defendants collectively owned approximately 10% of the
4    outstanding shares of LXU and were hence "insiders" of LSB.

5        41.    Between 2003 and December 2005, McCarthy, acting in his capacity as
6    advisor to Partners and Focus, repeatedly and consistently made favorable statements,
7    orally and in writing, regarding LXU and encouraged Partners and Focus to retain and
8    increase their LXU positions.

9        42.    For example, in an email message to Lin of August 15, 2003, McCarthy
10   stated, "may be somne [sic] good things happening at lsbd," *i.e.,* at LSB.

11       43.    Partners, Focus and Offshore Partners bought LXU during this period at
12   prices exceeding $8 per share. By the end of 2004, Plaintiffs collectively held in excess
13   of 400,000 shares of LXU bought on McCarthy's advice.

14       44.    In an email message to Lin of May 15, 2005, McCarthy wrote, "lxu did a
15   great job on call still think we have a double/triple," *i.e.*, that the price of LXU was likely
16   to double or triple.

17       45.    In an email message to Lin of August 24, 2005, Mark Fleischhauer
18   ("Fleischhauer"), Jayhawk's portfolio manager, wrote to Lin:

19       Did you see JCI buy YRK for $56.50 per share in cash? Back of the
         envelope, that is no 10X EBITDA and about 3/4 sales based on deal EV of
20       $3.2 bn. York's margins are a fair bit lower than LXU's in this business and
         growth prospects probably not quite as strong given LXU's weighting
21       towards geothermal so LXU may deserve a premium multiple to this. At
         10X EBITDA, LXU's climate control business is worth around $200 mm
22       (almost the total EV of the company).

23       46.    Between July and November 2005, in a generally rising market, LXU
24   dropped from approximately $7.30 per share to approximately $5.00 per share.
25   McCarthy repeatedly advised Partners and Focus to hold their LXU shares.

26       47.    Plaintiffs held their LXU positions and did not sell them during this period
27   solely on the basis of McCarthy's misleading, deceptive advice, and, as a result,
28   sustained significant losses.

12

**Complaint**

1    48.    Plaintiffs are informed and believe, and on that basis allege, that McCarthy

2    advised them to hold their shares of LXU solely to benefit Defendants.  LXU is a

3    relatively illiquid security and both Plaintiffs and Defendants held significant positions.

4    Defendants could not sell their LXU because of a "lock-up" provision of the transaction

5    pursuant to which they had been acquired. Had McCarthy properly advised Plaintiffs to

6    sell their LXU holdings, this would have further depressed LXU's price, to the detriment

7    of Defendants, the value of whose holdings would have declined. In so doing, McCarthy

8    breached his fiduciary duty to Plaintiffs by placing his own interests, and those of

9    Defendants, ahead of Plaintiffs'.

10   49.    During the fall of 2005, McCarthy began to change his LSB tune.  In an

11   email message to Lin of November 7, 2005, McCarthy wrote, "I like the preferred [stock]

12   much more than the common [*i.e.*, LXU] – I am sick of dealing with these guys," "these

13   guys" being LSB's management.

14   50.    McCarthy began recommending that Partners and Focus sell a substantial

15   proportion of their LXU positions. In an email message to Lin of December 7, 2005,

16   McCarthy wrote, "if I do not get some resolution this week or next – I will sell some

17   common after my lock up date in late dec." Lin took this to mean that Defendants

18   intended to sell LXU as soon as possible and as a recommendation, made in McCarthy's

19   capacity as an investment advisor to Plaintiffs, that Partners and Focus should do the

20   same.

21   51.    McCarthy made his recommendation that Partners and Focus should sell

22   LXU with knowledge that he was providing misleading advice and for the purpose of

23   deceiving Partners and Focus and inducing them to rely on that advice and sell LXU.

24   Defendants made the misrepresentation that they intended to sell LXU with knowledge

25   of the falsity of this statement and for the purpose of deceiving Partners, Focus and

26   Offshore Partners and inducing them to rely on that statement and sell LXU.

27   52.    Partners, Focus and Offshore Partners reasonably relied on McCarthy's

28   deceptive, misleading advice and Defendants' misrepresentation with respect to their

13

1   intentions and sold a significant portion of their LXU at the end of 2005 at under $5 per
2   share, realizing a huge loss, expecting Defendants to also sell at or around the same time,
3   based on McCarthy's representations. Partners', Focus' and Offshore Partners' losses
4   were a direct and proximate result of McCarthy's and Defendants' fraud and breaches
5   of fiduciary duty.

6       53.    Contrary to McCarthy's representations to Partners and Focus, however,
7   Defendants sold none of their LXU shares. In fact, in the one- to three-month period
8   following Partners', Focus' and Offshore Partners' sales of their LXU shares, Defendants
9   actually increased their LXU positions according to the relevant SEC filings.

10      54.    McCarthy appears to have deliberately provided Plaintiffs with deceptive
11  advice, and certainly misrepresented Defendants' intentions with respect to LXU. In
12  essence, McCarthy advised Plaintiffs to *hold* their LXU positions while the prices were
13  falling, and then to *sell* when LXU bottomed out and began to rebound. As already
14  explained, McCarthy's "hold" advice benefitted Defendants by preventing the further
15  erosion of LXU's price, and hence the value of Defendants' positions in LXU, that
16  would have resulted from Plaintiffs liquidating their holdings. McCarthy's "sell" advice
17  when LXU was at or near its nadir also benefitted Defendants by placing more shares
18  into the market at a time when Defendants were buying. As an insider of LSB, McCarthy
19  was no doubt privy to information sufficient to allow him to predict the market trajectory
20  of LXU with far greater accuracy than Plaintiffs, and McCarthy appears to have used that
21  information to benefit Defendants, to the great detriment of Plaintiffs.

22      55.    In the approximately twelve-month period following Partners', Focus' and
23  Offshore Partners' sales of LXU, LXU's price increased from approximately $5 per share
24  to approximately $14, to the great benefit of Defendants.

25      56.    Plaintiffs did not feel comfortable re-acquiring LXU during this period.
26  Defendants' antics with respect to those securities had become obvious, and Defendants
27  were still insiders of LSB and therefore in a position to work more mischief. The stock,
28  in essence, had become radioactive from Plaintiffs' perspective.

