1   Philip Heller, PLC (State Bar No. 113938)
    Debi A. Ramos, Esq. (State Bar No. 135373)
2   **FAGELBAUM & HELLER LLP**
    2049 Century Park East, Suite 4250
3   Los Angeles, California 90067-3254
    Telephone:   (310) 286-7666
4   Facsimile:   (310) 286-7086
    E-Mail:      ph@philipheller.com
5
    Attorneys for Plaintiffs, Primarius Capital LLC;
6   Primarius China Fund LP; Primarius Focus LP;
    Primarius Partners LP and Primarius Offshore
7   Partners Ltd.

8

9                  **UNITED STATES DISTRICT COURT**

10           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11                     **SAN FRANCISCO DIVISION**

12

13   PRIMARIUS CAPITAL, LLC;          )   Case No.: C 07-01804(EDL)
     PRIMARIUS CHINA FUND, LP;        )
14   PRIMARIUS FOCUS, LP; PRIMARIUS   )   **FIRST AMENDED COMPLAINT**
     PARTNERS, LP; and PRIMARIUS      )
15   OFFSHORE PARTNERS LTD.,          )
                                      )   **DEMAND FOR JURY TRIAL**
16                 Plaintiffs,        )
                                      )
17        vs.                         )
                                      )
18   JAYHAWK CAPITAL                  )
     MANAGEMENT, LLC; JAYHAWK         )
19   CHINA FUND (CAYMAN), LTD.;       )
     JAYHAWK INVESTMENTS, LP;         )
20   JAYHAWK INSTITUTIONAL            )
     PARTNERS, LP;  KENT C.           )
21   MCCARTHY and Does 1 through 100, )
     inclusive,                       )
22                                    )
                   Defendants.        )
23   _____)

24

25       Plaintiffs Primarius Capital LLC, Primarius China Fund LP, Primarius Partners

26   LP, Primarius Focus LP and Primarius Offshore Partners Ltd. allege:

27

28

**Jurisdiction and Venue**

1.      This action arises under §§ 9 and 10(b) of the Exchange Act, 15 U.S.C. §§ 78i and 78j(b) respectively and § 206 of the Investment Advisers Act, 15 U.S.C. § 80b-6(1) as hereinafter more fully appears.  This Court therefore has subject matter jurisdiction under 28 U.S.C. § 1331.  The Court should assume supplemental subject matter jurisdiction of Plaintiffs' state law claims under 28 U.S.C. § 1367 because those claims and Plaintiffs' federal claims arise out of a common nucleus of operative fact.

2.      The acts and/or transactions that are the subject of this Complaint occurred in the Northern District of California and elsewhere.  Moreover, Defendants each transact business and/or are found within this District.  Accordingly, this Court has personal jurisdiction over each defendant, and venue is proper under 28 U.S.C. .§ 1391(b).

3.      Additionally, Article XII, paragraph 12.1(o) of the Primarius China Fund Limited Partnership Agreement, which, along with the Primarius China Fund LP Confidential Private Placement Memorandum, determines the rights and duties of Primarius China's general and limited partners, provides in pertinent part:

**THE PARTNERS AND ASSIGNEES HEREBY CONSENT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA AND THE FEDERAL COURTS OF THE UNITED STATES, IN EACH CASE SITTING IN SAN FRANCISCO COUNTY, CALIFORNIA, IN ANY PROCEEDING RELATING TO THIS AGREEMENT.**

**THE PARTNERS AND ASSIGNEES AGREE NOT TO RAISE ANY OBJECTION TO VENUE IN THE COURTS OF THE STATE OF CALIFORNIA AND THE FEDERAL COURTS OF THE UNITED STATES, IN EACH CASE SITTING IN SAN FRANCISCO COUNTY, CALIFORNIA, IN ANY PROCEEDING RELATING TO THIS AGREEMENT.**  [Emphasis in original.]

4.      Jayhawk China has therefore consented to the personal and subject matter jurisdiction and venue of this Court with respect to all matters herein relating to the Primarius China Agreement.

/ / /

/ / /___

2

## Case Overview

5.      Plaintiffs in this action, four hedge funds, Primarius China Fund LP ("Primarius China"), Primarius Partners LP ("Partners"), Primarius Focus LP ("Focus") and Primarius Offshore Partners LP ("Offshore Partners") (collectively, the "Primarius Funds"), and those funds' general partner, Primarius Capital LLC ("Primarius"), seek to recover damages arising out of Defendants' violations of federal securities statutes, violations of the California Unfair Business Practices Act, fraud, breach of fiduciary duty, breach of contract, negligent misrepresentation and conspiracy to commit this wrongdoing, and also seek declaratory relief.

6.      Defendant Kent C. McCarthy ("McCarthy") controls a large group of affiliated investment entities that includes Defendants Jayhawk Capital Management, LLC ("Jayhawk"), an investment management firm, and Defendants Jayhawk China Fund (Cayman), Ltd. ("Jayhawk China"), Jayhawk Investments, LP ("Jayhawk Investments") and Jayhawk Institutional Partners, LP ("Jayhawk Institutional") (collectively, the "Jayhawk Funds"), all hedge funds.  According to a submission on hedgefund.net in January 2007, Jayhawk China had approximately $526 million under management, with total "firm assets," which included Jayhawk Investments and Jayhawk Institutional, totaling approximately $602 million.

7.      McCarthy has a history of luring smaller funds, like the Primarius Funds here, and their managers into association with him either by offering to help them by providing investment capital, becoming their investment advisor and research analyst, and purportedly enhancing their credibility through their association with him, or by telling them that he is essentially looking for a successor to take over all or part of his duties with respect to the management of the Jayhawk Funds, or by doing both.  After the smaller funds have allied themselves with McCarthy, accepted often token investments from him and/or his funds, accepted McCarthy as an investment advisor and given him one-way, *i.e.*, non-reciprocal, complete access in real-time or near real-time to their positions and trading activities ("transparency") and also a cut of their earnings,

**First Amended Complaint**

he, Jayhawk and the Jayhawk Funds wrongfully conspire to use the smaller funds to advance their own financial interests, to the smaller funds' great detriment.

8.    As explained in greater detail below, that is what happened here. In or around the last quarter of 2002 and the first quarter of 2003, McCarthy approached Patrick Lin ("Lin"), managing member and portfolio manager of Plaintiff Primarius Capital LLC ("Primarius"), and told Lin the story described in the preceding paragraph. Soon thereafter, Defendants, acting in conspiracy and with the intent to deceive and defraud Plaintiffs, agreed to: (1) transfer the management of one of McCarthy's smaller funds to Primarius; (2) contribute substantial capital to a new Primarius fund focused on China and the Asian markets (Primarius China); (3) have McCarthy act as investment advisor and research analyst to Plaintiffs; (4) allow Plaintiffs to promote the Primarius Funds using its association with McCarthy, Jayhawk and the Jayhawk Funds; and (5) invest in Focus and Partners. Defendants induced and deceived Plaintiffs into: (1) sharing certain fees Primarius collected from the Primarius Funds' limited partners with Jayhawk and certain of the Jayhawk Funds; (2) waiving certain fees for the Defendants normally paid by the Primarius Funds' limited partners; (3) granting Defendants one-way, non-reciprocal transparency into the Primarius Funds' positions and trading activities; (4) accepting Jayhawk as a member of Primarius with the right to receive a share of Primarius' income and profits; (5) contributing Lin's management skill; and (6) sharing investment ideas and strategies with Defendants.

9.    As detailed below, the relationships that resulted among the parties from the agreements summarized above imposed upon Defendants certain fiduciary duties to Plaintiffs.

10.    As also detailed below, Defendants, acting in conspiracy, breached these fiduciary duties, defrauded Plaintiffs and committed other wrongdoing, *inter alia,* by: (1) misrepresenting to Plaintiffs that they required transparency into the positions and trading activities of the Primarius Funds for McCarthy to discharge his duties as those funds' investment advisor and research analyst and then using the information they

4

1   acquired to benefit themselves at Plaintiffs' expense; (2) knowingly providing false and

2   misleading investment advice and analysis for the purpose of benefitting Defendants at

3   Plaintiffs' expense; (3) misrepresenting their intentions and trading activities with

4   respect to certain securities held by both the Jayhawk and Primarius Funds to benefit

5   themselves at Plaintiffs' expense; (4) knowingly providing false and misleading

6   explanations for certain trading activity of the Jayhawk Funds for the purpose of

7   benefitting Defendants at Plaintiffs' expense; and (5) committing front-running against

8   Primarius China in connection with certain redemption requests made to that fund by

9   Jayhawk China.

## The Parties

11      11.     Plaintiff Primarius Capital LLC ("Primarius") is a Delaware limited liability

12   company with its principal place of business at One Montgomery Street, San Francisco,

13   California.  Primarius is in the business of managing private investment funds, including

14   Plaintiffs Primarius China Fund LP, Primarius Partners LP, Primarius Focus LP and

15   Primarius Offshore Partners Ltd.

16      12.     Plaintiff Primarius China Fund LP ("Primarius China") is a Delaware

17   limited partnership with its principal place of business at One Montgomery Street, San

18   Francisco, California.  Primarius China is "hedge fund" that was in the business of

19   investing on behalf of its limited partners primarily in publicly-traded US, China-related,

20   Hong Kong and Taiwan securities.  Primarius China was dissolved as of September 29,

21   2006, largely as a result of the wrongdoing described herein, and is currently in the

22   process of winding up its operations.  Primarius is the sole general partner of Primarius

23   China.

24      13.     Plaintiff Primarius Focus LP ("Focus") is a Delaware limited partnership

25   with its principal place of business at One Montgomery Street, San Francisco, California.

26   Focus is a "hedge fund" in the business of investing on behalf of its limited partners in

27   a broad range of securities and other instruments including without limitation options,

28   preferred stock, debt instruments, cash equivalents and privately-placed securities of

**First Amended Complaint**

1    public and private companies.

2        14.    Plaintiff Primarius Partners LP ("Partners") is a Delaware limited

3    partnership with its principal place of business at One Montgomery Street, San

4    Francisco, California.  Partners is a "hedge fund" in the business of investing on behalf

5    of its limited partners in a broad range of securities and other instruments including

6    without limitation options, preferred stock, debt instruments, cash equivalents and

7    privately-placed securities of public and private companies.

8        15.    Plaintiff Primarius Offshore Partners Ltd. ("Offshore Partners") is a British

9    Virgin Islands corporation with its principal place of business at One Montgomery

10   Street, San Francisco, California.  Offshore Partners is a "hedge fund" in the business of

11   investing on behalf of its limited partners in a broad range of securities and other

12   instruments including without limitation options, preferred stock, debt instruments, cash

13   equivalents and privately-placed securities of public and private companies.

14       16.    Defendant Jayhawk Capital Management, LLC ("Jayhawk") is a Delaware

15   limited liability company with its principal place of business at 5410 West 61st Place,

16   Mission, Kansas.  Plaintiffs are informed and believe, and on that basis allege, that

17   Jayhawk is in the business of managing and serving as investment advisor to private

18   investment funds, including Defendants Jayhawk China Fund (Cayman), Ltd., Jayhawk

19   Investments, LP and Jayhawk Institutional Partners, LP.  Jayhawk is a member of

20   Primarius and a limited partner of Partners.  Defendant Kent McCarthy is the manager

21   and sole member of Jayhawk.