14

1    57.    Had McCarthy not recommended that Partners and Focus sell LXU, and had
2    Defendants not misrepresented to Partners and Focus that they should sell LXU,
3    Partners, Focus and Offshore Partners would not have done so.  McCarthy's fraudulent
4    advice and Defendants' misrepresentation caused Partners to suffer a loss of
5    approximately $1,293,000, Focus to suffer a loss of approximately $1,556,000, and
6    Offshore Partners to suffer a loss of approximately $620,000, for a total of approximately
7    $3,469,000, with respect to shares of LXU they would still be holding today but for
8    Defendants' wrongdoing.

9    58.    Defendants' wrongdoing with respect to LXU also damaged Plaintiffs by
10   negatively affecting their performance during the relevant period.  Absent Defendants'
11   misconduct with respect to LXU alone, the performance of Focus, Partners and Offshore
12   Partners would have been 40-80% better than it actually was.  As a result, investors
13   pulled out of the Primarius funds, and prospective investors declined to invest.

14   **2.    Linktone (LTON) - Fraud, Fiduciary Breach and Front-Running**

15   59.    Linktone Ltd. ("Linktone") is a Chinese company based in Shanghai and
16   engaged in the business of selling wireless, value-added services such as ring tones and
17   weather forecasts for use with mobile telephones.  Linktone trades on NASDAQ under
18   the symbol LTON.

19   60.    As detailed below, Defendants, in breach of their fiduciary duties, dumped
20   huge numbers of LTON shares on the market without informing Plaintiffs, thereby
21   greatly depressing LTON's trading price and hence the value of Plaintiffs' own LTON
22   positions.  To benefit Defendants, McCarthy then fraudulently misrepresented to
23   Plaintiffs that he did not know why LTON's price was falling, when he actually knew
24   full well that Defendants were responsible, causing Plaintiffs to retain their LTON
25   positions, which they would have liquidated had they known the truth.  Finally,
26   Defendants committed front-running against Primarius China in connection with a
27   redemption request made to that fund by Jayhawk China.

28   61.    Beginning in 2005 and extending through January 2006, Primarius China,

15

1    Partners, Focus and Offshore Partners held substantial positions in LTON.

2       62.    During the same period, Jayhawk China also held a substantial position in

3    LTON. According to the relevant SEC filings, Jayhawk China owned approximately 2

4    million shares of LTON, or roughly 7.8% of Linktone's outstanding shares.

5       63.    Throughout 2005, McCarthy, acting as an advisor to Primarius China,

6    Partners and Focus, repeatedly and consistently made favorable statements, orally and

7    in writing, regarding LTON and encouraged Partners and Focus to retain and increase

8    their LTON positions.

9       64.    In an email message to Lin of June 16, 2005, McCarthy wrote, "been buying

10    more lton."

11       65.    In an email message to Lin of November 12, 2005, McCarthy wrote,

12    "linktone – I feel like they may surprise everybody when they report in a couple of weeks

13    both in sales and earnings, and outlook – stock is very cheap – tomo [another company

14    in the same sector as Linktone] have a big run." McCarthy's reference to tomo's "big

15    run" implied that the same was likely to happen with LTON.

16       66.    On or about January 20, 2006, Lin received a voice mail message from the

17    CEO of Linktone. In his message, the CEO told Lin he had spoken with McCarthy and

18    provided McCarthy with certain information concerning the company's performance.

19       67.    The next day, Lin spoke with McCarthy on the telephone. McCarthy, who

20    had been "pumping" LTON to Plaintiffs for the past four months and consistently

21    advising them to buy LTON, gave Lin no indication that Defendants intended to sell any

22    of their shares of LTON. At that point, LTON's price was over $10 per share.

23       68.    Over the succeeding several days, LTON's price per share fell from

24    approximately $10 to approximately $8.50.

25       69.    Lin asked McCarthy, Plaintiffs' investment advisor, why LTON's price was

26    falling. McCarthy responded that he had no idea. This was a blatant misrepresentation.

27    As McCarthy would confess to Lin approximately one week later, and as McCarthy

28    knew full well at the time of Lin's inquiry, LTON's price was falling because

1   Defendants, which collectively held a substantial proportion of LTON's outstanding
2   shares, had been dumping large numbers of those shares on the market. Plaintiffs
3   reasonably relied on McCarthy's misrepresentation and held their LTON positions, to
4   their great detriment. Had McCarthy informed Lin that Defendants intended to dump
5   their LTON shares or that they were doing so, Plaintiffs would have sold their LTON as
6   well, knowing that Defendants' trading would depress LTON's price. The reason for
7   McCarthy's misrepresentation is obvious – had Plaintiffs known the truth and sold their
8   LTON too, the price Defendants would have been able to obtain for their shares would
9   have been lower. Defendants' dumping of LTON in this fashion without informing
10  Plaintiffs of their intention, or of the trading itself, constituted both fraud and a breach
11  of Defendants' fiduciary duties to Plaintiffs.

12      70.    Soon thereafter, on the morning of February 1, 2006, before the markets
13  opened, LTON released its quarterly performance figures, which were below projections.
14  Consequently, contrary to McCarthy's advice and predictions, LTON's per share price
15  fell an additional 20%, to approximately $6.75 that week.

16      71.    In an email message to Lin later on February 1, 2006, McCarthy wrote, with
17  respect to LTON, "I am buying," indicating that he was now causing the Defendants to
18  repurchase the LTON shares they had just sold at between $8.50 and $10 for the much
19  lower price occasioned by the negative quarterly figures.

20      72.    Defendants performed their "dump and buy" pirouette in total disregard for
21  the substantial harm it predictably did to Plaintiffs.

22      73.    Plaintiffs are informed and believe, and on that basis allege, that Defendants
23  sold LTON, on inside information, believing that Plaintiffs would sell substantial
24  numbers of their LTON shares once the unfavorable quarterly report was released,
25  thereby front-running Plaintiffs. These sales by Defendants in anticipation of sales by
26  Plaintiffs also constituted a breach of Defendants' fiduciary duty not to use their
27  transparency rights to the detriment of Plaintiffs.