22       17.    Plaintiffs are informed and believe, and on that basis allege, that Defendant

23   Jayhawk China Fund (Cayman), Ltd. ("Jayhawk China") is a Cayman Islands corporation

24   with its principal place of business at  5410 West 61st Place, Mission, Kansas. Jayhawk

25   China is in the business of investing in Chinese securities listed in Hong Kong, the US

26   and China and Jayhawk is the sole general partner and investment manager of Jayhawk

27   China.   Jayhawk China was founded in 1995 and was federally registered as an

28   investment advisor with the SEC in 2004.  According to Jayhawk China promotional

C:\WPDATA\36184\002\Pleading\FAC\07-01804EDL FAC.wpd                                        **First Amended Complaint**

1    materials dated July 2005, Defendant Kent McCarthy is the "President" of Jayhawk

2    China.  Jayhawk China is a limited partner of Primarius China.

3          18.    Plaintiffs are informed and believe, and on that basis allege, that Defendant

4    Jayhawk Investments, LP ("Jayhawk Investments") is a Delaware limited partnership

5    with its principal place of business at  5410 West 61st Place, Mission, Kansas.  Plaintiffs

6    are informed and believe, and on that basis allege, that Jayhawk Investments is in the

7    business of investing in various securities, other hedge funds  and other interests on

8    behalf of its limited partners and that Jayhawk is the sole general partner and investment

9    manager of Jayhawk Investments.  Jayhawk Investments is a member of Primarius and

10   a limited partner of Partners and Focus.

11         19.    Plaintiffs are informed and believe, and on that basis allege, that Defendant

12   Jayhawk Institutional Partners, LP ("Jayhawk Institutional") is a Delaware limited

13   partnership with its principal place of business at 5410 West 61st Place, Mission, Kansas.

14   Plaintiffs are informed and believe, and on that basis allege, that Jayhawk Institutional

15   is in the business of investing in various securities and other interests on behalf of its

16   limited partners and that Jayhawk is the sole general partner and investment manager of

17   Jayhawk Institutional.

18         20.    Plaintiffs are informed and believe, and on that basis allege, that Kent

19   McCarthy ("McCarthy") is, and at all relevant times was, a citizen of Kansas residing in

20   Johnson County, Kansas, or a citizen of Nevada residing in Incline Village, Nevada.

21   McCarthy is the principal of Jayhawk, Jayhawk China, Jayhawk Investments and

22   Jayhawk Institutional.

23         21.    Plaintiffs are informed and believe and on that basis allege that McCarthy

24   is the alter ego of Jayhawk, Jayhawk China, Jayhawk Investments and Jayhawk

25   Institutional.

26         22.    Plaintiffs are ignorant of the true names and capacities of Defendants named

27   herein as Does 1 through 100, inclusive, and therefore sue these Defendants by fictitious

28   names.  Plaintiffs will seek leave of court to amend this Complaint to allege their true

7

**First Amended Complaint**

1    names and capacities when they are ascertained.

2    **Development of A Relationship of Trust and Confidence Between the Parties**

3    23.    In or around October 2002, Lin made a presentation concerning the

4    investment activities and strategies of Primarius and Partners, then the only Primarius

5    fund, at a conference hosted by Banc of America Securities Prime Brokerage.  After

6    Lin's presentation, McCarthy approached Lin, introduced himself and expressed an

7    interest in discussing a possible alliance between himself and the Jayhawk entities on the

8    one hand and Lin and Primarius on the other.

9    24.    Over the succeeding several months, McCarthy, through Jayhawk's general

10    counsel, solicited marketing materials, subscription agreements, offering memoranda and

11    other documentation and information concerning Primarius and Partners and their

12    performance from Primarius.  McCarthy also began soliciting information concerning

13    Lin's meetings with the management of companies in which Primarius was considering

14    investment and Lin's opinions with respect to certain markets and securities.  The

15    parties, directly and through their counsel, also began negotiating the specific terms of

16    the alliance between the Primarius and Jayhawk entities.  The parties envisioned an

17    investment by McCarthy and/or certain Jayhawk entities in Primarius, McCarthy and/or

18    certain Jayhawk entities acquiring a right to participate in the management of Primarius

19    through membership in that LLC, Primarius taking over the management of one of

20    McCarthy's funds called "Lucky Henry," and changes in Primarius' operating agreement

21    that would be necessary to implement the alliance.

22    25.    Lin and Primarius saw the alliance being negotiated with McCarthy and the

23    Jayhawk entities as potentially being of great benefit to the Primarius and the Primarius

24    Funds.  Lin had only set off on his own as an independent manager in 2002, with the

25    establishment of Primarius and Partners.  McCarthy held himself out as having been

26    Goldman Sachs' number one producer with great expertise at picking profitable

27    investments and raising funds and a large network of contacts.  Plaintiffs are informed,

28    and on that basis allege, that, for their part, McCarthy and the Jayhawk entities were well

8

1   aware of the disparity in size and "name recognition" between the parties, and also aware
2   of Lin's expertise, abilities and reputation as an excellent fund manager, and therefore
3   viewed Primarius and the Primarius Funds from the beginning as prime candidates for
4   the implementation of their wrongful scheme.

5       26.     During this period, based on the actions and communications of McCarthy
6   and the Jayhawk entities, a close relationship of trust and confidence developed between
7   the parties, including what Lin believed to be a personal friendship between himself and
8   McCarthy.

9       27.     In or around May 2003, Jayhawk and Primarius entered into a "Management
10  Transfer Agreement" with an effective date of June 1, 2003, a copy of which is appended
11  to this Complaint as Exhibit A, and which is incorporated in its entirety by this reference.
12  The Management Transfer Agreement was the first concrete step in the implementation
13  of McCarthy's and the Jayhawk entities' scheme and conspiracy to turn the Primarius
14  funds to their own use.

15      28.     Pursuant to the Management Transfer Agreement, Jayhawk became a
16  member of Primarius, which gave it the right to participate in the management of
17  Primarius, and Jayhawk and Jayhawk Investments collectively obtained the right to
18  receive 10% of certain fees payable by the Primarius funds' limited partners, *i.e.*, a
19  participation in Primarius' income and profits.  Jayhawk became the only member of
20  Primarius other than Lin with a participation in Primarius's income and profits.  In
21  consideration of Jayhawk's profit participation and membership in Primarius, and
22  pursuant to Jayhawk's right to participate in Primarius' management, McCarthy was to
23  provide investment advice to the funds Primarius managed.  A biography of McCarthy
24  sent to Lin on July 31, 2003 by McCarthy's office states in pertinent part, "In June, 2003,
25  Primarius Focus retained Kent McCarthy to serve as research analyst and advisor to
26  assist the Portfolio Manager, Patrick Lin, with respect to his Partnership
27  responsibilities."

28      29.     Throughout the relationship among the parties, McCarthy continuously

**First Amended Complaint**

encouraged Lin to place his faith and trust in McCarthy, as opposed to other advisors and analysts Primarius from time to time employed and from whom Primarius obtained research and analysis. McCarthy repeatedly asked Lin why he needed other analysts when he had McCarthy, encouraged Lin to look to McCarthy as his sole source of investment ideas (apart from Lin himself), and continually made negative comments about the other analysts Primarius used. Until the relationship soured, Lin would speak to McCarthy regarding investment issues as often as three times per week for up to an hour.

30.    As detailed below, McCarthy's efforts to induce Primarius to rely on him were largely successful. McCarthy was more experienced than Lin in China investments and had a successful track record. Moreover, many of the investment recommendations McCarthy made related to investment in securities in which McCarthy had previously invested prior to the relationship with Plaintiffs. Further, since McCarthy and the Jayhawk Funds had themselves invested in certain of the Primarius Funds, Lin reasonably accepted at face value McCarthy's repeated assurances that he would not give poor advice because to do so would hurt his own interests as well as Plaintiffs'.

31.    In becoming a member of Primarius, Jayhawk acquired the full range of fiduciary duties incumbent upon the members of a limited liability company.

32.    Shortly after the execution of the Management Transfer Agreement, Lin and McCarthy began discussing and negotiating expanding the Primarius/Jayhawk alliance through the establishment of Primarius China, which was to be a fund similar to, but smaller than, Jayhawk China. Jayhawk China would provide the "seed investment," *i.e.*, an initial, substantial investment, in Primarius China, and McCarthy would provide the new fund with investment advice.

33.    On July 3, 2003, Lin sent McCarthy an email message suggesting that if McCarthy and the Jayhawk entities wanted "idea flows" from Lin and Primarius, the parties might discuss a profit participation for Primarius "similar to how Jayhawk is getting profit on Pimarius [sic]." Fifteen minutes later, McCarthy responded with an

**First Amended Complaint**

1   email message that said, "MY INTEREST WOULD BE TO TURN THE WHOLE

2   THING OVER TO SOMEBODY – MAYBE WE CAN TALK About this summer [sic]

3   – kent" [emphasis in original].  Plaintiffs are informed and believe, and on that basis

4   allege, that, at the time he sent this message, McCarthy had no intention of "turn[ing] the

5   whole thing over," *i.e.*, ceding management of Jayhawk China or any other Jayhawk

6   entity, to anyone, and made his statement in this regard in furtherance of Defendants'

7   scheme and conspiracy to wrongfully turn Plaintiffs to their own use.

8       34.    As of September 15, 2003, Primarius, Primarius China, Jayhawk China and

9   Jayhawk entered into a "Fee Sharing Agreement," a copy of which is appended to this

10   Complaint as Exhibit B, and which is incorporated in its entirety by this reference.

11   Through this agreement, Defendants gained full, one-way transparency into Primarius

12   China (*i.e.*, Primarius China did not receive reciprocal transparency with respect to any

13   Jayhawk entity) and Jayhawk China obtained the right to receive 10% of management

14   fees paid by Primarius China's limited partners.  In exchange, McCarthy was required

15   to provide investment advice and consultation to Primarius and Primarius would be

16   permitted to inform investors and potential investors in Primarius China that Jayhawk

17   China was a significant "shareholder" in Primarius China and that McCarthy and

18   Jayhawk had a participatory role in Primarius China's investment strategy as a

19   consultant/analyst.

20       35.    After the establishment of Primarius China, McCarthy and the Jayhawk

21   entities treated Primarius China in many ways as one of Jayhawk's funds.  McCarthy and

22   Jayhawk regularly solicited information concerning Lin, Primarius and Primarius China

23   to be used in Jayhawk's newsletters and regularly reported to its own investors on the

24   performance of Primarius China.  Beginning from Primarius China's inception in

25   September 2003, Jayhawk required that Primarius provide it complete, one-way

26   transparency with respect to all of Primarius China's holdings and trading activities.  Lin

27   (and the managers of certain other non-Jayhawk funds under the Jayhawk umbrella) were

28   also required to provide Jayhawk monthly with their "long and short picks" for the next

**First Amended Complaint**

1   month, *i.e.,* their predictions with respect to the likely best (long) and worst (short)

2   performing relevant stocks.  Further evidencing Jayhawk's desire to exercise control over

3   Primarius, Jayhawk then monitored these picks over the course of the month and

4   reported back to Lin and the other managers concerning the accuracy of their predictions.

5         36.    As described below, the Primarius/Jayhawk alliance eventually expanded

6   such that various Jayhawk entities became limited partners of Partners, in addition to

7   their interests in Primarius, Primarius China and Focus.   Plaintiffs provided

8   accommodations to Defendants not provided to other limited partners of the Primarius

9   funds.   Primarius China and Focus typically charged their limited partners a 2%

10  management fee; Partners charged a 1.5% management fee.  Primarius China, Focus and

11  Partners also charged their limited partners a 20% incentive fee on all profits realized by

12  such limited partners.  Primarius China charged Jayhawk China only a 1% management

13  fee and no incentive fee, Focus charged Defendants no management or incentive fees,

14  and Partners charged Defendants minimal management fees and only a partial incentive

15  fee.  Plaintiffs made these accommodations in consideration of and with the expectation

16  of receiving honest, good faith advice from McCarthy.

17        37.    Plaintiffs have paid Defendants approximately $665,000 to date in profit

18  sharing and have waived approximately $3.5 million in management and incentive fees

19  for Defendants.

20

21

22

23

24

25

26

27

28

C:\WPDATA\36184\002\Pleading\FAC\07-01804EDL FAC.wpd      **First Amended Complaint**

**Summary of the Jayhawk Entities' Positions and Interests in, and Duties to, Primarius, Primarius China, Partners and Focus**

38.    As alleged above, pursuant to the Management Transfer Agreement, as of June 1, 2003, Jayhawk became a member of Primarius with a 10% profit participation in that limited liability company.  As a member of Primarius, Jayhawk owed Primarius the full range of fiduciary duties incumbent upon members of limited liability companies to other members and to the company itself.