28      74.    Defendants also committed front-running against Primarius China and

17

**Complaint**

1   breached their fiduciary duties to that fund with respect to certain LTON trades in

2   connection with certain redemption requests. On May 15, 2006, as described in greater

3   detail below, Jayhawk China requested withdrawal of approximately $19 million of the

4   approximately $29 million it had invested in Primarius China.

5       75.   Defendants knew that, to pay this redemption, Primarius China would either

6   have to raise cash by liquidating a substantial proportion of its portfolio, including at

7   least a substantial proportion of its position in LTON, transfer to Jayhawk China large

8   numbers of shares of securities held by Primarius China including shares of LTON, or

9   both. Defendants knew the extent of Primarius China's LTON holdings because of the

10  transparency right they had with respect to that fund.

11      76.   At or around the time of making the redemption request, and without

12  informing Lin, Primarius or Primarius China, Defendants began dumping huge numbers

13  of shares of LTON on the market for the second time in less than five months. In an

14  email message to Lin of May 18, 2006, McCarthy wrote, with respect to LTON, "I am

15  out." But Defendants clearly wanted Plaintiffs to hold *their* LTON shares; in the same

16  May 18, 2006 email message, McCarthy advised Plaintiffs that "lton will go to 11."

17  Instead of "going to 11," however, because of Defendants' dumping of their LTON

18  shares, LTON's price fell from approximately $7.50 on May 15, 2006 to approximately

19  $3.70 on or around August 11, 2006. Having cratered the price of LTON, Jayhawk

20  China then informed Lin that it would be happy to accept shares of that stock as part of

21  the payment of its redemption request in Primarius China, shares Jayhawk China knew

22  Primarius China held because of Defendants' transparency into Primarius China.

23      77.   Defendants' reasons for doing this are obvious. Defendants anticipated that

24  Primarius China would have to liquidate substantial numbers of shares of LTON to pay

25  Jayhawk China's redemption request, which liquidation Defendants also knew would

26  depress LTON's market price. By front-running Primarius China and breaching their

27  fiduciary duties to that fund, Defendants were able to sell their LTON shares at a higher

28  price than they would have been able to obtain had they waited for Primarius China to

18

**Complaint**

1    sell. Should Primarius China choose to pay Jayhawk China's redemption in securities

2    rather than cash, Jayhawk China would obviously receive more shares of LTON from

3    Primarius China were Defendants first to depress LTON's price by dumping great

4    quantities of their own LTON shares. They could then also buy back the shares they had

5    dumped at bargain prices. Defendants actions in this regard constituted front-running

6    and a breach of the fiduciary duties they owed to Plaintiffs.

7        78.    That Defendants were abusing their transparency right in Primarius China

8    to monitor that fund's trading activities so as to be able to front-run Primarius China is

9    evidenced by an email message of May 15, 2006 to Lin from Fleischhauer stating:

10

11         I notice that you have not started raising any cash in Primarius China Fund.
           We have given notice on the redemption and Mike Schmitz [of Jayhawk]
           has sent the notice to Hedgeworks [Primarius' bookkeeper]. You should

12         have enough time to liquidate names in an orderly manner by the end of
           June. Also, if we will be receiving securities we will need to know ahead

13         of time.

14        79.    Defendants' misconduct with respect to LTON directly and proximately

15    caused Primarius China a loss of approximately \$2,221,000, Partners a loss of

16    approximately \$305,000, Focus a loss of approximately \$919,000 and Offshore Partners

17    a loss of approximately \$191,000, for a total of approximately \$3,331,000.

18        80.    Defendants' misconduct with respect to LTON also greatly harmed all four

19    Primarius funds as well as Primarius, by negatively affecting their short-term

20    performance, thereby causing investors to lose confidence in, and divest from, the funds,

21    and potential investors not to make investments they would otherwise have made.

22    Primarius China alone was down by 5.50% in May 2006, 5.67% in June 2006 and

23    10.99% in July 2006 largely because of Defendants' misconduct with respect to LTON,

24    which misconduct cost Primarius China approximately 7% in performance for 2006.

25    Focus', Partners' and Offshore Partners' performance was off for 2006 by approximately

26    3.5%, 2% and 2% respectively as a result of Defendants' wrongdoing with respect to

27    LTON.

28        81.    Plaintiffs are currently unable to provide greater detail concerning

          **Complaint**

1    Defendants' holdings and trades in LTON because Defendants have failed to make the

2    relevant, required SEC filings since December 2005.  This omission is consistent with

3    Defendants' pattern of deceit, fraud and fiduciary breaches with respect to Plaintiffs and

4    hiding their actions from the markets and authorities.

5        **3.    Sinovac (SVA) - Market Manipulation, Fiduciary Breach and Front-**

6            **Running**

7        82.    Sinovac Biotech Ltd., also known in China as Beijing Kexing Bioproducts

8    ("Sinovac"), is a Chinese company in the business of manufacturing hepatitis, avian flu

9    and other vaccines.  It is traded on the American Stock Exchange under the symbol SVA.

10        83.    As detailed below, Defendants unlawfully manipulated the market for SVA

11    in an attempt to keep SVA's price down for the purpose of pressuring SVA's

12    management into entering into a private investment deal, thereby depressing the value

13    of Plaintiffs' SVA holdings, and/or preventing those holdings from attaining the value

14    they would have but for Defendants' wrongdoing.  Defendants then committed front-

15    running against Primarius China in connection with a redemption request made to that

16    fund by Jayhawk China.

17        84.    Plaintiffs introduced Defendants to SVA in or around the fall of 2005.

18        85.    McCarthy viewed Sinovac favorably and encouraged Lin to speak with

19    certain venture capital associates of McCarthy.  McCarthy's goal was to assemble a

20    group of venture capital associates and negotiate a private investment in public equity

21    ("PIPE") in Sinovac.  In a PIPE, the company offers a block of publicly traded securities

22    to a private investor, typically at a discount from the market price.  The PIPE benefits the

23    company by permitting it access to quick cash with reasonable transaction costs.  The

24    PIPE benefits the private investor by enabling him to acquire the stock at a lower than

25    market price and to purchase a substantial block of the stock without having to "chase"

26    a market price rising because of his purchases.