39.    As of May 15, 2006, Jayhawk China had two capital accounts in Primarius China with a combined balance of approximately $32.5 million.  The balance of Jayhawk China's accounts had appreciated by approximately $1.9 million over the preceding four months.  As a limited partner of Primarius China, with full "transparency" into that fund's trading and holdings, and by virtue of McCarthy's role as an investment advisor to Primarius China, Jayhawk China was at all relevant times in a fiduciary relationship with Primarius China and owed that fund the full range of applicable fiduciary duties, including the duty not to engage in trades or take other actions harmful to Primarius China.  Plaintiffs are informed and believe, and on that basis allege, that a substantial part of the funds invested through Jayhawk China in Primarius China are McCarthy's personal funds.

40.    As of June 30, 2006, Jayhawk had one capital account in Partners with a balance of $111,350.  As a limited partner of Partners, with full "transparency" into that fund's trading and holdings initially, and later into that fund's "top five" holdings *i.e.,* the five securities in which the value of Partners' holdings were greatest, and by virtue of McCarthy's role as an investment advisor to Partners, Jayhawk was at all relevant times in a fiduciary relationship with Partners and owed that fund the full range of applicable fiduciary duties, including the duty not to engage in trades or take other actions harmful to Partners. Plaintiffs are informed and believe, and on that basis allege, that a substantial part of the funds invested through Jayhawk in Partners are McCarthy's personal funds.

1    41.    As of June 30, 2006, Jayhawk Investments had two capital accounts in

2   Partners with a balance of $1,376,000.  As a limited partner of Partners, with full

3   "transparency" into that fund's trading and holdings initially, and later into that fund's

4   "top five" holdings, and by virtue of McCarthy's role as an investment advisor to,

5   Jayhawk was at all relevant times in a fiduciary relationship with Partners and owed that

6   fund the full range of applicable fiduciary duties, including the duty not to engage in

7   trades or take other actions harmful to Partners.  Plaintiffs are informed and believe, and

8   on that basis allege, that a substantial part of the funds invested through Jayhawk

9   Investments in Partners are McCarthy's personal funds.

10    42.    As of June 30, 2006, Jayhawk had two capital accounts in Focus with a

11   combined balance of $948,000.  As a limited partner of Focus, with full "transparency"

12   into that fund's trading and holdings initially, and later into that fund's "top five"

13   holdings, and by virtue of McCarthy's role as an investment advisor to Focus, Jayhawk

14   was at all relevant times in a fiduciary relationship with Focus and owed that fund the

15   full range of applicable fiduciary duties, including the duty not to engage in trades or

16   take other actions harmful to Focus.  Plaintiffs are informed and believe, and on that

17   basis allege, that a substantial part of the funds invested through Jayhawk in Focus are

18   McCarthy's personal funds.

19    43.    As of June 30, 2006, Jayhawk Investments had two capital accounts in

20   Focus with a combined balance of $3,965,000.  As a limited partner of Focus, with full

21   "transparency" into that fund's trading and holdings initially, and later into that fund's

22   "top five" holdings, and by virtue of McCarthy's role as an investment advisor to Focus,

23   Jayhawk Investments was at all relevant times in a fiduciary relationship with Focus and

24   owed that fund the full range of applicable fiduciary duties, including the duty not to

25   engage in trades or take other actions harmful to Focus.  Plaintiffs are informed and

26   believe, and on that basis allege, that a substantial part of the funds invested through

27   Jayhawk Investments in Focus are McCarthy's personal funds.

28

**First Amended Complaint**

## Summary of the Jayhawk Entities' "Transparency"
## in Primarius China, Partners and Focus

44.    As alleged above, under the Fee Sharing Agreement, Jayhawk China and its employees, and hence McCarthy and the other Defendants and their employees, had complete transparency with respect to Primarius China's portfolio and investment activities beginning on or about September 15, 2003.  Because of Defendants' abuse of this right, described in detail below, Primarius terminated this transparency on or about May 31, 2006 (and Primarius China's performance subsequently improved markedly).

45.    Bank of America was the prime broker for Partners and Focus from their respective inceptions through approximately February 2004, when Goldman Sachs became these funds' prime broker.  During the period when Bank of America served as prime broker for Partners and Focus, Defendants and their employees had complete transparency with respect to Partners' and Focus' portfolios and investment activities because Primarius and Defendants shared computer access to this information through Bank of America.  When Goldman Sachs became these funds' prime broker, Defendants retained their transparency with respect to each fund's "top five."

## Summary of McCarthy's Role as Advisor to Plaintiffs

46.    As alleged above, pursuant to the Fee Sharing Agreement, McCarthy was required to provide investment advice to Primarius China beginning on or about September 15, 2003.  McCarthy was, therefore, in a fiduciary relationship with Primarius China at all relevant times and owed that fund the full range of applicable fiduciary duties.

47.    As alleged above, in consideration of the 10% of Primarius' "Gross Fees" paid to Jayhawk and Jayhawk Investments pursuant to the Management Transfer Agreement, and the waiver of the standard  incentive fee and reduction of the standard management fee, McCarthy was required to provide investment advice to Partners beginning on or about June 1, 2003.  McCarthy was, therefore, in a fiduciary relationship with Partners at all relevant times and owed that fund the full range of applicable

C:\WPDATA\36184\002\Pleading\FAC\07-01804EDL FAC.wpd    **First Amended Complaint**

1  fiduciary duties.  McCarthy's advice was also an exercise of Jayhawk's right to

2  participate in the management of Primarius by virtue of its membership in that limited

3  liability company pursuant to the Management Transfer Agreement.

4  48.  As alleged above, in consideration of the 10% of Primarius' "Gross Fees"

5  paid to Jayhawk and Jayhawk Investments pursuant to the Management Transfer

6  Agreement, and the waiver of the standard  incentive fee and reduction of the standard

7  management fee, McCarthy was required to provide investment advice to Focus

8  beginning on or about June 1, 2003.  McCarthy was, therefore, in a fiduciary relationship

9  with Focus at all relevant times and owed that fund the full range of applicable fiduciary

10  duties.  McCarthy's advice was also an exercise of Jayhawk's right to participate in the

11  management of Primarius by virtue of its membership in that limited liability company

12  pursuant to the Management Transfer Agreement.

13  **Defendants' Improper Acts**

14  49.  Between mid-2003, at the latest, and into 2006, Defendants breached their

15  fiduciary duties to Plaintiffs, committed front-running against Plaintiffs, violated

16  provisions of the securities statutes, including without limitation Rule 10b-5 and

17  committed common law fraud against Plaintiffs, all as described below.    This

18  wrongdoing was committed pursuant to an intentional plan and conspiracy among the

19  various Defendants with the purpose of benefitting Defendants at Plaintiffs' expense.

20  The allegations in this section of this Complaint are organized around four particular

21  securities that provide examples of Defendants' misconduct.  They do not constitute a

22  full and final inventory of Defendants' wrongdoing.  Plaintiffs will amend and augment

23  their allegations as necessary once their investigation is complete.

24  **1.    Sohu.com, Inc. (SOHU) – Fraud, Breach of Fiduciary Duty**

25  50.  Sohu.com, Inc., whose stock is traded as SOHU on NASDAQ, is a

26  corporation based in Beijing and engaged in the business of operating an Internet search

27  engine service.

28  51.  SOHU was one of McCarthy's early "success stories."  SOHU was selling

1    at approximately $43 in mid-2003; McCarthy told Lin that he had bought SOHU at

2    approximately $1.   In or around 2002, McCarthy's Lucky Henry fund (which later

3    became Focus) and Jayhawk China owned approximately 10% of SOHU's outstanding

4    shares.   McCarthy often bragged to Lin of his close relationship with SOHU's senior

5    officers, including the CFO, telling Lin that he had once gone helicopter skiing with him.

6        52.    When Lucky Henry became Focus in June 2003, SOHU made up a

7    significant part of its portfolio.   On McCarthy's repeated recommendations, Primarius

8    China and Partners also acquired significant positions in SOHU.   In fact, Primarius

9    China invested in SOHU when it was at its historical high price.

10       53.    Between June 2003 and approximately the end of 2004, McCarthy, acting

11   in his capacity as investment advisor and research analyst to the Primarius Funds,

12   "pumped" SOHU, *i.e.*, told Plaintiffs he believed SOHU to be a favorable investment

13   which Plaintiffs should hold.   McCarthy relayed his recommendations to Plaintiffs

14   through interstate telephone and Internet systems.

15       54.    McCarthy's advice was fraudulent.  McCarthy gave his advice and made his

16   representations knowing they were false and misleading at the time given and for the

17   purpose of inducing Plaintiffs to hold their SOHU positions.   At or about the same time

18   as McCarthy was providing his fraudulent recommendations and advice, he and the other

19   Defendants, without informing Plaintiffs of their intentions or actions despite their

20   fiduciary duty to do so, were using the Jayhawk Enterprise to sell SOHU on the open

21   market.  Plaintiffs are unable to offer more specifics concerning the dates of, or numbers

22   of shares involved in, the Jayhawk Enterprise's SOHU sales largely because Defendants

23   either failed to make required SEC filings, or have provided misleading information in

24   the filings they have made, with the intent of deceiving and misleading both Plaintiffs

25   and government regulators.   Plaintiffs are informed and believe, and on that basis allege,

26   that each of Defendants' SOHU trades was effectuated and settled through the use of

27   interstate wires and/or Internet systems.

28       55.    McCarthy thus committed two types of wrongdoing against Plaintiffs in

17

1  connection with SOHU.  First, he acted affirmatively to provide fraudulent investment

2  advice as Plaintiffs' investment advisor and research analyst, the fraudulent nature of the

3  advice evidenced by the fact that at the same time he was advising Plaintiffs to hold

4  SOHU, he and the other Defendants were using the Jayhawk Enterprise to sell SOHU.

5  Second, as Plaintiffs' investment advisor and research analyst, McCarthy had a fiduciary

6  duty to inform Plaintiffs if his view of SOHU as a favorable investment changed.  That

7  McCarthy's view of SOHU did in fact change is again evidenced by the fact he and the

8  other Defendants used the Jayhawk Enterprise to sell SOHU.  Nonetheless, McCarthy

9  either remained silent, or continued to "pump" SOHU.

10      56.    In reasonable reliance on McCarthy's fraudulent recommendations and

11  advice and his omission to inform Plaintiffs of Defendants' intention to sell SOHU, or

12  that his view of SOHU as a favorable investment had changed, Plaintiffs retained the

13  great bulk of their SOHU positions and, as a result, suffered great damage when the price

14  of SOHU declined.    But for McCarthy's fraudulent recommendations and advice,

15  Plaintiffs would have sold their SOHU shares at prices far higher than those to which

16  SOHU's price ultimately declined.

17      57.    The thinking underlying Defendants' fraudulent scheme with respect to

18  SOHU is obvious.  SOHU is a relatively illiquid stock.  Had McCarthy provided

19  Plaintiffs with appropriate advice, or informed them of Defendants' intentions with

20  respect to selling SOHU, Plaintiffs would have sold SOHU as well.  Any substantial sale

21  by Plaintiffs would have depressed SOHU's market price, thereby, of course, lowering

22  the price at which Defendants could sell.  By defrauding Plaintiffs, Defendants avoided

23  the decline in SOHU's price a substantial sale by Plaintiffs would have caused, thereby

24  allowing Defendants to sell at a higher price than they could have had McCarthy been

25  truthful with Plaintiffs.

26      58.    As a direct and proximate result of Defendants' wrongdoing with respect

27  to SOHU, Plaintiffs have incurred substantial damages, in an amount to be proven at

28  trial.  Moreover, those limited partners who redeemed their interests in the various

1    Primarius Funds during the relevant period also suffered damages proportional to their

2    interests in the funds at the time of the redemptions.