27        86.    An email message from Joe Anderson of Abingworth Management, Ltd. to

28    McCarthy of October 10, 2005, which was copied to Lin, states, "it is clear the company

1  [SVA] has to raise money soon to fund the expansion of production facilities. Could be

2  a good PIPE opportunity for Abingworth/Jayhawk?"

3      87.    Another email message from Anderson to McCarthy of October 13, 2005

4  evidences the plan to keep SVA's price low, expressing the desire to "control any

5  financing" or "pick up stock in the open market before it runs away." SVA's price on

6  that date was $6.10.

7      88.    In another email message of January 27, 2006, Anderson wrote, "Maybe this

8  could be one for us to look at jointly – possibly a PIPE."

9      89.    On January 27, 2006, McCarthy sent an email message to Lin asking if Lin

10 had received Anderson's email message and stating, "he is interested in SVA again."

11     90.    From speaking with other SVA shareholders and Sinovac's investor

12 relations officer, Lin determined that Sinovac's management was not interested in the

13 PIPE McCarthy was proposing, and Lin gave this information to McCarthy during this

14 period.

15     91.    McCarthy, however, refused to take "no" for an answer.  In an email

16 message to Lin of April 5, 2006, he wrote, "Joe had a deal with us Texas Pacific –

17 Kleiner Perkins and Abingworth to do 25 million – at the last minute First Boston has

18 been saying the co changed its mind and is not going ahead . . . we have no alligience

19 [sic] to First Boston – let's do the deal direct."

20     92.    Plaintiffs are informed and believe, and on that basis allege, that throughout

21 this period, Defendants and their allies were knowingly spreading inaccurate rumors

22 within the relevant investment community that SVA was looking to do a PIPE, which

23 rumors were intended to, and did depress the price of SVA.  Investors would be less

24 likely to purchase SVA on the open market if they expected that at any moment that

25 market might be flooded with large numbers of new shares issued pursuant to a PIPE.

26 Defendants' purpose in doing this was to induce SVA's management to agree to the PIPE

27 McCarthy desired, and Defendants' actions in this regard were willful.

28     93.    Defendants' improper manipulation of the market for SVA during this

21

**Complaint**

1   period obviously harmed Plaintiffs by depressing the value of their holdings of SVA

2   and/or limiting any increase in that value that might have occurred absent McCarthy's

3   wrongdoing.

4       94.     In or around early April 2006, McCarthy appears to have finally accepted

5   that Sinovac was not going to deal with him in the short term and caused Jayhawk China

6   to purchase a substantial position in SVA in the open market.

7       95.     By early May 2006, SVA had risen to approximately $5 from approximately

8   $4. Defendants, however, did not leave SVA alone for long. By mid-May 2006, they

9   were at it again. An email message from Joe Anderson to McCarthy of May 18, 2006

10  states, "They [SVA] dumped Credit Suisse as agent, but if this is a go now, I am sure we

11  could revive interest in a private syndicate with Abingworth, Jayhawk, Kleiner and

12  Texas Pacific (Group)."

13      96.     At or around this time, Defendants began dumping large quantities of SVA

14  on the market for two reasons. First, to again depress SVA's price in an effort to

15  pressure the company's management into doing a deal with McCarthy and his allies, and,

16  second, as described below, in connection with Jayhawk China's redemption request to

17  Primarius China.

18      97.     On May 15, 2006, as described in greater detail below, Jayhawk China

19  requested withdrawal of approximately $19 million of the approximately $29 million it

20  had invested in Primarius China.

21      98.     Defendants knew that, to pay this redemption, Primarius China would either

22  have to raise cash by liquidating a substantial proportion of its portfolio, including at

23  least a substantial proportion of its position in SVA, transfer to Jayhawk China large

24  numbers of shares of securities held by Primarius China including shares of SVA, or

25  both. Defendants knew the extent of Primarius China's SVA holdings because of the

26  transparency right they had with respect to that fund.

27      99.     At or around the time of making the redemption request, and without

28  informing Lin, Primarius or Primarius China, Defendants began dumping huge numbers

of shares of SVA on the market, depressing the price of SVA from just under $5 on or about May 5, 2006 to $1.95 on or around July 11, 2006. Defendants' actions in this regard constituted front-running and a breach of the fiduciary duties they owed to Plaintiffs.

100. Defendants did this for at least two reasons. First, Defendants anticipated that Primarius China would have to liquidate substantial numbers of shares of SVA to pay Jayhawk China's redemption request, which liquidation Defendants also knew would depress SVA's market price. By front-running Primarius China and breaching their fiduciary duties to that fund, Defendants were able to sell their SVA shares at a higher price than they would have been able to obtain had they waited for Primarius China to sell. Should Primarius China choose to pay Jayhawk China's redemption in securities rather than cash, Jayhawk China would obviously receive more shares of SVA from Primarius China were Defendants first to depress SVA's price by dumping great quantities of their own SVA shares. They could then also buy back the shares they had dumped at bargain prices.

101. Second, Defendants knew that depressing SVA's price would make the offer of Defendants and their venture capitalist allies more attractive to Sinovac's management.

102. That Defendants were abusing their transparency right in Primarius China to monitor that fund's trading activities so as to be able to front-run Primarius China is evidenced by an email message of May 15, 2006 to Lin from Fleischhauer stating:

> I notice that you have not started raising any cash in Primarius China Fund. We have given notice on the redemption and Mike Schmitz [of Jayhawk] has sent the notice to Hedgeworks [Primarius' bookkeeper]. You should have enough time to liquidate names in an orderly manner by the end of June. Also, if we will be receiving securities we will need to know ahead of time.

103. As a direct and proximate result of Defendants' misconduct with respect to SVA, Primarius China suffered a loss of approximately $1,840,000, Partners suffered a loss of approximately $96,700, Focus suffered a loss of approximately $431,000 and

23

1    Offshore Partners suffered a loss of approximately $62,000, for a total of approximately

2    $2,389,700.

3        104.   Defendants' misconduct with respect to SVA also greatly harmed all four

4    Primarius funds, as well as Primarius, by negatively affecting their short-term

5    performance, thereby causing investors to lose confidence in, and divest from, the funds,

6    and potential investors not to make investments they would otherwise have made.