3          59.    Plaintiffs are informed and believe, and on that basis allege, that Defendants

4    have failed to make certain required filings with the SEC with respect to SOHU, and

5    have done so in furtherance of their conspiracy against Plaintiffs and to conceal their

6    activities from the markets and the regulatory authorities.

7          **2.    CDC Corp. (CHINA) – Fraud, Breach of Fiduciary Duty**

8          60.    CDD Corp., whose stock is traded as CHINA on NASDAQ, is a corporation

9    based in Hong Kong and engaged in the software business.

10         61.    At all relevant times, all four Primarius Funds held substantial positions in

11   CHINA.

12         62.    Plaintiffs are informed and believe, and on that basis allege, that, at all

13   relevant times, certain Defendants also held substantial positions in CHINA.

14         63.    Between June 2003 and into 2006, McCarthy, acting in his capacity as

15   investment advisor to Primarius and the Primarius Funds, "pumped" CHINA, *i.e.*, told

16   Plaintiffs he believed CHINA to be a favorable investment which Plaintiffs should hold.

17   McCarthy relayed his recommendations to Plaintiffs through interstate telephone and

18   Internet systems.

19         64.    McCarthy's advice was fraudulent. McCarthy gave his advice and made his

20   representations knowing they were false and misleading at the time given and for the

21   purpose of inducing Plaintiffs to hold their CHINA positions.  On at least three separate

22   occasions, at or about the same time as McCarthy was providing his fraudulent

23   recommendations and advice, he and the other Defendants, without informing Plaintiffs

24   of their intentions or actions, were using the Jayhawk Enterprise to sell CHINA on the

25   open market.  Plaintiffs are informed and believe, and on that basis allege, that each of

26   Defendants' CHINA trades was effectuated and settled through the use of interstate wires

27   and/or Internet systems.

28         65.    At or around the end of 2003 or the beginning of 2004, at a time when

19

McCarthy was fraudulently advising Plaintiffs to hold their CHINA positions, Defendants, without informing Plaintiffs of their intentions or conduct despite their fiduciary duty to do so, used the Jayhawk Enterprise to sell CHINA on the open market. Plaintiffs are informed and believe, and on that basis allege, that each of Defendants' CHINA trades was effectuated and settled through the use of interstate wires and/or Internet systems.

66.    At or around the end of 2004 or the beginning of 2005, again at a time when McCarthy was fraudulently advising Plaintiffs to hold their CHINA positions, Defendants, without informing Plaintiffs of their intentions or conduct despite their fiduciary duty to do so, used the Jayhawk Enterprise to sell CHINA on the open market. Plaintiffs are informed and believe, and on that basis allege, that each of Defendants' CHINA trades was effectuated and settled through the use of interstate wires and/or Internet systems.

67.    Early in 2006, again at a time when McCarthy was fraudulently advising Plaintiffs to hold their CHINA positions, Defendants, without informing Plaintiffs of their intentions or conduct despite their fiduciary duty to do so, used the Jayhawk Enterprise to sell CHINA on the open market.  Plaintiffs are unable to offer more specifics concerning the dates of, or numbers of shares involved in, the Jayhawk Enterprise's CHINA sales largely because Defendants either failed to make required SEC filings, or have provided misleading information in the filings they have made, with the intent of deceiving and misleading both Plaintiffs and government regulators.  Plaintiffs are informed and believe, and on that basis allege, that each of Defendants' CHINA trades was effectuated and settled through the use of interstate wires and/or Internet systems.

68.    McCarthy committed two types of wrongdoing against Plaintiffs in connection with CHINA.  First, he acted affirmatively to provide fraudulent investment advice as Plaintiffs' investment advisor and research analyst, the fraudulent nature of the advice evidenced by the fact that at the same time he was advising Plaintiffs to hold

CHINA, he and the other Defendants were using the Jayhawk Enterprise to sell CHINA. Second, as Plaintiffs' investment advisor and research analyst, McCarthy had a fiduciary duty to inform Plaintiffs if his view of CHINA as a favorable investment changed. That McCarthy's view of CHINA did in fact change is again evidenced by the fact he and the other Defendants used the Jayhawk Enterprise to sell CHINA. Nonetheless, McCarthy either remained silent, or continued to "pump" CHINA.

69.    On each of the three occasions described above, and throughout the period from approximately June 2003 into 2006, in reasonable reliance on McCarthy's fraudulent recommendations and advice and his omissions to inform Plaintiffs of Defendants' intention to sell CHINA, or that his view of CHINA as a favorable investment had changed, Plaintiffs retained the great bulk of their CHINA positions and, as a result, suffered great damage when the price of CHINA declined. But for McCarthy's fraudulent recommendations and advice, Plaintiffs would have sold their CHINA shares at prices far higher than those to which CHINA's price ultimately declined.

70.    The thinking underlying Defendants' fraudulent scheme with respect to CHINA is obvious. CHINA is a relatively illiquid stock. Had McCarthy provided Plaintiffs with appropriate advice, or informed them of Defendants' intentions with respect to selling CHINA, Plaintiffs would have sold CHINA as well. Any substantial sale by Plaintiffs would have depressed CHINA's market price, thereby, of course, lowering the price at which Defendants could sell. By defrauding Plaintiffs, Defendants avoided the decline in CHINA's price a substantial sale by Plaintiffs would have caused, thereby allowing Defendants to sell at a higher price than they could have had McCarthy been truthful with Plaintiffs.

71.    As a direct and proximate result of Defendants' wrongdoing with respect to CHINA, Plaintiffs have incurred substantial damages, in an amount to be proven at trial. Moreover, those limited partners who redeemed their interests in the various Primarius Funds during the relevant period also suffered damages proportional to their

**First Amended Complaint**

interests in the funds at the time of the redemptions.

72.    Plaintiffs are informed and believe, and on that basis allege, that Defendants have failed to make certain required filings with the SEC with respect to CHINA, and have done so in furtherance of their conspiracy against Plaintiffs and to conceal their activities from the markets and the regulatory authorities.

### 3.    Oplink (OPLK) - 10b-5, Fraud, Fiduciary Breach and Front-Running

73.    Oplink Communications, Inc., ("Oplink") is a US company based in Fremont, California but with most of its operations in China.  Oplink manufactures optical equipment and is traded on NASDAQ under the symbol OPLK.

74.    As detailed below, Defendants, acting in conspiracy and in breach of their fiduciary duties, dumped huge numbers of OPLK shares on the market without informing Plaintiffs, thereby greatly depressing OPLK's trading price and hence the value of Plaintiffs' own OPLK positions.  To benefit Defendants, McCarthy, again acting in furtherance of the conspiracy, then fraudulently misrepresented to Plaintiffs that he did not know why OPLK's price was falling, when he actually knew full well that Defendants were responsible, causing Plaintiffs to retain their OPLK positions, which they would have liquidated had they known the truth.  Finally, Defendants conspired to commit front-running against Primarius China in connection with a redemption request made to that fund by Jayhawk China.

75.    Although OPLK was initially Lin's investment idea, McCarthy did his own due diligence into the company and began recommending it widely to others, as well as to Lin.  Knowing of McCarthy's prior success with SOHU and CHINA, when McCarthy became enthusiastic about OPLK, it validated Lin's initial view about the stock, and Lin again relied on McCarthy's self-professed expertise.

76.    Accordingly, when McCarthy made favorable statements about OPLK and encouraged Lin to buy more, Lin did so.  During 2004 and 2005, all four Primarius Funds had substantial positions in OPLK, a fact known to Defendants by virtue of their

**First Amended Complaint**

one-way transparency into the Primarius Funds.

77.    According to public information available at www.sec.gov, or the Edgar or Bloomberg services, Jayhawk China held 732,440 shares of OPLK as of the end of December 2005.

78.    Throughout 2005, McCarthy, acting as an advisor to Primarius China, Partners and Focus, repeatedly and consistently made favorable statements, orally and in writing, regarding OPLK and encouraged Partners and Focus to retain and increase their OPLK positions.

79.    In an email message to Lin of June 16, 2005, McCarthy wrote, "have heard oplink may have a couple of big orders."

80.    McCarthy also "pumped" OPLK in TV appearances on CNBC and the TV show hosted by Jim Cramer.

81.    After Jayhawk China pushed OPLK's price up to approximately $12 between August and October 2005, OPLK's price per share fell to $9.59.

82.    Lin asked McCarthy, Plaintiffs' investment advisor, why OPLK's price was falling. McCarthy responded that he had no idea. This was a blatant misrepresentation, and was made in furtherance of a conspiracy with those Jayhawk entities that held OPLK. As McCarthy would confess to Lin approximately one week later, and as Defendants knew full well at the time of Lin's inquiry, OPLK's price was falling because Defendants, which collectively held a substantial proportion of OPLK's outstanding shares, had been dumping large numbers of those shares on the market. Plaintiffs reasonably relied on McCarthy's misrepresentation and held their OPLK positions, to their great detriment. Had McCarthy informed Lin that Defendants intended to dump their OPLK shares or that they were doing so, Plaintiffs would have sold their OPLK as well, knowing that Defendants' trading would depress OPLK's price. McCarthy and those Jayhawk entities that held OPLK conspired to hide their true intentions from Plaintiffs so the Jayhawk entities could sell their OPLK shares for a higher price. As Defendants well knew, had Plaintiffs known the truth, *i.e.,* that the Jayhawk entities

1   intended to sell huge numbers of shares, Plaintiffs would have sold their OPLK too,

2   which would have meant that the price Defendants would have been able to obtain for

3   their shares would have been lower.  Defendants' dumping of OPLK in this fashion

4   without informing Plaintiffs of their intention, or of the trading itself, constituted both

5   fraud and a breach of Defendants' fiduciary duties to Plaintiffs.

6       83.    Defendants also conspired to committed front-running against Primarius

7   China and breached their fiduciary duties to that fund with respect to certain OPLK

8   trades in connection with certain redemption requests.  On May 15, 2006, as described

9   in greater detail below, Jayhawk China requested withdrawal of approximately $19

10  million of the approximately $29 million it had invested in Primarius China.

11      84.    Defendants knew that, to pay this redemption, Primarius China would either

12  have to raise cash by liquidating a substantial proportion of its portfolio, including at

13  least a substantial proportion of its position in OPLK, or transfer to Jayhawk China large

14  numbers of shares of securities held by Primarius China including shares of OPLK, at

15  depressed prices.  Defendants knew the extent of Primarius China's OPLK holdings

16  because of the transparency right they had with respect to that fund.

17      85.    At or around the time of making the redemption request, and without

18  informing Lin, Primarius or Primarius China, Defendants, again in furtherance of their

19  conspiracy to use Plaintiffs to benefit themselves, began dumping huge numbers of

20  shares of OPLK on the market, depressing the price of OPLK from approximately $20

21  on or around May 1, 2006 to $15.58 on or around May 22, 2006.  Defendants actions in

22  this regard constituted front-running and a breach of the fiduciary duties they owed to

23  Plaintiffs.

24      86.    Defendants' reasons for doing this, and the thinking underlying their

25  conspiracy, are obvious.  Defendants anticipated that Primarius China would have to

26  liquidate substantial numbers of shares of OPLK to pay Jayhawk China's redemption

27  request, which liquidation Defendants also knew would depress OPLK's market price.

28  By front-running Primarius China and breaching their fiduciary duties to that fund,

24

Defendants were able to sell their OPLK shares at a higher price than they would have been able to obtain had they waited for Primarius China to sell.  Should Primarius China choose to pay Jayhawk China's redemption in securities rather than cash, Jayhawk China would obviously receive more shares of OPLK from Primarius China were Defendants first to depress OPLK's price by dumping great quantities of their own OPLK shares. They could then also buy back the shares they had dumped at bargain prices.

87.    That Defendants were abusing their transparency right in Primarius China to monitor that fund's trading activities so as to be able to front-run Primarius China is evidenced by an email message of May 15, 2006 to Lin from Mark Fleischhauer ("Fleischhauer"), Jayhawk's portfolio manager, stating:

> I notice that you have not started raising any cash in Primarius China Fund. We have given notice on the redemption and Mike Schmitz [of Jayhawk] has sent the notice to Hedgeworks [Primarius' bookkeeper].  You should have enough time to liquidate names in an orderly manner by the end of June.  Also, if we will be receiving securities we will need to know ahead of time.