7    Primarius China alone was down by 5.50% in May 2006, 5.67% in June 2006 and

8    10.99% in July 2006.  Losses caused by Defendants' misconduct with respect to SVA

9    constituted approximately 4% of Primarius China's value.  Focus lost approximately

10   1.5% of its value and Partners and Offshore Partners similarly were harmed.

11       105.   Plaintiffs are currently unable to provide greater detail concerning

12   Defendants' holdings and trades in SVA because Defendants have failed to make the

13   relevant, required SEC filings since December 2005.

14       **4.   Oplink (OPLK) - 10b-5, Fraud, Fiduciary Breach and Front-**

15       **Running**

16       106.   Oplink Communications, Inc., ("Oplink") is a US company based in

17   Fremont, California but with most of its operations in China.  Oplink manufactures

18   optical equipment and is traded on NASDAQ under the symbol OPLK.

19       107.   As detailed below, Defendants, in breach of their fiduciary duties, dumped

20   huge numbers of OPLK shares on the market without informing Plaintiffs, thereby

21   greatly depressing OPLK's trading price and hence the value of Plaintiffs' own OPLK

22   positions.   To benefit Defendants, McCarthy then fraudulently misrepresented to

23   Plaintiffs that he did not know why OPLK's price was falling, when he actually knew

24   full well that Defendants were responsible, causing Plaintiffs to retain their OPLK

25   positions, which they would have liquidated had they known the truth.   Finally,

26   Defendants committed front-running against Primarius China in connection with a

27   redemption request made to that fund by Jayhawk China.

28       108.   During 2005, Primarius China, Partners, Focus and Offshore Partners had

24

**Complaint**

substantial positions in OPLK.

109.    According to public information available at www.sec.gov, or the Edgar or Bloomberg services, Jayhawk China held 732,440 shares of OPLK as of the end of December 2005.

110.    Throughout 2005, McCarthy, acting as an advisor to Primarius China, Partners and Focus, repeatedly and consistently made favorable statements, orally and in writing, regarding OPLK and encouraged Partners and Focus to retain and increase their OPLK positions.

111.    In an email message to Lin of June 16, 2005, McCarthy wrote, "have heard oplink may have a couple of big orders."

112.    McCarthy also "pumped" OPLK in TV appearances on CNBC and the TV show, Jim Cramer's Mad Money.

113.    After Jayhawk China pushed OPLK's price up to approximately $12 between August and October 2005, OPLK's price per share fell to $9.59.

114.    Lin asked McCarthy, Plaintiffs' investment advisor, why OPLK's price was falling. McCarthy responded that he had no idea. This was a blatant misrepresentation. As McCarthy would confess to Lin approximately one week later, and as McCarthy knew full well at the time of Lin's inquiry, OPLK's price was falling because Defendants, which collectively held a substantial proportion of OPLK's outstanding shares, had been dumping large numbers of those shares on the market. Plaintiffs reasonably relied on McCarthy's misrepresentation and held their OPLK positions, to their great detriment. Had McCarthy informed Lin that Defendants intended to dump their OPLK shares or that they were doing so, Plaintiffs would have sold their OPLK as well, knowing that Defendants' trading would depress OPLK's price. The reason for McCarthy's misrepresentation is obvious – had Plaintiffs known the truth and sold their OPLK too, the price Defendants would have been able to obtain for their shares would have been lower. Defendants' dumping of OPLK in this fashion without informing Plaintiffs of their intention, or of the trading itself, constituted both fraud and a breach

**Complaint**

1   of Defendants' fiduciary duties to Plaintiffs.

2   115. Defendants also committed front-running against Primarius China and

3   breached their fiduciary duties to that fund with respect to certain OPLK trades in

4   connection with certain redemption requests. On May 15, 2006, as described in greater

5   detail below, Jayhawk China requested withdrawal of approximately $19 million of the

6   approximately $29 million it had invested in Primarius China.

7   116. Defendants knew that, to pay this redemption, Primarius China would either

8   have to raise cash by liquidating a substantial proportion of its portfolio, including at

9   least a substantial proportion of its position in OPLK, or transfer to Jayhawk China large

10   numbers of shares of securities held by Primarius China including shares of OPLK, at

11   depressed prices. Defendants knew the extent of Primarius China's OPLK holdings

12   because of the transparency right they had with respect to that fund.

13   117. At or around the time of making the redemption request, and without

14   informing Lin, Primarius or Primarius China, Defendants began dumping huge numbers

15   of shares of OPLK on the market, depressing the price of OPLK from approximately $20

16   on or around May 1, 2006 to $15.58 on or around May 22, 2006. Defendants actions in

17   this regard constituted front-running and a breach of the fiduciary duties they owed to

18   Plaintiffs.

19   118. Defendants' reasons for doing this are obvious. Defendants anticipated that

20   Primarius China would have to liquidate substantial numbers of shares of OPLK to pay

21   Jayhawk China's redemption request, which liquidation Defendants also knew would

22   depress OPLK's market price. By front-running Primarius China and breaching their

23   fiduciary duties to that fund, Defendants were able to sell their OPLK shares at a higher

24   price than they would have been able to obtain had they waited for Primarius China to

25   sell. Should Primarius China choose to pay Jayhawk China's redemption in securities

26   rather than cash, Jayhawk China would obviously receive more shares of OPLK from

27   Primarius China were Defendants first to depress OPLK's price by dumping great

28   quantities of their own OPLK shares. They could then also buy back the shares they had

26

1    dumped at bargain prices.

2        119.    That Defendants were abusing their transparency right in Primarius China

3    to monitor that fund's trading activities so as to be able to front-run Primarius China is

4    evidenced by an email message of May 15, 2006 to Lin from Fleischhauer stating:

6        I notice that you have not started raising any cash in Primarius China Fund.
         We have given notice on the redemption and Mike Schmitz [of Jayhawk]
7        has sent the notice to Hedgeworks [Primarius' bookkeeper]. You should
         have enough time to liquidate names in an orderly manner by the end of
8        June. Also, if we will be receiving securities we will need to know ahead
         of time.

9        120.    Defendants' misconduct with respect to OPLK directly and proximately

10   caused Primarius China a loss of approximately $1,387,000, Partners a loss of

11   approximately $284,000, Focus a loss of approximately $796,000, and Offshore Partners

12   a loss of approximately $170,000, for a total of approximately $2,137,000.