88.    Defendants' conspiratorial misconduct with respect to OPLK directly and proximately caused Plaintiffs to incur substantial damages, in an amount to be proven at trial.

89.    Defendants' conspiratorial misconduct with respect to OPLK also greatly harmed all four Primarius Funds by negatively affecting their short-term performance, thereby causing investors to lose confidence in, and divest from, the funds, and potential investors not to make investments they would otherwise have made.  Primarius China alone was down by 5.50% in May 2006, 5.67% in June 2006 and 10.99% in July 2006.

90.    Plaintiffs are currently unable to provide greater detail concerning Defendants' holdings and trades in OPLK because Defendants have failed to make the relevant, required SEC filings since December 2005.

### 4.    LSB Industries, Inc. (LXU) - 10b-5, Fraud  and Fiduciary Breach

91.    After Lin discovered McCarthy's wrongdoing with respect to OPLK, he confronted McCarthy about his failure to disclose the Jayhawk Funds' sales of that stock.

McCarthy promised Lin that he would be more forthcoming in the future, but soon broke his promise in his dealings with the stock of LSB Industries, Inc. ("LSB").

92.    LSB, whose common stock is traded as LXU on the American Stock Exchange, is a corporation based in Oklahoma and engaged in the chemical and also air conditioning, heating and climate control businesses.

93.    As detailed below, McCarthy, fraudulently, in breach of Defendants' fiduciary duties, and solely to benefit Defendants, advised Plaintiffs to hold their LXU positions when LXU's price was falling, then advised Plaintiffs to sell LXU when its price had bottomed out, while conspiring with various Jayhawk entities to make trades inconsistent with the advice he was giving Plaintiffs, all to Defendants' benefit and Plaintiffs' great detriment.

94.    At all relevant times, Partners, Focus and Offshore Partners held substantial positions in LXU.

95.    Plaintiffs are informed and believe, and on that basis allege, that, at all relevant times, certain Defendants collectively owned approximately 10% of the outstanding shares of LXU and were hence "insiders" of LSB.

96.    For more than two years, between 2003 and December 2005, McCarthy, acting in his capacity as advisor to Partners and Focus, repeatedly and consistently made favorable statements, orally and in writing, regarding LXU and encouraged Partners and Focus to retain and increase their LXU positions.  In fact, to this day, McCarthy continues to "pump" this stock.

97.    For example, in an email message to Lin of August 15, 2003, McCarthy stated, "may be somne [sic] good things happening at lsbd," *i.e.,* at LSB.

98.    Partners, Focus and Offshore Partners bought LXU during this period at prices exceeding $8 per share.  By the end of 2004, Plaintiffs collectively held in excess of 400,000 shares of LXU bought on McCarthy's advice.

99.    In an email message to Lin of May 15, 2005, McCarthy wrote, "lxu did a great job on call still think we have a double/triple," *i.e.*, that the price of LXU was likely

1    to double or triple.

2        100.   In an email message to Lin of August 24, 2005, Fleischhauer, wrote to Lin:

3    Did you see JCI buy YRK for $56.50 per share in cash?  Back of the
     envelope, that is no 10X EBITDA and about 3/4 sales based on deal EV of
4    $3.2 bn.  York's margins are a fair bit lower than LXU's in this business
     and growth prospects probably not quite as strong given LXU's weighting
5    towards geothermal so LXU may deserve a premium multiple to this.  At
     10X EBITDA, LXU's climate control business is worth around $200 mm
6    (almost the total EV of the company).

7        101.   Between July and November 2005, in a generally rising market, LXU

8    dropped  from  approximately  $7.30  per  share  to  approximately  $5.00  per  share.

9    McCarthy repeatedly advised Partners and Focus to hold their LXU shares.

10        102.   Plaintiffs held their LXU positions and did not sell them during this period

11    solely  on  the  basis  of  McCarthy's  misleading,  deceptive  advice,  and,  as  a  result,

12    sustained significant losses.

13        103.   Plaintiffs are informed and believe, and on that basis allege, that McCarthy

14    advised them to hold their shares of LXU solely to benefit Defendants.  LXU is a

15    relatively illiquid security and both Plaintiffs and Defendants held significant positions.

16    Defendants could not sell their LXU shares because of a "lock-up" provision of the

17    transaction pursuant to which those shares had been acquired.  Had McCarthy properly

18    advised Plaintiffs to sell their LXU holdings, this would have further depressed LXU's

19    price, to the detriment of Defendants, the value of whose holdings would have declined.

20    In so doing, McCarthy breached his fiduciary duty to Plaintiffs by placing his own

21    interests, and those of Defendants, ahead of Plaintiffs'.

22        104.   During the fall of 2005, McCarthy began to change his LSB tune.  In an

23    email message to Lin of November 7, 2005, McCarthy wrote, "i like the preferred [stock]

24    much more than the common [*i.e.*, LXU] – i am sick of dealing with these guys," "these

25    guys" being LSB's management.

26        105.   McCarthy began recommending that Partners and Focus sell a substantial

27    proportion of their LXU positions.  In an email message to Lin of December 7, 2005,

28    McCarthy wrote, "if i do not get some resolution this week or next – i will sell some

27

1  common after my lock up date in late dec." Lin took this to mean that Defendants
2  intended to sell LXU as soon as possible and as a recommendation, made in McCarthy's
3  capacity as an investment advisor to Plaintiffs, that Partners and Focus should do the
4  same.

5      106.   McCarthy made his recommendation that Partners and Focus should sell
6  LXU with knowledge that he was providing misleading advice, and in conspiracy with
7  those Jayhawk entities that held LXU, for the purpose of deceiving Partners and Focus
8  and inducing them to rely on that advice and sell LXU.  As part of the conspiracy,
9  Defendants made the misrepresentation that they intended to sell LXU with knowledge
10 of the falsity of this statement and for the purpose of deceiving Partners, Focus and
11 Offshore Partners and inducing them to rely on that statement and sell LXU.

12     107.   Partners, Focus and Offshore Partners reasonably relied on McCarthy's
13 deceptive, misleading advice and Defendants' misrepresentation with respect to their
14 intentions and sold a significant portion of their LXU shares at the end of 2005 at
15 approximately $5 per share, realizing a huge loss, expecting Defendants to also sell at
16 or around the same time, based on McCarthy's representations.  Partners', Focus' and
17 Offshore Partners' losses were a direct and proximate result of McCarthy's and
18 Defendants' fraud and breaches of fiduciary duty.

19     108.   Contrary to McCarthy's representations to Partners and Focus, however,
20 Defendants conspired among themselves not to sell any, and sold none of their LXU
21 shares.  In fact, in the one- to three-month period following Partners', Focus' and
22 Offshore Partners' sales of their LXU shares, Defendants, again acting in furtherance of
23 their conspiracy, held or increased their LXU positions according to the relevant SEC
24 filings.  McCarthy's decision to increase the Jayhawk Funds' LXU positions was no
25 mere change of mind which McCarthy simply neglected to communicate, but a
26 deliberate, and successful, attempt to defraud Plaintiffs.  Based on a review of written
27 materials from the University of Kansas, a client of McCarthy's, Plaintiffs are informed
28 and believe, and on that basis allege, that at the same time when he was recommending

**First Amended Complaint**

1  that Plaintiffs should *sell* LXU, McCarthy was advising the university to **buy** it.  From

2  its low point, when the Primarius Funds sold, LXU's price tripled over the succeeding

3  12 months.

4       109.  McCarthy appears to have deliberately provided Plaintiffs with deceptive

5  advice, and certainly misrepresented Defendants' intentions with respect to LXU.  In

6  essence, McCarthy advised Plaintiffs to **hold** their LXU positions while the prices were

7  falling, and then to *sell* when LXU bottomed out and began to rebound.  As already

8  explained, McCarthy's "hold" advice benefitted Defendants by preventing the further

9  erosion of LXU's price, and hence the value of Defendants' positions in LXU, that

10  would have resulted from Plaintiffs liquidating their holdings. McCarthy's "sell" advice

11  when LXU was at or near its nadir also benefitted Defendants by placing more shares

12  into the market at a time when Defendants, as they had planned and conspired to do,

13  were buying.  As an insider of LSB, McCarthy was no doubt privy to information

14  sufficient to allow him to predict the market trajectory of LXU with far greater accuracy

15  than Plaintiffs, and McCarthy appears to have used that information to benefit

16  Defendants, to the great detriment of Plaintiffs.

17       110.  Since Partners', Focus' and Offshore Partners' sales of LXU, LXU's price

18  increased from approximately $5 per share to a high of approximately $22, to the great

19  benefit of Defendants.

20       111.  Plaintiffs did not feel comfortable re-acquiring LXU during this period.

21  Defendants' antics with respect to the stocks had become obvious, and Defendants were

22  still insiders of LSB and therefore in a position to work more mischief.  Having already

23  suffered grave damage as a result of Defendants' wrongdoing in connection with this

24  stock, and given that Defendants remained in a position from which they could cause

25  additional harm in the future, Plaintiffs concluded that LXU was simply too risky an

26  investment.

27       112.  Had McCarthy not recommended that Partners and Focus sell LXU, and had

28  Defendants not misrepresented to Partners and Focus that they should sell LXU,

1    Partners, Focus and Offshore Partners would not have done so.   Defendants'
2    conspiratorial wrongdoing with respect to LXU directly and proximately caused these
3    funds to incur substantial damages, in an amount to be proven at trial.

4         113.   Defendants' conspiratorial wrongdoing with respect to LXU also damaged
5    Plaintiffs by negatively affecting their performance during the relevant period.   Absent
6    Defendants' conspiratorial misconduct with respect to LXU alone, the performance of
7    Focus, Partners and Offshore Partners would have been 40-80% better than it actually
8    was.   As a result, investors pulled out of the Primarius Funds, and prospective investors
9    declined to invest.

10        114.   Plaintiffs are informed and believe, and on that basis allege, that Defendants
11    have failed to make certain required filings with the SEC with respect to LXU, and have
12    done so in furtherance of their conspiracy against Plaintiffs and to conceal their activities
13    from the markets and the regulatory authorities.

14        **5.    Sinovac (SVA) - Fiduciary Breach and Front-Running**

15        115.   Sinovac Biotech Ltd., also known in China as Beijing Kexing Bioproducts
16    ("Sinovac"), is a Chinese company in the business of manufacturing hepatitis, avian flu
17    and other vaccines.   It is traded on the American Stock Exchange under the symbol SVA.

18        116.   As detailed below, Defendants, conspiring among themselves, unlawfully
19    manipulated the market for SVA in an attempt to keep SVA's price down for the purpose
20    of pressuring SVA's management into entering into a private investment deal, thereby
21    depressing the value of Plaintiffs' SVA holdings, and/or preventing those holdings from
22    attaining the value they would have but for Defendants' wrongdoing. Defendants, again
23    conspiring among themselves, then committed front-running against Primarius China in
24    connection with a redemption request made to that fund by Jayhawk China.

25        117.   Plaintiffs introduced Defendants to SVA in or around the fall of 2005.

26        118.   McCarthy viewed Sinovac favorably and encouraged Lin to speak with
27    certain venture capital associates of McCarthy. McCarthy's goal was to assemble a group
28    of venture capital associates and negotiate a private investment in public equity ("PIPE")

**First Amended Complaint**

in Sinovac. In a PIPE, the company offers a block of publicly traded securities to a private investor, typically at a discount from the market price. The PIPE benefits the company by permitting it access to quick cash with reasonable transaction costs. The PIPE benefits the private investor by enabling him to acquire the stock at a lower than market price and to purchase a substantial block of the stock without having to "chase" a market price rising because of his purchases.

119.    An email message from Joe Anderson of Abingworth Management, Ltd. to McCarthy of October 10, 2005, which was copied to Lin, states, "it is clear the company [SVA] has to raise money soon to fund the expansion of production facilities. Could be a good PIPE opportunity for Abingworth/Jayhawk?"