13       121.    Defendants' misconduct with respect to OPLK also greatly harmed all four

14   Primarius funds by negatively affecting their short-term performance, thereby causing

15   investors to lose confidence in, and divest from, the funds, and potential investors not

16   to make investments they would otherwise have made. Primarius China alone was down

17   by 5.50% in May 2006, 5.67% in June 2006 and 10.99% in July 2006. Losses caused

18   to Primarius China as a result of Defendants' misconduct in connection with OPLK,

19   LTON and SVA constituted more than 10% of the value of Primarius China, or more

20   than $3.5 million *lost* within a 6-month period.

21       122.    Plaintiffs are currently unable to provide greater detail concerning

22   Defendants' holdings and trades in OPLK because Defendants have failed to make the

23   relevant, required SEC filings since December 2005.

24           **Jayhawk China's Redemption Request from Primarius China**

25       123.    Jayhawk China is a limited partner of Primarius China and the owner of a

26   capital account with assets that were valued as of June 30, 2006 at approximately $29

27   million.

28       124.    The aggregate value of assets held by Primarius China as of June 30, 2006

27

1    was approximately $35 million.

2        125.   The capital account of Jayhawk China, therefore, constituted more than 80%

3    of the aggregate value of Primarius China.

4        126.   Primarius China is governed, and the rights and duties of its general and

5    limited partners determined, by the Primarius China Fund LP Limited Partnership

6    Agreement (the "Primarius China Agreement") and the Primarius China Fund

7    Confidential Private Placement Memorandum (the "Primarius China PPM"), true and

8    correct copies of which are appended to this Complaint as Exhibits C and D respectively

9    and are incorporated fully herein by this reference.

10       127.   Article VI, paragraph 6.1(a) of the Primarius China Agreement (Exhibit C

11   at pp. 12-13) provides in pertinent part:

12       [N]o Limited Partner or Assignee shall be entitled to withdraw any amount
         from, or receive the fair value of any portion of, any Capital Account of

13       such Limited Partner or Assignee, except to the extent (I) such right is
         described in the Memorandum in effect at the time such Capital Account

14       was established pursuant to this Agreement, or the General Partner, in its
         sole and absolute discretion, has agreed to a Substitute Withdrawal

15       Arrangement with such Limited Partner or Assignee with respect to such
         Capital Account; (ii) the General Partner, in its sole and absolute discretion,

16       permits such withdrawal; or (iii) such Limited Partner is entitled to receive
         distributions in connection with the winding up of the Partnership as

17       provided in Article XI.

18       128.   The "Memorandum" referred to in Article VI, paragraph 6.1(a) of the

19   Primarius China Agreement is the Primarius China PPM.

20       129.   Article VI, paragraph 6.1(e) of the Primarius China Agreement (Exhibit C

21   at pp. 13-14) provides in pertinent part:

22
         Notwithstanding any other provision of this Agreement, the General Partner
23       may suspend withdrawals and/or payments due to Limited Partners and
         Assignees in connection with withdrawals for the whole or any part of any
24       period during which:

25       (I) the General Partner determines that: (A) effecting such withdrawals or
         making such payments would . . . have a material adverse effect on the
26       Limited Partners generally; . . . or (C) circumstances exist as a result of
         which it is not reasonably practicable for the Partnership to realize on the
27       value of a material portion of its assets . . . .

28

130.   Section 6 of the Primarius China PPM (Exhibit D at pp. 22, 23 and 24)

provides in pertinent part:

> Subject to a one-year "lock-up" commencing on the date a capital contribution is credited to a Limited Partner's Capital Account, a Limited Partner may withdraw all or any part of the balance of such Capital Account as of the last day of any calendar quarter, upon not less than 45 days prior written notice to the General Partner.

* * *

> The General Partner may agree to a different withdrawal arrangement in respect of any Capital Account of a Limited Partner in its discretion. This will not entitle the Limited Partner that holds such Account, or any other Limited Partner, to such a different arrangement in respect of any other Capital Account. The General Partner also has the discretion to grant a Limited Partner the right to withdraw amounts from a Capital Account at a time that differs from, or upon a notice period shorter than, the time and notice period described above. This will not entitle the Limited Partner that holds such an Account, or any other Limited Partner, to such a right in respect of any other Capital Account.

* * *

> While the Fund expects to distribute cash to Limited Partners in respect of their withdrawals, there can be no assurance that the Fund will have sufficient cash to satisfy withdrawal requests, or that it will be able to liquidate investments at the time of such withdrawal requests at favorable prices. Under the foregoing circumstances or the circumstances described below under "Suspension of Withdrawals and Withdrawal Payments," the Fund may make "in kind" distributions of its portfolio securities, or distributions consisting of a combination of cash and portfolio securities, to satisfy withdrawal requests. To the extent the Fund makes "in kind" distributions, it will allocate such distributions among the holders of the Capital Accounts entitled thereto such that each such holder shall, except for immaterial variances, receive a *pro rata* portion thereof. Securities distributed "in kind" may not be readily marketable or saleable and may have to be held by the Limited Partners who receive them for an indefinite period of time.

* * *

> The General Partner may suspend withdrawals and/or payments due to Limited Partners in connection with withdrawals for the whole or any part of any period during which the General Partner reasonably determines that: (A) effecting such withdrawals, or making such payments would . . . have a material adverse effect on the Limited Partners generally; . . . or (C) circumstances exist as a result of which it is not reasonably practicable for the Fund to realize on the value of a material portion of its assets. The General Partner may also suspend withdrawals and/or payments due to Limited Partners in connection with withdrawals in order for the Fund to effect the orderly liquidation of its assets necessary to effect withdrawals.

29

131.   The Primarius China Agreement at p. A-6 defines "Notification" in pertinent part as follows:

**Notification**" to a Person - a written notice that is deemed to be duly given to such Person on the date of delivery if delivered in person to such Person or sent to such Person by confirmed facsimile transmission or reputable overnight courier, or on the earlier of actual receipt or three (3) Business Days after the date of mailing if mailed to such Person by registered or certified mail (first class postage prepaid, return receipt requested); *provided however*, that: (I) a Notification to the Partnership shall be deemed to be duly given to the Partnership only upon its actual receipt by the Partnership . . . Any Notification required or permitted to be given to a Partner shall be sent to such Partner at such address or to such facsimile number as such Partner may notify the Partnership by way of a Notification . . .. [Emphasis in original.]