120.    Another email message from Anderson to McCarthy of October 13, 2005 evidences the plan to keep SVA's price low, expressing the desire to "control any financing" or "pick up stock in the open market before it runs away." SVA's price on that date was $6.10.

121.    In another email message of January 27, 2006, Anderson wrote, "Maybe this could be one for us to look at jointly – possibly a PIPE."

122.    On January 27, 2006, McCarthy sent an email message to Lin asking if Lin had received Anderson's email message and stating, "he is interested in SVA again."

123.    From speaking with other SVA shareholders and Sinovac's investor relations officer, Lin determined that Sinovac's management was not interested in the PIPE McCarthy was proposing, and Lin gave this information to McCarthy during this period.

124.    McCarthy, however, refused to take "no" for an answer. In an email message to Lin of April 5, 2006, he wrote, "Joe had a deal with us Texas Pacific – Kleiner Perkins and Abbingworth [sic] to do 25 million – at the last minute First Boston has been saying the co changed its mind and is not going ahead . . . we have no alligience [sic] to First Boston – let's do the deal direct."

125.    Plaintiffs are informed and believe, and on that basis allege, that throughout

31

this period, Defendants, conspiring among themselves and with their allies, were knowingly spreading inaccurate rumors within the relevant investment community that SVA was looking to do a PIPE, which rumors were intended to, and did depress the price of SVA.  Investors would be less likely to purchase SVA on the open market if they expected that at any moment that market might be flooded with large numbers of new shares issued pursuant to a PIPE.  Defendants' purpose in doing this was to induce SVA's management to agree to the PIPE McCarthy desired, and Defendants' actions in this regard were willful.

126.   Defendants' improper manipulation of the market for SVA during this period obviously harmed Plaintiffs by depressing the value of their holdings of SVA and/or limiting any increase in that value that might have occurred absent McCarthy's wrongdoing.

127.   In or around early April 2006, McCarthy appears to have finally accepted that Sinovac was not going to deal with him in the short term and caused Jayhawk China to purchase a substantial position in SVA in the open market.

128.   By early May 2006, SVA had risen to approximately $5 from approximately $4.  Defendants, however, did not leave SVA alone for long.  By mid-May 2006, they were at it again.  An email message from Joe Anderson to McCarthy of May 18, 2006 states, "They [SVA] dumped Credit Suisse as agent, but if this is a go now, I am sure we could revive interest in a private syndicate with Abingworth, Jayhawk, Kleiner and Texas Pacific (Group)."

129.   At or around this time, Defendants, acting in conspiracy, began dumping large quantities of SVA on the market for two reasons:  first, to again depress SVA's price in an effort to pressure the company's management into doing a deal with McCarthy and his allies, and, second, as described below, in connection with Jayhawk China's redemption request to Primarius China.

130.   On May 15, 2006, as described in greater detail below, Jayhawk China requested withdrawal of approximately $19 million of the approximately $29 million it

1    had invested in Primarius China.

2    131.    Defendants knew that, to pay this redemption, Primarius China would either

3    have to raise cash by liquidating a substantial proportion of its portfolio, including at

4    least a substantial proportion of its position in SVA, transfer to Jayhawk China large

5    numbers of shares of securities held by Primarius China including shares of SVA, or

6    both.  Defendants knew the extent of Primarius China's SVA holdings because of the

7    transparency right they had with respect to that fund.

8    132.    At or around the time of making the redemption request, and without

9    informing Lin, Primarius or Primarius China, Defendants, again acting in furtherance of

10   their conspiracy to use Plaintiffs to benefit themselves, began dumping huge numbers

11   of shares of SVA on the market, depressing the price of SVA from just under $5 on or

12   about May 5, 2006 to $1.95 on or around July 11, 2006.  Defendants' conspiratorial

13   actions in this regard constituted front-running and a breach of the fiduciary duties they

14   owed to Plaintiffs.

15   133.    Defendants' conspiracy had at least two goals.  First, Defendants anticipated

16   that Primarius China would have to liquidate substantial numbers of shares of SVA to

17   pay Jayhawk China's redemption request, which liquidation Defendants also knew would

18   depress SVA's market price.  By front-running Primarius China and breaching their

19   fiduciary duties to that fund, Defendants were able to sell their SVA shares at a higher

20   price than they would have been able to obtain had they waited for Primarius China to

21   sell.  Should Primarius China choose to pay Jayhawk China's redemption in securities

22   rather than cash, Jayhawk China would obviously receive more shares of SVA from

23   Primarius China were Defendants first to depress SVA's price by dumping great

24   quantities of their own SVA shares.  They could then also buy back the shares they had

25   dumped at bargain prices.

26   134.    Second, Defendants knew that depressing SVA's price would make the offer

27   of Defendants and their venture capitalist allies more attractive to Sinovac's

28   management.

135.   That Defendants were abusing their transparency right in Primarius China to monitor that fund's trading activities so as to be able to front-run Primarius China is evidenced by an email message of May 15, 2006 to Lin from Fleischhauer stating:

> I notice that you have not started raising any cash in Primarius China Fund. We have given notice on the redemption and Mike Schmitz [of Jayhawk] has sent the notice to Hedgeworks [Primarius' bookkeeper]. You should have enough time to liquidate names in an orderly manner by the end of June. Also, if we will be receiving securities we will need to know ahead of time.

136.   As a direct and proximate result of Defendants' conspiratorial misconduct with respect to SVA, Plaintiffs collectively have incurred substantial damages, in an amount to be proven at trial.

137.   Defendants' conspiratorial misconduct with respect to SVA also greatly harmed all four Primarius Funds, as well as Primarius, by negatively affecting their short-term performance, thereby causing investors to lose confidence in, and divest from, the funds, and potential investors not to make investments they would otherwise have made.  Primarius China alone was down by 5.50% in May 2006, 5.67% in June 2006 and 10.99% in July 2006. Losses caused by Defendants' misconduct with respect to SVA constituted approximately 4% of Primarius China's value.  Focus lost approximately 1.5% of its value and Partners and Offshore Partners similarly were harmed.

138.   Plaintiffs are currently unable to provide greater detail concerning Defendants' holdings and trades in SVA because Defendants have failed to make the relevant, required SEC filings since December 2005.

## 6.   Linktone (LTON) - Fraud, Fiduciary Breach and Front-Running

139.   Linktone Ltd. ("Linktone") is a Chinese company based in Shanghai and engaged in the business of selling wireless, value-added services such as ring tones and weather forecasts for use with mobile telephones. Linktone trades on NASDAQ under the symbol LTON.

140.   As detailed below, Defendants, in breach of their fiduciary duties, and as part of a conspiracy, dumped huge numbers of LTON shares on the market without

34

informing Plaintiffs, thereby greatly depressing LTON's trading price and hence the value of Plaintiffs' own LTON positions. To benefit Defendants, and in furtherance of the conspiracy, McCarthy then fraudulently misrepresented to Plaintiffs that he did not know why LTON's price was falling, when he actually knew full well that Defendants were responsible, causing Plaintiffs to retain their LTON positions, which they would have liquidated had they known the truth. Finally, in furtherance of the conspiracy, Defendants committed front-running against Primarius China in connection with a redemption request made to that fund by Jayhawk China.

141.   Beginning in 2005 and extending through January 2006, Primarius China, Partners, Focus and Offshore Partners held substantial positions in LTON.

142.   During the same period, Jayhawk China also held a substantial position in LTON.   In fact, according to the relevant SEC filings, Jayhawk China owned approximately 2 million shares of LTON, or roughly 7.8% of Linktone's outstanding shares.

143.   Throughout 2005, McCarthy, acting as an advisor to Primarius China, Partners and Focus, repeatedly and consistently made favorable statements, orally and in writing, regarding LTON and encouraged Partners and Focus to retain and increase their LTON positions.

144.   In an email message to Lin of June 16, 2005, McCarthy wrote, "been buying more lton."

145.   In an email message to Lin of November 12, 2005, McCarthy wrote, "linktone – i feel like they may surprise everybody when they report in a couple of weeks both in sales and earnings, and outlook – stock is very cheap – tomo [another company in the same sector as Linktone] have a big run."  McCarthy's reference to tomo's "big run" implied that the same was likely to happen with LTON.

146.   On or about January 20, 2006, Lin received a voice mail message from the CEO of Linktone.  In his message, the CEO told Lin he had spoken with McCarthy and provided McCarthy with certain information concerning the company's performance.

1    147.   The next day, Lin spoke with McCarthy on the telephone.  McCarthy, who

2    had been "pumping" LTON to Plaintiffs for the past four months and consistently

3    advising them to buy LTON, gave Lin no indication that Defendants intended to sell any

4    of their shares of LTON.  At that point, LTON's price was over $10 per share.  McCarthy

5    made his "pumping" statements and advised Plaintiffs to hold and/or increase their

6    LTON positions knowing that the Jayhawk entities that held LTON intended to sell large

7    quantities of their shares, and as part of a conspiracy with those Jayhawk entities to

8    deceive Plaintiffs into holding their LTON positions.

9    148.   Over the succeeding several days, LTON's price per share fell from

10   approximately $10 to approximately $8.50.

11   149.   Lin asked McCarthy, Plaintiffs' investment advisor, why LTON's price was

12   falling.  McCarthy responded that he had no idea.  This was a blatant misrepresentation.

13   As McCarthy would confess to Lin approximately one week later, and as McCarthy

14   knew full well at the time of Lin's inquiry, LTON's price was falling because

15   Defendants, which collectively held a substantial proportion of LTON's outstanding

16   shares, had been dumping large numbers of those shares on the market.   Plaintiffs

17   reasonably relied on McCarthy's misrepresentation and held their LTON positions, to

18   their great detriment.  Had McCarthy informed Lin that Defendants intended to dump

19   their LTON shares or that they were doing so, Plaintiffs would have sold their LTON as

20   well, knowing that Defendants' trading would depress LTON's price.  The reason for

21   McCarthy's misrepresentations, and the purpose of the conspiracy among Defendants

22   with respect to LTON, is obvious – had Plaintiffs known the truth and sold their LTON

23   too, the price Defendants would have been able to obtain for their shares would have

24   been lower.  Defendants' dumping of LTON in this fashion without informing Plaintiffs

25   of their intention, or of the trading itself, constituted both fraud and a breach of

26   Defendants' fiduciary duties to Plaintiffs.

27   150.   Soon thereafter, on the morning of February 1, 2006, before the markets

28   opened, LTON released its quarterly performance figures, which were below projections.

36

1    Consequently, contrary to McCarthy's advice and predictions, LTON's per share price

2    fell an additional 20%, to approximately $6.75 that week.

3        151.    In an email message to Lin later on February 1, 2006, McCarthy wrote, with

4    respect to LTON, "i am buying," indicating that he and the Jayhawk entities with whom

5    he was conspiring, intended to repurchase the LTON shares they had just sold at between

6    $8.50 and $10 for the much lower price occasioned by the negative quarterly figures.

7        152.    Defendants performed their "dump and buy" pirouette in total disregard for

8    the substantial harm it predictably did to Plaintiffs.

9        153.    Plaintiffs are informed and believe, and on that basis allege, that

10    Defendants, conspiring among themselves, sold LTON, on inside information, believing

11    that Plaintiffs would sell substantial numbers of their LTON shares once the unfavorable

12    quarterly report was released, thereby front-running Plaintiffs.    These sales by

13    Defendants in anticipation of sales by Plaintiffs also constituted a breach of Defendants'

14    fiduciary duty not to use their transparency rights to the detriment of Plaintiffs.

15        154.    Defendants also conspired to commit front-running against Primarius China

16    and breached their fiduciary duties to that fund with respect to certain LTON trades in

17    connection with certain redemption requests.  On May 15, 2006, as described in greater

18    detail below, Jayhawk China requested withdrawal of approximately $19 million of the

19    approximately $29 million it had invested in Primarius China.