132.   The Primarius China Agreement at p. A-6 defines "Person" as "any natural person, whether acting in an individual or representative capacity, or any Entity.

133.   The Primarius China Agreement at p. A-3 defines "Entity" as follows:

any domestic or foreign corporation, partnership (whether general or limited), joint venture, limited liability company, business trust or association, trust, estate, unincorporated association or organization, custodian, government (or political subdivision, department or agency thereof), cooperative or other entity, whether acting in an individual or representative capacity.

134.   The Primarius China Agreement at p. A-6 defines "Partner" as "the General Partner, each Additional General Partner and each Limited Partner."

135.   On May 15, 2006, Michael D. Schmitz ("Schmitz"), Jayhawk's CFO wrote to Stephen Douglas of HedgeWorks, LLC ("HedgeWorks"), Primarius' administrator and bookkeeper, stating that Jayhawk China "would like to make a redemption of its interests in the [China] Fund that are in excess of $10,000,000 USD as of June 30, 2006 . . .."

136.   In an e-mail message of July 5, 2006 to Patrick Lin ("Lin"), managing member and portfolio manager of Primarius, Mark Fleischhauer of Jayhawk stated, "WE ARE NOW MAKING A FULL REDEMPTION REQUEST WITH RESPECT TO OUR INVESTMENT IN PRIMARIUS CHINA FUND." [Emphasis in original.]

137.   In a letter of July 11, 2006 to Lin, Schmitz wrote:

This is notification that [Jayhawk China] would like to make a full

30

1

2

3

redemption of its capital interests in the [China] Fund as of September 30, 2006. This is in addition to the June 30, 2006 redemption request and does not change the terms of that request, but is designed to request a withdrawal of whatever Jayhawk capital interests remain in the [China] Fund as of September 30, 2006.

4

5

6

7

8

9

10

11

12

138.  Shortly after receiving Jayhawk China's redemption requests, Primarius determined that, due to prevailing market conditions and the size of the requested withdrawals relative to the aggregate value of Primarius China's assets, pursuant to Article VI, paragraph 6.1(a) of the Primarius China Agreement and Section 6 of the Primarius China  PPM, effecting the withdrawals and making the payments Jayhawk China sought  would have a material adverse effect on Primarius China and its limited partners generally and that circumstances existed as a result of which it was not reasonably practicable for Primarius China to realize on the value of a material portion of its assets in connection with Jayhawk China's requested withdrawals.

13

14

15

16

17

18

19

20

21

139.  Primarius crafted a schedule of payments of Jayhawk China's requested withdrawals pursuant to which Jayhawk China would have received $4 million in cash and/or securities immediately, $1 million in cash and/or securities as of July 31, 2006, $1 million in cash and/or securities as of August 31, 2006, and the balance of Jayhawk China's capital account in Primarius China as of the earlier of December 31, 2006 (subject to standard processing procedures, with actual payment estimated to occur in mid-January 2007); or (2) as soon as possible after such date as Primarius, using reasonable diligence, secured investment to replace Jayhawk China's position in Primarius China.

22

23

24

140.  Jayhawk China rejected this schedule, demanded payment of the entire balance of Jayhawk China's capital account and repeatedly threatened Primarius and Primarius China with litigation if its demands are not met.

25

26

141.  On or about October 18, 2006, Primarius transferred to Jayhawk China $5,710,296 in cash towards its requested redemption in Primarius China.

27

28

142.  On or about November 15, 2006, Primarius transferred to Jayhawk China an additional $4,827,332 in cash towards its requested redemption in Primarius China.

31

**Complaint**

143.  On or about December 29, 2006, Primarius transferred to Jayhawk China an additional approximately $3.3 million towards its requested redemption in Primarius China.

144.  After analyzing the damage caused to Primarius China, Partners and Focus by certain unfair, unlawful activities of Defendants detailed herein, including without limitation front-running, provision of fraudulent investment advice and other material misrepresentations and numerous breaches of fiduciary duties, Primarius decided to make no further payments to Jayhawk China towards its requested redemption in Primarius China and to hold the amount of Jayhawk China's remaining interest in Primarius China in escrow pending the outcome of this action and to request that the Court hold such funds a proper offset against damages owed to Plaintiffs resulting from the misconduct described herein.

## FIRST CAUSE OF ACTION
### Section 10(b) of the Exchange Act and Rule 10b-5
(Against All Defendants)

145.  Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 144 above, as if fully set forth herein.

146.  Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, and by use of a means or instrumentality of interstate commerce, the mails or a facility of a national securities exchange, have

(a)  employed a device, scheme or artifice to defraud;

(b)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)  engaged in acts, practices and/or courses of business which operated or would operate as a fraud or deceit upon any person.

1    147.  As a direct and proximate result, Plaintiffs, and each of them, have suffered

2   damages in an amount to be determined at trial.

3    ### SECOND CAUSE OF ACTION

4    ### Sections 9(a) and (e) of the Exchange Act

5    (Against All Defendants)

6    148.  Plaintiffs reallege and incorporate by reference each and every allegation

7   in paragraphs 1 through 147 above, as if fully set forth herein.

8    149.  Defendants, and each of them, by engaging in the conduct described above,

9   directly or indirectly, in connection with the purchase or sale of a security, and by use

10   of a means or instrumentality of interstate commerce, the mails or a facility of a national

11   securities exchange, have knowingly, willfully and intentionally effected, alone or with

12   one or more other persons, a series of transactions in securities registered on a national

13   securities exchange creating actual or apparent active trading in such security, and/or

14   raising or depressing the price of such securities, for the purpose of inducing the

15   purchase and/or sale of such securities by others.

16    150.  As a direct and proximate result, Plaintiffs, and each of them, have suffered

17   damages in an amount to be determined at trial.

18    ### THIRD CAUSE OF ACTION

19    ### Section 206 of the Investment Advisers Act

20    (Against McCarthy)

21    151.  Plaintiffs reallege and incorporate by reference each and every allegation

22   in paragraphs 1 through 150 above, as if fully set forth herein.