20        155.    Defendants knew that, to pay this redemption, Primarius China would either

21    have to raise cash by liquidating a substantial proportion of its portfolio, including at

22    least a substantial proportion of its position in LTON, transfer to Jayhawk China large

23    numbers of shares of securities held by Primarius China including shares of LTON, or

24    both.  Defendants knew the extent of Primarius China's LTON holdings because of the

25    transparency right they had with respect to that fund.

26        156.    At or around the time of making the redemption request, and without

27    informing Lin, Primarius or Primarius China, Defendants, again in furtherance of their

28    conspiracy to use Plaintiffs to benefit themselves, began dumping huge numbers of

**First Amended Complaint**

shares of LTON on the market for the second time in less than five months.  In an email message to Lin of May 18, 2006, McCarthy wrote, with respect to LTON, "i am out." But Defendants clearly wanted Plaintiffs to hold *their* LTON shares; in the same May 18, 2006 email message, McCarthy advised Plaintiffs that "lton will go to 11."  Instead of "going to 11," however, because of Defendants' conspiratorial dumping of their LTON shares, LTON's price fell from approximately $7.50 on May 15, 2006 to approximately $3.70 on or around August 11, 2006.  With Defendants thus having cratered the price of LTON, Jayhawk China then informed Lin that it would be happy to accept shares of that stock as part of the payment of its redemption request in Primarius China, shares Jayhawk China knew Primarius China held because of Defendants' transparency into Primarius China.

157.  Defendants' reasons for doing this, and the thinking underlying their conspiracy, are obvious.  Defendants anticipated that Primarius China would have to liquidate substantial numbers of shares of LTON to pay Jayhawk China's redemption request, which liquidation Defendants also knew would depress LTON's market price. By front-running Primarius China and breaching their fiduciary duties to that fund, Defendants were able to sell their LTON shares at a higher price than they would have been able to obtain had they waited for Primarius China to sell.  Should Primarius China choose to pay Jayhawk China's redemption in securities rather than cash, Jayhawk China would obviously receive more shares of LTON from Primarius China were Defendants first to depress LTON's price by dumping great quantities of their own LTON shares. They could then also buy back the shares they had dumped at bargain prices.  Defendants actions in this regard constituted front-running and a breach of the fiduciary duties they owed to Plaintiffs.

158.  That Defendants were abusing their transparency right in Primarius China to monitor that fund's trading activities so as to be able to front-run Primarius China is evidenced by an email message of May 15, 2006 to Lin from Fleischhauer stating:

/ / /

1    I notice that you have not started raising any cash in Primarius China Fund.
2    We have given notice on the redemption and Mike Schmitz [of Jayhawk]
     has sent the notice to Hedgeworks [Primarius' bookkeeper]. You should
3    have enough time to liquidate names in an orderly manner by the end of
     June. Also, if we will be receiving securities we will need to know ahead
4    of time.

5    159.   Defendants' conspiratorial misconduct with respect to LTON directly and

6    proximately caused Plaintiffs to incur substantial damages, in an amount to be proven

7    at trial.

8    160.   Defendants' conspiratorial misconduct with respect to LTON also greatly

9    harmed all four Primarius Funds as well as Primarius, by negatively affecting their short-

10   term performance, thereby causing investors to lose confidence in, and divest from, the

11   funds, and potential investors not to make investments they would otherwise have made.

12   Primarius China alone was down by 5.50% in May 2006, 5.67% in June 2006 and

13   10.99% in July 2006 largely because of Defendants' misconduct with respect to LTON,

14   which misconduct cost Primarius China approximately 7% in performance for 2006.

15   Focus', Partners' and Offshore Partners' performance was off for 2006 by approximately

16   3.5%, 2% and 2% respectively as a result of Defendants' wrongdoing with respect to

17   LTON.

18   161.   Plaintiffs are currently unable to provide greater detail concerning

19   Defendants' holdings and trades in LTON because Defendants failed to make the

20   relevant, required SEC filings in December 2005 and, Plaintiffs are informed and

21   believe, and on that basis allege, have also failed to make certain other required filings

22   since. These omissions are consistent with Defendants' pattern of deceit, fraud and

23   fiduciary breaches with respect to Plaintiffs and evidence a practice of hiding their

24   actions from the markets and regulatory authorities.

25   **7.   51job Inc. (JOBS) – Breach of Fiduciary Duty**

26   162.   51job Inc., traded on NASDAQ as JOBS, is a Cayman Islands corporation

27   engaged in the business of providing integrated human resources services in China.

28   163.   During 2005 and 2006, the Primarius Funds held substantial positions in

JOBS.  In early 2005, Lin and McCarthy discussed selling JOBS short, which Lin did for more than a year.  Investors typically take a short position in a security if they believe its value will decrease.  Although Defendants also sold JOBS short, they "covered," which means they mitigated the risk of shorting by buying long the amount of shares shorted.  In breach of his fiduciary duties as the Primarius Funds' investment advisor and research analyst, however, McCarthy never disclosed to Plaintiffs that Defendants had "covered" their short positions in JOBS.  In mid-2006, the price of JOBS increased and, as a result of their short positions, the Primarius Funds incurred significant losses – losses Defendants avoided because they had "covered" their short positions.

164.   Had McCarthy informed Plaintiffs that he believed it would be prudent to cover their short positions in JOBS as Defendants had, they would have done so, thereby avoiding significant losses, in an amount to be proven at trial.

### 8.   Netease.com Inc. (NTES) – Breach of Fiduciary Duty

165.   Netease.com Inc., traded on NASDAQ as NTES, is a Cayman Islands corporation engaged in the business of providing an Internet "community" for Chinese users.

166.   During 2005 and 2006, the Primarius Funds held positions in NTES. In late 2005, Primarius China was "long" in NTES, meaning that Lin anticipated that NTES would increase in value.  During this period, however, knowing by virtue of Defendants' transparency into the Primarius Funds that those funds held long positions in NTES, Defendants took short positions in NTES.  In breach of his fiduciary duties as the Primarius Funds' investment advisor and research analyst, however, McCarthy never disclosed to Plaintiffs that Defendants had taken short positions in NTES in late 2005.  From late 2005 into early 2006, NTES' price declined and, because of their short positions, the Jayhawk Funds realized significant profits.

167.   Had McCarthy complied with his fiduciary duties to Plaintiffs and informed them that he believed it would be prudent to take short positions in NTES, instead of simply bragging about Defendants' profits after the fact, Plaintiffs would have also taken

40

short positions, and realized significant gains. Instead, they suffered significant losses in an amount to be proven at trial.

### 9. China Security & Survey Technology (CSCT) – Fiduciary Breach

168.    China Security & Survey Technology, traded on NASDAQ as CSCT, is a Delaware corporation engaged in the business of manufacturing security and surveillance systems through its subsidiaries.

169.    During early to mid-2006, Defendants were aware that CSCT was contemplating a PIPE. Plaintiffs are informed and believe, and on that basis allege, that Defendants benefitted from this PIPE.

170.    In breach of his fiduciary duties as the Primarius Funds' investment advisor and research analyst, however, McCarthy never disclosed the PIPE opportunity to Plaintiffs, instead keeping the opportunity for Defendants. CSCT's stock subsequently increased in price from approximately $5 at the time the PIPE was completed to more than $15 as of April 2007. CSCT's price is currently approximately $13.

171.    Had McCarthy complied with his fiduciary duties to Plaintiffs and informed them of the PIPE opportunity, Plaintiffs would have taken advantage of it and realized profits, as did Defendants, in an amount to be proven at trial.

### Jayhawk China's Redemption Request from Primarius China

172.    Jayhawk China is a limited partner of Primarius China and the owner of a capital account with assets that were valued as of June 30, 2006 at approximately $29 million.

173.    The aggregate value of assets held by Primarius China as of June 30, 2006 was approximately $35 million.

174.    The capital account of Jayhawk China, therefore, constituted more than 80% of the aggregate value of Primarius China.

175.    Primarius China is governed, and the rights and duties of its general and limited partners determined, by the Primarius China Fund LP Limited Partnership Agreement (the "Primarius China Agreement") and the Primarius China Fund

41

Confidential Private Placement Memorandum (the "Primarius China PPM"), true and correct copies of which are appended to this Complaint as Exhibits C and D respectively and are incorporated fully herein by this reference.

176.   Article VI, paragraph 6.1(a) of the Primarius China Agreement (Exhibit C at pp. 12-13) provides in pertinent part:

> [N]o Limited Partner or Assignee shall be entitled to withdraw any amount from, or receive the fair value of any portion of, any Capital Account of such Limited Partner or Assignee, except to the extent (i) such right is described in the Memorandum in effect at the time such Capital Account was established pursuant to this Agreement, or the General Partner, in its sole and absolute discretion, has agreed to a Substitute Withdrawal Arrangement with such Limited Partner or Assignee with respect to such Capital Account; (ii) the General Partner, in its sole and absolute discretion, permits such withdrawal; or (iii) such Limited Partner is entitled to receive distributions in connection with the winding up of the Partnership as provided in Article XI.

177.   The "Memorandum" referred to in Article VI, paragraph 6.1(a) of the Primarius China Agreement is the Primarius China PPM.

178.   Article VI, paragraph 6.1(e) of the Primarius China Agreement (Exhibit C at pp. 13-14) provides in pertinent part:

> Notwithstanding any other provision of this Agreement, the General Partner may suspend withdrawals and/or payments due to Limited Partners and Assignees in connection with withdrawals for the whole or any part of any period during which:
>
> (i) the General Partner determines that: (A) effecting such withdrawals or making such payments would . . . have a material adverse effect on the Limited Partners generally; . . . or (C) circumstances exist as a result of which it is not reasonably practicable for the Partnership to realize on the value of a material portion of its assets . . ..

179.   Section 6 of the Primarius China PPM (Exhibit D at pp. 22, 23 and 24) provides in pertinent part:

> Subject to a one-year "lock-up" commencing on the date a capital contribution is credited to a Limited Partner's Capital Account, a Limited Partner may withdraw all or any part of the balance of such Capital Account as of the last day of any calendar quarter, upon not less than 45 days prior written notice to the General Partner.
>
> * * *
>
> The General Partner may agree to a different withdrawal arrangement in respect of any Capital Account of a Limited Partner in its discretion.  This

42

will not entitle the Limited Partner that holds such Account, or any other Limited Partner, to such a different arrangement in respect of any other Capital Account. The General Partner also has the discretion to grant a Limited Partner the right to withdraw amounts from a Capital Account at a time that differs from, or upon a notice period shorter than, the time and notice period described above. This will not entitle the Limited Partner that holds such an Account, or any other Limited Partner, to such a right in respect of any other Capital Account.

* * *

While the Fund expects to distribute cash to Limited Partners in respect of their withdrawals, there can be no assurance that the Fund will have sufficient cash to satisfy withdrawal requests, or that it will be able to liquidate investments at the time of such withdrawal requests at favorable prices. Under the foregoing circumstances or the circumstances described below under "Suspension of Withdrawals and Withdrawal Payments," the Fund may make "in kind" distributions of its portfolio securities, or distributions consisting of a combination of cash and portfolio securities, to satisfy withdrawal requests. To the extent the Fund makes "in kind" distributions, it will allocate such distributions among the holders of the Capital Accounts entitled thereto such that each such holder shall, except for immaterial variances, receive a *pro rata* portion thereof. Securities distributed "in kind" may not be readily marketable or saleable and may have to be held by the Limited Partners who receive them for an indefinite period of time.

* * *

The General Partner may suspend withdrawals and/or payments due to Limited Partners in connection with withdrawals for the whole or any part of any period during which the General Partner reasonably determines that: (A) effecting such withdrawals, or making such payments would . . . have a material adverse effect on the Limited Partners generally; . . . or (C) circumstances exist as a result of which it is not reasonably practicable for the Fund to realize on the value of a material portion of its assets. The General Partner may also suspend withdrawals and/or payments due to Limited Partners in connection with withdrawals in order for the Fund to effect the orderly liquidation of its assets necessary to effect withdrawals.