23    152.  McCarthy was, at all relevant times, an "investment adviser" within the

24   meaning of section 202(11) of the Investment Advisers Act, 15 U.S.C. § 80b-6(11), in

25   that he, for compensation, engaged in the business of advising others, either directly or

26   through publications or writings, as to the value of securities and/or as to the advisability

27   of investing in, purchasing, or selling securities.

28    153.  In his capacity as an investment adviser, McCarthy:

33

1    (a)    employed devices, schemes and artifices to defraud Plaintiffs;

2    (b)    engaged in transactions, practices and courses of business which operated

3    as a fraud and/or deceit on Plaintiffs; and

4    (c)    engaged in acts, practices and/or courses of business which were fraudulent,

5    deceptive and/or manipulative.

6    154.    Because of McCarthy's acts described above, Plaintiffs are entitled to:  (1)

7    rescission of all agreements between them or any one of them on the one hand and

8    McCarthy on the other for the provision of investment advice; and (2) restitution of all

9    moneys paid to McCarthy and/or any other Defendant as consideration for all such

10    agreements.

11    **FOURTH CAUSE OF ACTION**

12    **<u>Fraud</u>**

13    (Against All Defendants)

14    155.    Plaintiffs reallege and incorporate by reference each and every allegation

15    in paragraphs 1 through 154 above, as if fully set forth herein.

16    156.  As    described    herein,    Defendants    made    numerous    material

17    misrepresentations with knowledge of their falsity, and/or numerous knowing,

18    intentional omissions of fact to Plaintiffs with the intention of inducing Plaintiffs to rely

19    upon such misrepresentations and/or omissions, Plaintiffs reasonably relied upon these

20    misrepresentations and, as a direct and proximate result, suffered great damage.

21    **FIFTH CAUSE OF ACTION**

22    **<u>Breach of Fiduciary Duty</u>**

23    (Against All Defendants)

24    157.    Plaintiffs reallege and incorporate by reference each and every allegation

25    in paragraphs 1 through 156 above, as if fully set forth herein.

26    158.    As explained herein, Defendants owed Plaintiffs certain fiduciary duties as

27    limited partners and/or members of, or as investment advisor to, Plaintiffs.

28    159.    Defendants repeatedly breached these duties, directly and proximately

34

1   causing Plaintiffs to suffer great damage.

2   ## SIXTH CAUSE OF ACTION

3   ### Breach of Contract

4   (Against McCarthy)

5   160.   Plaintiffs reallege and incorporate by reference each and every allegation

6   in paragraphs 1 through 159 above, as if fully set forth herein.

7   161.   McCarthy promised and was contractually bound to provide each of

8   Plaintiffs Primarius, Primarius China, Focus and Partners with professional, competent

9   good faith investment advice.

10  162.   Primarius, Primarius China, Focus and Partners each provided good and

11  adequate consideration in exchange for McCarthy's promises and contractual

12  obligations.

13  163.   Primarius, Primarius China, Focus and Partners each have at all times

14  complied with each and every contractual obligation owed to McCarthy and are not in

15  breach of any such obligation.  To the extent Primarius, Primarius China, Focus or

16  Partners might not have performed, such performance was excused by McCarthy's

17  breaches.

18  164.   McCarthy breached his contractual obligations to provide professional,

19  competent, good faith investment advice to each of Primarius, Primarius China, Focus

20  and Partners numerous times, as detailed in this Complaint.

21  165.   As a direct and proximate result of McCarthy's breaches, each of Primarius,

22  Primarius China, Focus and Partners have suffered great damage.

23  ## SEVENTH CAUSE OF ACTION

24  ### Declaratory Relief

25  (Against Jayhawk China)

26  166.   Plaintiffs reallege and incorporate by reference each and every allegation

27  in paragraphs 1 through 165 above, as if fully set forth herein.

28  167.   An actual controversy has arisen and now exists between Primarius China

35

and Jayhawk China concerning their respective rights and duties with respect to Jayhawk China's requested withdrawals from Primarius China.  Specifically, Primarius China contends that it has the right to suspend all payment of Jayhawk China's requested withdrawals and hold any outstanding amounts that might otherwise be due on those withdrawals in escrow pending the outcome of this action, and to apply such outstanding amounts against any award made to Primarius China.  Plaintiffs are informed and believe, and on that basis allege, that Jayhawk China contends that it is entitled to a full, immediate redemption of the balance of Jayhawk China's capital accounts in Primarius China.

168.   Primarius China desires a judicial determination of its rights and duties with respect to payment of the remainder of Jayhawk China's requested withdrawals, including without limitation its right to suspend all payment of Jayhawk China's requested withdrawals and hold any outstanding amounts that might otherwise be due on those withdrawals in escrow pending the outcome of this action, and to apply such outstanding amounts against any award made to Primarius China.

169.   A judicial declaration is necessary and appropriate at this time pursuant to the facts and averments stated in this Complaint in that Primarius China's ability to manage  the winding up of that fund are significantly affected by the determination of the issue described above.

170.   Wherefore, Primarius China requests a court decree herein providing that it has the right to suspend all payment of Jayhawk China's requested withdrawals and hold any outstanding amounts that might otherwise be due on those withdrawals in escrow pending the outcome of this action, and to apply such outstanding amounts against any award made to Primarius China.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     On the First through Sixth Causes of Action, an award of compensatory damages, together with pre-judgment interest at the maximum rate allowable by law;

B.    On the Seventh Cause of Action, a court decree providing that Primarius China has the right to suspend all payment of Jayhawk China's requested withdrawals and hold any outstanding amounts that might otherwise be due on those withdrawals in escrow pending the outcome of this action, and to apply such outstanding amounts against any award made to Primarius China;

C.    On the Fourth and Fifth Causes of Action, an award of punitive damages;

D.    On all causes of action, an award of Plaintiffs' cost and expenses for this litigation, including reasonable attorney's fees, expert fees and other disbursements; and

E.    Such other and further relief as the Court might deem appropriate.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury with respect to all issues so triable.

Dated:        March **29** 2007                          Respectfully submitted,

                                                    **FAGELBAUM & HELLER LLP**


                                                    By _____
                                                        Philip Heller
                                                        Attorneys for Plaintiffs

38