180. The Primarius China Agreement at p. A-6 defines "Notification" in pertinent part as follows:

**Notification**" to a Person - a written notice that is deemed to be duly given to such Person on the date of delivery if delivered in person to such Person or sent to such Person by confirmed facsimile transmission or reputable overnight courier, or on the earlier of actual receipt or three (3) Business Days after the date of mailing if mailed to such Person by registered or certified mail (first class postage prepaid, return receipt requested); *provided however*, that: (i) a Notification to the Partnership shall be deemed to be duly given to the Partnership only upon its actual receipt by the Partnership . . . Any Notification required or permitted to be given to a Partner shall be sent to such Partner at such address or to such facsimile

43

number as such Partner may notify the Partnership by way of a Notification
. . .. [Emphasis in original.]

181.   The Primarius China Agreement at p. A-6 defines "Person" as "any natural person, whether acting in an individual or representative capacity, or any Entity.

182.   The Primarius China Agreement at p. A-3 defines "Entity" as follows:

any domestic or foreign corporation, partnership (whether general or limited), joint venture, limited liability company, business trust or association, trust, estate, unincorporated association or organization, custodian, government (or political subdivision, department or agency thereof), cooperative or other entity, whether acting in an individual or representative capacity.

183.   The Primarius China Agreement at p. A-6 defines "Partner" as "the General Partner, each Additional General Partner and each Limited Partner."

184.   On May 15, 2006, Michael D. Schmitz ("Schmitz"), Jayhawk's CFO wrote to Stephen Douglas of HedgeWorks, LLC ("HedgeWorks"), Primarius' administrator and bookkeeper, stating that Jayhawk China "would like to make a redemption of its interests in the [China] Fund that are in excess of $10,000,000 USD as of June 30, 2006 . . .."

185.   In an e-mail message of July 5, 2006 to Lin, Mark Fleischhauer of Jayhawk stated, "WE ARE NOW MAKING A FULL REDEMPTION REQUEST WITH RESPECT TO OUR INVESTMENT IN PRIMARIUS CHINA FUND."  [Emphasis in original.]

186.   In a letter of July 11, 2006 to Lin, Schmitz wrote:

This is notification that [Jayhawk China] would like to make a full redemption of its capital interests in the [China] Fund as of September 30, 2006. This is in addition to the June 30, 2006 redemption request and does not change the terms of that request, but is designed to request a withdrawal of whatever Jayhawk capital interests remain in the [China] Fund as of September 30, 2006.

187.   Shortly after receiving Jayhawk China's redemption requests, Primarius determined that, due to prevailing market conditions and the size of the requested withdrawals relative to the aggregate value of Primarius China's assets, pursuant to Article VI, paragraph 6.1(a) of the Primarius China Agreement and Section 6 of the

44

Primarius China PPM, effecting the withdrawals and making the payments Jayhawk China sought would have a material adverse effect on Primarius China and its limited partners generally and that circumstances existed as a result of which it was not reasonably practicable for Primarius China to realize on the value of a material portion of its assets in connection with Jayhawk China's requested withdrawals.

188. Primarius crafted a schedule of payments of Jayhawk China's requested withdrawals pursuant to which Jayhawk China would have received $4 million in cash and/or securities immediately, $1 million in cash and/or securities as of July 31, 2006, $1 million in cash and/or securities as of August 31, 2006, and the balance of Jayhawk China's capital account in Primarius China as of the earlier of December 31, 2006 (subject to standard processing procedures, with actual payment estimated to occur in mid-January 2007); or (2) as soon as possible after such date as Primarius, using reasonable diligence, secured investment to replace Jayhawk China's position in Primarius China.

189. Jayhawk China rejected this schedule, demanded payment of the entire balance of Jayhawk China's capital account and repeatedly threatened Primarius and Primarius China with litigation if its demands are not met.

190. On or about October 18, 2006, Primarius transferred to Jayhawk China $5,710,296 in cash towards its requested redemption in Primarius China.

191. On or about November 15, 2006, Primarius transferred to Jayhawk China an additional $4,827,332 in cash towards its requested redemption in Primarius China.

192. On or about December 29, 2006, Primarius transferred to Jayhawk China an additional approximately $3.3 million towards its requested redemption in Primarius China.

193. After analyzing the damage caused to Primarius China, Partners and Focus by certain unfair, unlawful activities of Defendants detailed herein, including without limitation front-running, provision of fraudulent investment advice and other material misrepresentations and numerous breaches of fiduciary duties, Primarius decided to

make no further payments to Jayhawk China towards its requested redemption in Primarius China and to hold the amount of Jayhawk China's remaining interest in Primarius China in escrow pending the outcome of this action and to request that the Court hold such funds a proper offset against damages owed to Plaintiffs resulting from the misconduct described herein.

## FIRST CAUSE OF ACTION

### Section 10(b) of the Exchange Act and Rule 10b-5

(Against All Defendants)

194.    Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 193 above, as if fully set forth herein.

195.    Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, and by use of a means or instrumentality of interstate commerce, the mails or a facility of a national securities exchange, have

(a)    employed a device, scheme or artifice to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices and/or courses of business which operated or would operate as a fraud or deceit upon any person.

196.    As a direct and proximate result, Plaintiffs, and each of them, have suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### Section 206 of the Investment Advisers Act

(Against McCarthy)

197.    Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 196 above, as if fully set forth herein.

198.    McCarthy was, at all relevant times, an "investment adviser" within the

46

**First Amended Complaint**

meaning of section 202(11) of the Investment Advisers Act, 15 U.S.C. § 80b-6(11), in that he, for compensation, engaged in the business of advising others, either directly or through publications or writings, as to the value of securities and/or as to the advisability of investing in, purchasing, or selling securities.

199.   In his capacity as an investment adviser, McCarthy:

(a)     employed devices, schemes and artifices to defraud Plaintiffs;

(b)     engaged in transactions, practices and courses of business which operated as a fraud and/or deceit on Plaintiffs; and

(c)     engaged in acts, practices and/or courses of business which were fraudulent, deceptive and/or manipulative.

200.   Because of McCarthy's acts described above, Plaintiffs are entitled to:  (1) rescission of all agreements between them or any one of them on the one hand and McCarthy on the other for the provision of investment advice; and (2) restitution of all moneys paid to McCarthy and/or any other Defendant as consideration for all such agreements.

## THIRD CAUSE OF ACTION

## Fraud

(Against All Defendants)

201.   Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 200 above, as if fully set forth herein.

202.  As described herein, Defendants made numerous material misrepresentations with knowledge of their falsity, and/or numerous knowing, intentional omissions of fact to Plaintiffs with the intention of inducing Plaintiffs to rely upon such misrepresentations and/or omissions, Plaintiffs reasonably relied upon these misrepresentations and, as a direct and proximate result, suffered great damage.

/ / /

/ / /

/ / /

47

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FOURTH CAUSE OF ACTION

### Breach of Fiduciary Duty

(Against All Defendants)

203.   Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 202 above, as if fully set forth herein.

204.   As explained herein, Defendants owed Plaintiffs certain fiduciary duties as limited partners and/or members of, or as investment advisor to, Plaintiffs.

205.   Defendants repeatedly breached these duties, directly and proximately causing Plaintiffs to suffer great damage.

## FIFTH CAUSE OF ACTION

### Breach of Contract

(Against McCarthy)

206.   Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 205 above, as if fully set forth herein.

207.   McCarthy promised and was contractually bound to provide each of Plaintiffs Primarius, Primarius China, Focus and Partners with professional, competent good faith investment advice.

208.   Primarius, Primarius China, Focus and Partners each provided good and adequate consideration in exchange for McCarthy's promises and contractual obligations.

209.   Primarius, Primarius China, Focus and Partners each have at all times complied with each and every contractual obligation owed to McCarthy and are not in breach of any such obligation.  To the extent Primarius, Primarius China, Focus or Partners might not have performed, such performance was excused by McCarthy's breaches.

210.   McCarthy breached his contractual obligations to provide professional, competent, good faith investment advice to each of Primarius, Primarius China, Focus and Partners numerous times, as detailed in this Complaint.

48

211.   As a direct and proximate result of McCarthy's breaches, each of Primarius, Primarius China, Focus and Partners have suffered great damage.

## SIXTH CAUSE OF ACTION

### California Unfair Business Practices Act

(Against All Defendants)

212.   Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 211 above, as if fully set forth herein.

213.   As described herein, Defendants and each of them engaged in unlawful, unfair and fraudulent business acts and practices in violation of the California Unfair Business Practices Act, California Business & Professions Code § 17200, *et seq.*

214.   As a direct and proximate result of these violations, Plaintiffs and each of them suffered great damage.

## SEVENTH CAUSE OF ACTION

### Civil Conspiracy

**(Against All Defendants)**

215.   Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 214 above, as if fully set forth herein.

216.   Defendants conspired together to violate § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to commit fraud against Plaintiffs, to breach fiduciary duties to Plaintiffs and to commit violations of the California Unfair Business Practices Act, causing Plaintiffs great damage.

## EIGHTH CAUSE OF ACTION

### Declaratory Relief

(Against Jayhawk China)

217.   Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 216 above, as if fully set forth herein.

218.   An actual controversy has arisen and now exists between Primarius China and Jayhawk China concerning their respective rights and duties with respect to Jayhawk

49

China's requested withdrawals from Primarius China.  Specifically, Primarius China contends that it has the right to suspend all payment of Jayhawk China's requested withdrawals and hold any outstanding amounts that might otherwise be due on those withdrawals in escrow pending the outcome of this action, and to apply such outstanding amounts against any award made to Primarius China.  Plaintiffs are informed and believe, and on that basis allege, that Jayhawk China contends that it is entitled to a full, immediate redemption of the balance of Jayhawk China's capital accounts in Primarius China.

219.   Primarius China desires a judicial determination of its rights and duties with respect to payment of the remainder of Jayhawk China's requested withdrawals, including without limitation its right to suspend all payment of Jayhawk China's requested withdrawals and hold any outstanding amounts that might otherwise be due on those withdrawals in escrow pending the outcome of this action, and to apply such outstanding amounts against any award made to Primarius China.

220.   A judicial declaration is necessary and appropriate at this time pursuant to the facts and averments stated in this Complaint in that Primarius China's ability to manage  the winding up of that fund are significantly affected by the determination of the issue described above.

221.   Wherefore, Primarius China requests a court decree herein providing that it has the right to suspend all payment of Jayhawk China's requested withdrawals and hold any outstanding amounts that might otherwise be due on those withdrawals in escrow pending the outcome of this action, and to apply such outstanding amounts against any award made to Primarius China.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     On the First through Fifth and Seventh Causes of Action, an award of compensatory damages, together with pre-judgment interest at the maximum rate allowable by law;

50

1

2

3

   B.  On the Sixth Cause of Action, an order requiring Defendants to disgorge all sums received from Plaintiffs as a result of violations of the California Unfair Business Practices Act.

4

5

6

7

8

   C.  On the Eighth Cause of Action, a decree providing that Primarius China has the right to suspend all payment of Jayhawk China's requested withdrawals and hold any outstanding amounts that might otherwise be due on those withdrawals in escrow pending the outcome of this action, and to apply such outstanding amounts against any award made to Primarius China;

9

10

   D.  On all causes of action, an award of Plaintiffs' costs and expenses for this litigation, including reasonable attorneys' fees, expert fees and other disbursements; and

11

   E.  Such other and further relief as the Court might deem appropriate.

12

13

## DEMAND FOR JURY TRIAL

14

15

   Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury with respect to all issues so triable.

16

17

Dated:  June 11, 2007       Respectfully submitted,

18

             **FAGELBAUM & HELLER LLP**

19

20

21

         By: _____

22

           Philip Heller, PLC
           Attorneys for Plaintiffs, Primarius

23

           Capital LLC; Primarius China Fund
           LP; Primarius Focus LP; Primarius

24

           Partners LP and Primarius Offshore
           Partners Ltd.

25

26

27

28

C:\WPDATA\36184\002\Pleading\FAC\07-01804EDL FAC.wpd          **First Amended Complaint**