*Copy No:_____*                    *Furnished to:* _____

## *CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM*

# *PRIMARIUS CHINA FUND LP*

*(a Delaware limited partnership)*

### **General Partner**:

**Primarius Capital LLC**

101 California

Suite 4010

San Francisco, California 94111

NEITHER THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES REGULATORY AUTHORITY OF ANY STATE, NOR ANY OTHER REGULATORY OR SELF-REGULATORY AUTHORITY OR BODY, HAS PASSED UPON THE VALUE OF THE LIMITED PARTNERSHIP INTERESTS DESCRIBED HEREIN, MADE ANY RECOMMENDATION AS TO THEIR PURCHASE, APPROVED OR DISAPPROVED THIS OFFERING OR THE QUALIFICATIONS OF THE GENERAL PARTNER, OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM.

PURSUANT TO A RULE ADOPTED BY THE U.S. COMMODITY FUTURES TRADING COMMISSION, THE GENERAL PARTNER IS NOT REQUIRED TO REGISTER, AND IS NOT REGISTERED, WITH THE COMMISSION AS A "COMMODITY POOL OPERATOR." AMONG OTHER THINGS, THE RULE REQUIRES THE GENERAL PARTNER TO FILE A CLAIM OF RELIEF WITH THE NATIONAL FUTURES ASSOCIATION. THE RULE ALSO REQUIRES EITHER THAT THE AGGREGATE INITIAL MARGIN AND PREMIUMS REQUIRED TO ESTABLISH THE PARTNERSHIP'S FUTURES POSITIONS NOT EXCEED 5% OF THE LIQUIDATION VALUE OF THE PARTNERSHIP'S PORTFOLIO, OR THAT THE AGGREGATE NET NOTIONAL VALUE OF THE PARTNERSHIP'S FUTURES POSITIONS NOT EXCEED 100% OF THE LIQUIDATION VALUE OF THE PARTNERSHIP'S PORTFOLIO. IF THE GENERAL PARTNER DETERMINES NOT TO COMPLY WITH THAT RULE, IT MUST EITHER REGISTER WITH THE COMMISSION OR CEASE CAUSING THE FUND TO TRADE COMMODITY INTERESTS.

April 1, 2004

## INTRODUCTION AND GENERAL INFORMATION

Primarius China Fund LP (the "**Fund**") is a recently organized Delaware limited partnership whose investment objective is to generate superior long-term capital appreciation, in varying market conditions, by investing on a long basis and short basis in a select number of investments identified by Primarius Capital LLC, the Fund's general partner (the "**General Partner**").  In seeking to achieve this objective, the General Partner expects to invest the majority of the Fund's capital in publicly-traded Hong Kong and China shares (primarily Hong Kong H Shares, Hong Kong Red Chips, Chinese A and B shares, and US listed ADRs of Chinese companies) and the balance in the Taiwanese equity markets.   As described more fully herein, although the General Partner expects to focus on publicly-traded equity and equity-related securities of these types, it may pursue a diverse range of trading strategies and investments.   In addition, the General Partner may employ any number of investment techniques in implementing the Fund's investment strategy in addition to short selling, such as borrowing on margin, engaging in derivative transactions and employing arbitrage strategies.

The General Partner has overall responsibility for managing the business and affairs of the Fund and making all investment and trading decisions for the Fund.

The Fund is offering its limited partnership interests ("**Interests**") by way of this Confidential Private Placement Memorandum (which, together with its exhibits, is referred to as the "**Memorandum**"). You should not construe the contents of this Memorandum as legal, tax, financial or other advice or as a recommendation or advice in relation to the subscription, purchase, holding or disposition of an Interest. **You should consult your independent professional advisers in assessing the merits and risks of investing in the Fund.**   You and your advisers must rely on your own examination of the Fund, the Interests and the terms of this offering in assessing such merits and risks.  In doing so, you should carefully review this Memorandum and consider the following:

**An investment in the Fund should be considered speculative and involves substantial risk due to, among other things, the nature of the Fund's investment strategy and techniques, the significant fees and costs associated with such an investment and the illiquidity of Interests. You should not invest in the Fund unless you have no need for immediate liquidity with respect to your investment, are fully able to bear the financial risk of your investment for an indefinite period of time and are fully able to sustain the loss of all or a significant part of your investment. In light of this financial risk, you should consider an investment in the Fund only for an appropriate portion of your overall portfolio.**

**The Fund and General Partner urge you to carefully consider the special considerations and risk factors relating to an investment in the Fund, as described in §7, "RISK FACTORS," and in other sections of this Memorandum, as well as the actual and potential conflicts of interest to which the General Partner and its affiliates and their respective principals will be subject in managing the business and affairs of the Fund and in making investment and trading decisions for the Fund, as described in §8, "CONFLICTS OF INTEREST," and in other sections of this Memorandum.**

The Fund has not registered or qualified the Interests for offer or sale under the Securities Act of 1933, as amended (the "**Securities Act**"), or the securities laws of any state or any other jurisdiction.  The Fund is offering and selling Interests by way of a "private placement" exempt from the registration requirements of the Securities Act and applicable state securities laws pursuant to Rule 506 of Regulation D under the Securities Act ("**Regulation D**") and comparable state law exemptions.  Investors may not

transfer their Interests except in transactions that are exempt from, or not subject to, the registration requirements of the Securities Act and other applicable securities laws. Investors who wish to transfer their Interests must also comply with the restrictions and conditions on transfer set forth in the Fund's Limited Partnership Agreement (the "**LPA**"). Among other things, an investor may transfer an Interest only with the General Partner's consent, which the General Partner may withhold in its discretion. Interests will not be listed on any exchange, and no public market for Interests otherwise exists or is likely to develop.

This Memorandum constitutes an offer to you only if the General Partner has entered your name on the cover page hereof. You are being provided this Memorandum for the exclusive purpose of assessing the merits and risks of investing in the Fund. In the absence of the General Partner's express prior written consent, you may not copy, use or transmit this Memorandum or any data or information contained herein, in whole or in part, or permit such action by others for any purpose (except that you may provide copies of this Memorandum or portions hereof to your legal, tax, financial and other advisers for the purpose of assisting you in determining whether an investment in the Fund is appropriate for you). Upon the General Partner's request, you must return this Memorandum and any other materials relating to this offering that the General Partner has provided to you.

Neither the delivery of this Memorandum nor the offer, issue or sale of Interests shall, under any circumstances, constitute a representation that the information contained in this Memorandum is correct at any time subsequent to the date of this Memorandum.

The General Partner reserves the right to modify any of the terms of the Fund and this offering before the date on which the Fund first issues Interests pursuant to this Memorandum (the "**Initial Closing**"). Accordingly, the information contained in this Memorandum, as well as the terms of: (1) the LPA, (2) the form of Subscription Agreement and Power of Attorney (the "**Subscription Agreement**") pursuant to which investors become limited partners of the Fund ("**Limited Partners**"), and (3) the Fund's other contractual agreements, are subject to modification before the Initial Closing. If the General Partner materially modifies any of the terms of this offering before the Initial Closing, it will provide you with supplemental information relating to such modifications a reasonable time before the Initial Closing to afford you the opportunity to determine whether you still wish to invest in the Fund.

The General Partner invites you and your representatives to review any materials that are available to it relating to the Fund, the Interests, the management and investment experience of the General Partner and its managing member, and any other matters relating to this offering. The General Partner will afford you and your representatives the opportunity to ask it questions regarding those matters and to obtain any additional information necessary to verify the accuracy of any representations or information set forth in this Memorandum to the extent the General Partner possesses such information or can acquire it and provide it to you without unreasonable effort or expense. If you have any questions regarding this Memorandum, please direct them to Mr. Patrick Lin at (415) 675-3355 (phone); (415) 675-3350 (fax); or patrick@primariuscapital.com. The Fund has not authorized any person other than Mr. Lin to give you any information concerning the Fund or the General Partner other than that contained in this Memorandum. Accordingly, any information given or representation made by any dealer, salesman or other person and (in either case) not contained herein should be regarded as unauthorized and should not be relied upon.

## FUND DIRECTORY

**The Fund:**

*Primarius China Fund LP*

c/o
Primarius Capital LLC
101 California
Suite 4010
San Francisco, California 94111
Tel:  (415) 675-3355
Fax:  (415) 675-3350

**General Partner of the Fund:**

*Primarius Capital LLC*

101 California
Suite 4010
San Francisco, California 94111
Tel:  (415) 675-3355
Fax:  (415) 675-3350

**Prime Broker of the Fund:**

*UBS Securities LLC*

1285 Avenue of the Americas
9th Floor
New York, NY 10019
Tel: (212) 713-9138
Fax: (212) 713-9016

| **Auditors of the Fund:** | **Counsel to the General Partner:** |
|---|---|
| *Rothstein Kass & Co.* | *Gardner Carton & Douglas LLP* |
| 44 Montgomery Street | 191 North Wacker Drive, Suite 3700 |
| San Francisco, California 94104 | Chicago, Illinois 60606 |
| Tel: (415) 788-6666 | Tel.: (312) 569-1000 |
| Fax: (415) 788-1990 | Fax: (312) 569-3000 |

iii

| TABLE OF CONTENTS |
|---|

**Page**

INTRODUCTION AND GENERAL INFORMATION ............................................................... i

FUND DIRECTORY ................................................................................................ iii

§1.   SUMMARY OF PRINCIPAL TERMS .................................................................. 1

§2.   MANAGEMENT ........................................................................................... 9

§3.   INVESTMENT OBJECTIVE, STRATEGIES AND TECHNIQUES ........................... 12

§4.   EXPENSES; MANAGEMENT FEES AND INCENTIVE ALLOCATIONS ............... 18

§5.   BROKERAGE .............................................................................................. 21

§6.   WITHDRAWALS ......................................................................................... 22

§7.   RISK FACTORS ........................................................................................... 24

§8.   CONFLICTS OF INTEREST ........................................................................... 38

§9.   CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ............................. 39

Exhibits

Form of Limited Partnership Agreement ..................................................... **Exhibit A**
Form of Subscription Agreement and Power of Attorney ............................ **Exhibit B**

## §1.    SUMMARY OF PRINCIPAL TERMS

This Summary of Principal Terms summarizes various features of the Fund, some of which are discussed in greater detail in other sections of this Memorandum.  This Summary is qualified in its entirety by those other sections.

In addition, this Memorandum summarizes certain provisions of the governing documents and contractual agreements relating to the Fund, as well as certain provisions of applicable statutes, rules and regulations.  These summaries are intended to be brief and do not purport to provide detailed descriptions or explanations of the topics they cover.

Moreover, this Memorandum does not summarize every provision of the governing documents and contractual agreements relating to the Fund, but only those provisions that the Fund believes are likely to be of greatest interest to prospective investors.  This Memorandum is therefore qualified in its entirety by the full text of those documents and agreements, which you should read in their entirety for a more complete understanding of the Fund and the Interests.

Copies of the LPA and the Subscription Agreement are attached to this Memorandum.  Copies of the Fund's other contractual agreements are available from the Fund upon request.

### GENERAL

| | |
|---|---|
| ***The Fund*** | Primarius China Fund LP (a Delaware limited partnership). |
| ***The General Partner of the Fund*** | Primarius Capital LLC (a Delaware limited liability company). |
| | The General Partner has overall responsibility for managing the business and affairs of the Fund and making all investment and trading decisions for the Fund. |
| | Patrick Lin is the managing member and portfolio manager of the General Partner.  In that capacity, Mr. Lin will make all investment and trading decisions for the Fund. |
| | See §2, "MANAGEMENT." |

### INVESTMENT OBJECTIVE AND STRATEGY

| | |
|---|---|
| ***Investment Objective and Strategy*** | The Fund's investment objective is to generate superior long-term capital appreciation, in varying market conditions, by investing on a long basis and short basis in a select number of investments identified by the General Partner. |
| | In seeking to achieve this objective, the General Partner expects to invest the majority of the Fund's capital in publicly-traded Hong Kong and China shares (primarily Hong Kong H Shares, Hong Kong Red Chips, Chinese A and B shares, and US listed ADRs of Chinese companies) and the balance in the Taiwanese equity markets.  As described more fully herein, although the General Partner expects to focus on publicly-traded |

equity and equity-related securities of these types, it may pursue a diverse range of trading strategies and investments. For example, the General Partner may invest a significant portion of the Fund's assets in one or more of the following: preferred stocks, illiquid securities (including privately placed equity and debt securities of public and private companies), fixed-income instruments (including bonds (convertible and non-convertible), bank debt and defaulted debt), trade claims and senior and subordinated tranches of asset-backed pools. In addition, the General Partner may employ any number of investment techniques in implementing the Fund's investment strategy in addition to short selling, such as borrowing on margin, engaging in derivative transactions and employing arbitrage strategies.

See §3, "INVESTMENT OBJECTIVE, STRATEGIES AND TECHNIQUES."

| | |
|---|---|
| *Risk and Risk Management* | Although the General Partner will use what it considers appropriate investment research techniques and risk management strategies in investing and reinvesting the Fund's assets, an investment in the Fund should be considered speculative and involves substantial risk. **No assurance can be given that the Fund will achieve its investment objective or that it will not sustain losses.** See §7, "RISK FACTORS." |

## THE OFFERING OF INTERESTS

| | |
|---|---|
| *Qualified Investors* | You may not invest in the Fund unless you are a "Qualified Investor," *i.e.,* both an "accredited investor" as defined in Rule 501(a) of Regulation D and a "qualified client" as defined in Rule 205-3 under the Investment Advisers Act of 1940, as amended. The Subscription Agreement contains concise descriptions of the types of investors that qualify as "Qualified Investors." |
| *Minimum Capital Contribution* | If you wish to become a Limited Partner you must make an initial capital contribution to the Fund of at least $500,000. The General Partner may raise or lower this minimum from time to time and accept initial capital contributions below the established minimum in its discretion. |
| *Capital Sought* | The Fund must receive aggregate subscriptions of at least $10 million as a condition to commencing its operations. The Fund is not subject to any maximum capitalization limit. |
| *Initial Offering Period* | The General Partner expects that the Fund's initial offering period (the "**Initial Offering Period**") will end on or about September 5, 2003, but may defer the termination of the Initial Offering Period in its discretion to a date not later than December 31, 2003. |
| *Continuous Offering Period* | After the close of the Initial Offering Period, the General Partner may in its discretion accept subscriptions for additional Interests, and permit existing Limited Partners to contribute additional capital to the Fund, on the first business day of each month or on such other day or days as the |

General Partner may from time to time determine. The General Partner, however, may suspend the offering of Interests from time to time or terminate the offering of Interests at any time in its discretion.

**Use of Proceeds**

The Fund will use the proceeds of this offering to implement its investment strategy and to pay certain expenses of the Fund. See §4, "EXPENSES; MANAGEMENT FEES AND INCENTIVE ALLOCATIONS – *Expenses*."

**Subscription Procedures**

If you wish to become a Limited Partner, you must complete and execute a Subscription Agreement and deliver it (via fax and mail) to the Fund c/o the General Partner at the Fund's address set forth in the Fund Directory on page iii. A copy of the Subscription Agreement is attached to this Memorandum as an exhibit, and an "execution ready" copy of that document accompanies this Memorandum.

If the Fund, in the General Partner's discretion, accepts your Subscription Agreement, whether in respect of the full subscription amount or only part thereof, you must transmit your subscription funds to the Fund by wire transfer in accordance with the General Partner's instructions no later than three business days before the relevant subscription date (subject to waiver by the General Partner in its discretion). Any interest earned on your subscription funds before the relevant subscription date will be credited to the Fund.

Your execution of a Subscription Agreement constitutes a binding offer to purchase the Interest subscribed for thereunder and an agreement to hold your offer open until your subscription is accepted (in whole or in part) or rejected by the Fund. Your execution of the Subscription Agreement and its acceptance by the Fund together constitute your agreement to be bound by the terms of the Subscription Agreement and the LPA. The General Partner, on behalf of the Fund, reserves the right to accept or reject your Subscription Agreement, and any additional capital contribution you wish to make to the Fund, in whole or in part, in its discretion.

## CAPITAL ACCOUNTS AND ECONOMIC ALLOCATIONS

**Capital Accounts**

The Fund will determine a Limited Partner's economic interest in the Fund by establishing a capital account for each capital contribution made by such Limited Partner ("**Account**" or "**Capital Account**"). The Fund generally will credit a Limited Partner's Capital Account with: (i) such Limited Partner's capital contribution to that Account and (ii) such Account's *pro rata* share of the Fund's economic profits, both realized and unrealized, and debit such Account with: (i) any distributions to or withdrawals by such Limited Partner from such Account, (ii) such Account's *pro rata* share of the Fund's economic losses, both realized and unrealized, (iii) such Account's *pro rata* share of the Fund's expenses, (iv) the Management Fees chargeable to such Account and payable to the General Partner (discussed below) and (v) the Incentive

3

Allocations chargeable to such Account and allocable to the General Partner (discussed below).

For a more complete description of Capital Accounts, including the manner in which the Fund allocates profits and losses for federal income tax purposes, see Article VII of the LPA.

### EXPENSES; MANAGEMENT FEES AND INCENTIVE ALLOCATIONS; SALES CHARGES

**Expenses**

The General Partner is responsible for all salaries, bonuses and employee benefit expenses of its principals and employees who are involved in the management and conduct of the business and affairs of the Fund and in making investment and trading decisions for the Fund. The General Partner is also responsible for related overhead, including office space and equipment, utilities and other similar items, except as otherwise described in §4, "EXPENSES; MANAGEMENT FEES AND INCENTIVE ALLOCATIONS – Expenses," and in §5, "BROKERAGE."

The Fund generally will bear all other costs and expenses associated with its organization, the offering of Interests, and its ongoing operations.

The Fund's organizational costs and expenses, together with offering costs and expenses incurred in connection with the offer and sale of Interests at the Initial Closing, are not expected to exceed $100,000. Notwithstanding U.S. generally accepted accounting principles, the Fund will amortize these costs and expenses in equal installments over a period of 60 months, commencing as of the end of the month in which the Initial Offering Period ends, for purposes of calculating its net asset value ("**NAV**"). The Fund does not expect that ongoing offering costs after the Initial Offering Period will be significant.

The Fund expects that its operational costs and expenses will consist primarily of: (i) such due diligence, research and portfolio management expenses as the General Partner shall deem appropriate; (ii) Management Fees and Incentive Allocations; (iii) transaction costs incurred in connection with the investment and reinvestment of the Fund's assets, including brokerage commissions, dealer mark-ups, mark-downs and spreads, and related clearing and settlement charges; (iv) interest expense on the Fund's borrowings (including margin debt) and expenses associated with short sales; (v) direct operating expenses, including accounting, auditing, administrative, compliance, bookkeeping, tax form preparation, custodial and consulting fees, costs and expenses; fees, costs and expenses of third-party service providers that provide such services; printing and mailing costs; and (vi) filing and other regulatory fees and expenses.

For a more complete description of the expenses of the Fund, see §4, "EXPENSES; MANAGEMENT FEES AND INCENTIVE ALLOCATIONS – Expenses."

4

| | |
|---|---|
| ***Management Fees*** | The Fund ordinarily will debit from each Limited Partner's Capital Account, and pay to the General Partner, a management fee (the "**Management Fee**") in an amount equal to 0.50% of the balance of such Account as of the beginning of each quarter (approximately 2% annually). |
| | For a more complete description of the Management Fees, see §4, "EXPENSES; MANAGEMENT FEES AND INCENTIVE ALLOCATIONS -- *Management Fees*." |
| ***Incentive Allocations*** | As of the end of each calendar year (an "**Incentive Allocation Calculation Date**"), the Fund ordinarily will debit from the Capital Account of each Limited Partner, and credit to the Capital Account of the General Partner, a special allocation of profits (the "**Incentive Allocation**") in an amount equal to 20% of the Net New Profit in respect of such Limited Partner's Capital Account at such time. Net New Profit exists in respect of a Limited Partner's Capital Account at a particular Incentive Allocation Calculation Date if the cumulative amount of net profit allocated to such Account over the life of such Account to and including such Incentive Allocation Calculation Date exceeds the "High Water Mark" for such Account – *i.e.*, the next highest amount of net profit allocated to such Account over the life of such Account to and including a prior Incentive Allocation Calculation Date. A similar allocation will be made to the General Partner in the event of a withdrawal or distribution from a Limited Partner's Capital Account before the end of the calendar year, in an amount equal to the product of the amount described above times the fraction, the numerator of which is the amount of such withdrawal and the denominator of which is the balance of such Account immediately before such withdrawal. In that case, the High Water Mark for such Account will be appropriately adjusted downward to reflect such withdrawal. |
| | If a capital withdrawal is made or required to be made from a Limited Partner's Capital Account following the allocation of losses to such Account reducing the balance of such Account below the High Water Mark for such Account, the High Water Mark for such Account will be decreased *pro rata* (in the same proportion as the amount of the withdrawal bears to the balance of such Account immediately before such withdrawal). |
| | Although the High Water Mark for a Capital Account will carry forward from year to year until exceeded, the General Partner will not be required to "repay" any Incentive Allocation allocated to it in the event such Account subsequently experiences losses. |
| | For a more complete explanation of the Incentive Allocations, see §4, "EXPENSES; MANAGEMENT FEES AND INCENTIVE ALLOCATIONS – *Incentive Allocations*." |
| ***Sales Charges*** | Investors will not owe any sales charges to the Fund or the General Partner in connection with the purchase of Interests, and the Fund will |

not expend its own funds for the purpose of compensating placement agents. The General Partner, however, may enter into agreements with placement agents (whether or not affiliated with the General Partner) and agree to compensate them at its own expense on a basis that is fully disclosed to affected investors.

An investor that has engaged its own agent to identify potential investments for such investor may owe a sales charge to that agent in connection with such investor's purchase of an Interest.

## *LIQUIDITY: DISTRIBUTIONS, WITHDRAWALS AND TRANSFERS*

***Distributions***

The Fund is not designed to generate a regular or fixed stream of income, and does not anticipate making distributions to Limited Partners. Income earned by the Fund will be reinvested and reflected in the value of Capital Accounts. If the Fund makes distributions, it generally will make them to the Limited Partners *pro rata* in accordance with their respective Capital Account balances, and such distributions may be in cash, marketable securities or a combination of the two.

***Withdrawals***

Voluntary Withdrawals. Subject to a one-year "lock-up" commencing on the date a capital contribution is credited to a Limited Partner's Capital Account, a Limited Partner may withdraw all or any part of the balance of such Capital Account as of the last day of any calendar quarter, upon not less than 45 days prior written notice to the General Partner.

Compulsory Withdrawals. The General Partner may require any Limited Partner to withdraw all or any part of the balance of its Capital Account(s) as of any month-end by giving not less than five days written notification to such Limited Partner. The General Partner may also require withdrawals without notice for certain tax and regulatory reasons.

Payments on Withdrawal. If a Limited Partner requests withdrawal from a Capital Account, or the General Partner requires a Limited Partner to withdraw a specific dollar amount from a Capital Account, and such amount is less than 95% of the balance of such Capital Account (as estimated in good faith by the General Partner), the General Partner will cause the Fund, to the extent reasonably practicable, to distribute the amount permitted or required to be withdrawn within thirty days following the effective date of such withdrawal. If the withdrawal amount is 95% or more of the balance of the Capital Account (as estimated in good faith by the General Partner), the General Partner will cause the Fund, to the extent reasonably practicable, to distribute 90% of the withdrawal amount within thirty days following the effective date of withdrawal and the remainder within thirty days after the next regular determination of the Fund's NAV.

Suspensions of Withdrawals and Withdrawal Payments. The General Partner may temporarily suspend withdrawals and withdrawal payments in certain limited circumstances.

For a more complete description of the provisions governing withdrawals, including the limited circumstances under which the General Partner may temporarily suspend withdrawals and withdrawal payments and require Limited Partners to withdraw without notice, see §6, "WITHDRAWALS," and Article VI of the LPA.

***Transfers***

Because the Fund has not registered the Interests under the Securities Act or other applicable laws, investors may not resell, assign, pledge or otherwise transfer Interests except in transactions that are exempt from or not subject to the registration requirements of the Securities Act and other applicable securities laws. In addition, a Limited Partner may not resell, assign, pledge or otherwise transfer an Interest, and transferees may not become Limited Partners, without the General Partner's prior written consent, which the General Partner may withhold in its sole and absolute discretion. Interests will not be listed on any exchange, and no public market for Interests otherwise exists or is likely to develop. As a result, an investor may not be able to liquidate its Interest in the event of a financial emergency or use its Interest as collateral for a loan. For a more complete description of the restrictions on and conditions applicable to transfers of Interests, see Section 5.5 of the LPA.

## *OTHER*

***Limited Liability***

A Limited Partner generally will have no liability for the Fund's debts or obligations beyond the value of its Capital Account(s) and the amount of its capital withdrawals and distributions.

***U.S. Federal Income Tax Considerations***

The Fund will be treated as a partnership (not as an association taxable as a corporation or as a "publicly traded partnership" taxable as a corporation) for federal income tax purposes and, therefore, will not be subject to federal income tax. Limited Partners, however, will be subject to income tax each year on their respective allocable shares of the Fund's income or gains (if any), even though the Fund does not intend to make any distributions to them.

Tax-exempt investors should be aware that the Fund expects to borrow and that, as a result, a substantial portion of the Fund's income may be treated as "unrelated business taxable income." An investment in the Fund therefore may not be suitable for tax-exempt investors, particularly charitable remainder trusts, who should consult their tax, legal and financial advisers regarding the tax considerations involved in an investment in the Fund.

See §9, "CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS," for a summary of certain material U.S. federal income tax principles and tax risks that are likely to apply to the Fund and its Limited Partners.

| | |
|---|---|
| ***Reports*** | As soon as reasonably practicable after the end of each calendar quarter, the Fund will provide to each Limited Partner a report reflecting the NAV of such Limited Partner's Capital Account(s) as of the end of such quarter as compared with the end of the previous quarter. |

As soon as reasonably practicable after the end of each calendar year, the Fund will provide to each Limited Partner an audited balance sheet of the Fund as of the end of such year and audited statements of income and changes in financial position of the Fund for such year.

As soon as practicable after the end of each calendar year, the Fund will provide each Limited Partner with such tax information and schedules as are necessary to enable such Limited Partner to prepare its U.S. federal income tax return.

***Fiscal Year; Accounting Matters***

The Fund's fiscal year will be the calendar year, unless the General Partner determines otherwise. The Fund will keep its financial books under the accrual method of accounting, and, as to matters not specifically described herein or in the LPA, in accordance with generally accepted accounting principles.

***Possible Formation of "Sister" Fund or Funds and/or Use of "Master – Feeder" Structure***

The General Partner may determine to form one or more additional funds whose investment objectives, strategies and techniques are identical to those of the Fund. In connection with organizing such additional fund or funds, the General Partner may determine to restructure the Fund such that the Fund and such additional fund or funds would contribute all of their assets to an offshore "master" fund (the "**Master Fund**") instead of conducting their investment and trading operations directly. The Master Fund, in turn, would conduct all investment and trading decisions for the Fund and such additional fund or funds, all of which would participate in the investment performance of the Master Fund as shareholders of the Master Fund.

It is contemplated that the General Partner would serve as the investment manager of the Master Fund. The Master Fund, however, would not pay any fees to the General Partner in connection with so serving, and formation of the Master Fund could be expected to reduce, rather than increase, the costs and expenses associated with the Fund's investment and trading activities. Thus, the General Partner believes that the restructuring described above would not have any material adverse economic affect on the Fund or its Limited Partners, and that the Master Fund would be essentially "transparent" to Limited Partners. See, however, §7, "RISK FACTORS – *FUND STRUCTURE RISK – Possible Master-Feeder Structure.*"

The General Partner will have the right to utilize the Fund as part of such a "master-feeder" structure in its own discretion and without seeking the consent of the Limited Partners.

***Counsel***

Gardner Carton & Douglas LLP, Chicago, Illinois, has assisted the General Partner in the preparation of this Memorandum and has advised

and may continue to advise the General Partner regarding its duties and responsibilities to the Fund (and the Limited Partners). Gardner Carton & Douglas LLP has not represented the Fund (or its Limited Partners) in organizing the Fund or negotiating its business terms or in connection with the offering of Interests. The Fund does not anticipate that it will engage separate counsel in connection with the organization or general operation of the Fund.

***Auditors***    The General Partner has selected Rothstein Kass & Co., San Francisco, California, to audit the financial statements of the Fund on an annual basis. The General Partner will have the right to change its selection of auditors for the Fund.

---

## §2.    MANAGEMENT

---

*General*

Primarius Capital LLC, a Delaware limited liability company, is the Fund's general partner.

Patrick Lin, born 1965, is the managing member and portfolio manager of the General Partner. Prior to founding the General Partner in 2002, Mr. Lin was a partner at Olympic Holdings USA Inc., Los Angeles, California, a private investment firm investing in public and private companies, from 2000 to 2001. Mr. Lin was Managing Director of Capital Markets and co-founding Partner of E*Offering (the investment banking division of E*Trade) in San Francisco, California, from 1999 to 2000. From 1993 to 1999, Mr. Lin was a Principal in Institutional Sales at Robertson Stephens & Co. in San Francisco, California. Mr. Lin also has previous sales and management experience with Goldman, Sachs & Co. and Baxter Healthcare.

Primarius Capital LLC currently manages two private investment funds in addition to the Fund. Each of these funds has made and expects to continue to make investments in the types of securities in which the Fund will invest. Unlike the Fund, however, neither of these funds focuses primarily on investing in Hong Kong, China and Taiwan.

Mr. Lin received his MBA/MMM (Masters of Management and Manufacturing) from J.L. Kellogg Graduate School of Management in 1993 and was awarded his Bachelor of Science in Business Management from the University of Southern California in 1986.

### *Responsibilities of the General Partner*

The General Partner will have overall responsibility for managing the business and affairs of the Fund in its capacity as general partner of the Fund, including making all investment and trading decisions on behalf of the Fund, and, subject to the provisions of the LPA and the requirements of applicable law, will have and may exercise full and exclusive right, power and authority to take such actions for and on behalf of the Fund as it may reasonably determine to be necessary, appropriate, advisable or convenient to carry on the Fund's business and achieve its objective.

In addition to Mr. Lin, the General Partner may hire additional full-time or part-time employees.

The General Partner is responsible for all salaries, bonuses and employee benefit expenses of its

9

principals and employees who are involved in the management and conduct of the business and affairs of the Fund and in making investment and trading decisions for the Fund. The General Partner is also responsible for related overhead, including office space and equipment, utilities and other similar items, except as otherwise described in §4, "EXPENSES; MANAGEMENT FEES AND INCENTIVE ALLOCATIONS – Expenses," and in §5, "BROKERAGE."

### The Strategic Advisors

Mr. Richard L. Chang and Mr. Kent C. McCarthy, whose biographies appear below, serve as "strategic advisors" to the General Partner in connection with the General Partner's management of the Fund. The sole function of the strategic advisors is to consult from time to time with the General Partner regarding general economic and market conditions and potential investment opportunities. Each strategic advisor serves solely in an advisory capacity and has no authority to make any investment decision or take any other action on behalf of the Fund. In addition, although the strategic advisors may from time to time collaborate with each other, they ordinarily operate independently from each other.

Richard L. Chang currently serves as a full-time strategic advisor to the General Partner. He was formerly a general partner of Bowman Capital Management, a leading technology investment firm with assets under management that exceeded $6.0 billion, where he split his time between the firm's venture capital investments and public hedge funds. On the public investment side, Mr. Chang was responsible for Bowman's investments in semiconductor foundry, consumer fabless, OSAT, media, entertainment, and contract manufacturing. In addition, Mr. Chang oversaw the firm's investing activities in Asia. He opened a satellite office in Taipei, Taiwan in May 2001. Mr. Chang joined Bowman Capital in 1999 as a co-founding member of the firm's first venture capital fund, the $500M Spinnaker Crossover Fund. He was also a General Partner and co-founder of the $400M Bowman Capital Private Equity Fund II.

Prior to joining Bowman Capital, Mr. Chang worked for Sony Corporation in Hong Kong. At Sony, he was the dedicated Asian representative for Sony Pictures Entertainment. He was responsible for expanding Sony Pictures' U.S. operations in Asia and as such was a co-founder of Columbia Pictures Asia which produced Crouching Tiger Hidden Dragon. Mr. Chang also co-founded Columbia TriStar Television Asia to produce local language TV shows. He executed the acquisition of and served as Chief Financial Officer for SuperTV, Sony's Taiwanese Cable Channel that had 400 employees and 2M subscribers. Mr. Chang also helped launch two satellite channels in India: SONY MAX, and AXN India.

Prior to Sony, Mr. Chang worked in the Mergers and Acquisitions group at Lazard Freres, where he specialized in media and telecommunications. He holds a Bachelor of Science in Economics with honours from the Wharton School, University of Pennsylvania and a Master of Arts in Politics, Philosophy and Economics from Oxford University.

Mr. Chang is a member of the Pacific Council on International Policy(Western Partner of the Council on Foreign Relations) and is a current or former board member of East West Players, Gobi Ventures in China, Great Schools.net, Persistent Edge and Shawei (acquired by Tom.com).

Kent C. McCarthy is the sole principal of Jayhawk Capital Management, L.L.C., which serves as investment manager of the Jayhawk China Fund (Cayman), Ltd. (the "Jayhawk Fund"). The Jayhawk Fund, which expects to make a substantial investment in the Fund, invests primarily in securities of Asian issuers.

Kent was a Vice President with Goldman Sachs & Co. from 1984 through 1994 in the Private Client Services Division. He continued his employment with Goldman Sachs & Co. as a consultant to their Private Client Services Division during 1994 and 1995. While with Goldman, Kent represented

Goldman's Private Client Services Division on the Stone Street Fund, a private investment fund for partners of Goldman Sachs & Co., from 1992 until 1995.

Kent received an MBA degree from Stanford University in 1984, a Master of Science degree in Taxation and Accounting in 1980 from the University of Kansas, and a B.S. degree in Business Administration and Accounting in 1979 from the University of Kansas. Prior to attending Stanford, Mr. McCarthy worked at Peat Marwick, Mitchell & Co. as a Certified Public Accountant in their tax department. From 1980 to 1981 he taught an undergraduate Finance course at the University of Kansas. In 1988 he returned to the University of Kansas to teach an MBA level course "Analysis of Financial Statements". Mr. McCarthy currently is teaching "Applied Portfolio Management," a course which he developed and funded, at the University of Kansas.

### *Exculpation and Indemnification*

The LPA provides that to the extent the General Partner has duties (including fiduciary duties) and liabilities relating thereto to the Fund or any Limited Partner, the General Partner shall not be liable for monetary or other damages to the Fund or such Limited Partner for the General Partner's good faith reliance on the provisions of this Agreement or for: (i) losses sustained or liabilities incurred by the Partnership or such Limited Partner as a result of errors or mistakes in judgment on the part of the General Partner, or any act or omission of the General Partner, except to the extent that it is Judicially Determined (defined below) that an act or omission of the General Partner was material to the matter giving rise to such losses or liabilities and that such act or omission constituted criminal wrongdoing, willful misfeasance, bad faith or gross negligence on the part of the General Partner; (ii) errors or mistakes in judgment on the part of any person, or any act or omission of any person, selected by the General Partner to perform services for or otherwise transact business with the Fund, except to the extent that it is Judicially Determined that such selection involved criminal wrongdoing, willful misfeasance, bad faith or gross negligence on the part of the General Partner and was material to the matter giving rise to such losses or liabilities; or (iii) circumstances beyond the General Partner's control, including changes in tax or other laws, rules or regulations or the bankruptcy, insolvency or suspension of normal business activities of any broker-dealer, bank or other financial institution holding assets of the Fund.

The LPA also provides that to the extent any affiliate of the General Partner, or any shareholder, partner, limited partner, director, officer, employee or agent of the General Partner or of any such affiliate, has duties (including fiduciary duties) and liabilities relating thereto to the Fund or any Limited Partner, such person shall not be liable for monetary or other damages to the Fund or such Limited Partner for such person's good faith reliance on the provisions of the LPA or for losses sustained or liabilities incurred by the Fund or such Limited Partner, except to the extent that it is Judicially Determined that an act or omission of such person was material to the matter giving rise to such losses or liabilities and that such act or omission constituted criminal wrongdoing, willful misfeasance or bad faith on the part of such person.

Pursuant to the LPA, the Fund will, to the fullest extent permitted by law, indemnify each General Partner Associate – *i.e.*, the General Partner, each of its affiliates, and each shareholder, partner, director, officer, employee or agent of the General Partner or any such affiliate – from and against any and all Losses (defined below), except to the extent that it is Judicially Determined that an act or omission of such General Partner Associate was material to the matter giving rise to such Losses and that such act or omission constituted criminal wrongdoing, willful misfeasance, bad faith or gross negligence on the part of such General Partner Associate (if such General Partner Associate is the General Partner), or criminal wrongdoing, willful misfeasance or bad faith on the part of such General Partner Associate (if such General Partner Associate is a General Partner Associate other than the General Partner).

"Losses" of a General Partner Associate of a General Partner Associate means any and all losses, damages, liabilities, costs, expenses (including reasonable legal fees and costs and expenses), judgments, fines, amounts paid in settlement, and other amounts actually and reasonably paid or incurred by such General Partner Associate in connection with any and all proceedings that arise from or relate, directly or indirectly, to acts or omissions (or alleged acts or omissions) of such General Partner Associate in connection with the LPA or the business or affairs of the Fund and in which such General Partner Associate may be involved, or is threatened to be involved, as a party, witness, deponent or otherwise, whether or not the same shall proceed to judgment or be settled or otherwise be brought to a conclusion.

"Judicially Determined" means determined in a judgment or order, not subject to further appeal or discretionary review, by a court, governmental body or agency or self-regulatory organization having jurisdiction to render or issue such judgment or order.

Pursuant to the LPA, the Fund exculpates and indemnifies the Strategic Advisors in a manner identical to that in which it exculpates and indemnifies the General Partner Associates.

Notwithstanding the foregoing, no exculpation or indemnification shall be permitted under the LPA to the extent such exculpation or indemnification would be inconsistent with the requirements of federal or state securities laws or other applicable law.

---

## §3.    INVESTMENT OBJECTIVE, STRATEGIES AND TECHNIQUES

### Introduction

The Fund's investment objective is to generate superior long-term capital appreciation, in varying market conditions, by investing on a long basis and short basis in a select number of investments identified by the General Partner. In seeking to achieve this objective, the General Partner expects to invest the majority of the Fund's capital in publicly-traded Hong Kong and China shares (primarily Hong Kong H Shares, Hong Kong Red Chips, Chinese A and B shares, and US listed ADRs of Chinese companies) and the balance in the Taiwanese equity markets. As described more fully herein, although the General Partner expects to focus on publicly-traded equity and equity-related securities of these types, it may pursue a diverse range of trading strategies and investments. In addition, the General Partner may employ any number of investment techniques in implementing the Fund's investment strategy in addition to short selling, such as borrowing on margin, engaging in derivative transactions and employing arbitrage strategies.

Although the General Partner will use what it considers appropriate investment research techniques and risk management strategies in investing and reinvesting the Fund's assets, an investment in the Fund should be considered speculative and involves substantial risk. **No assurance can be given that the Fund will achieve its investment objective or that it will not sustain losses.** See §7, "RISK FACTORS."

### The General Partner's Long/Short Investment Strategy and Investment Process

Patrick Lin, in his capacity as the General Partner's managing member, will implement the General Partner's investment process on behalf of the Fund. Mr. Lin believes that entrepreneurial companies that identify and capitalize on emerging trends present compelling opportunities in many different market conditions and can experience rapid and dramatic periods of growth. Such periods are often attributable to specific "catalysts" such as innovative or proprietary products and services, a shift in

the competitive landscape, management changes, or redeployment of company assets.

The General Partner utilizes numerous sources to identify these companies. An initial source will be an extensive network of national and regional brokers, analysts, and investment bankers who maintain close contacts with company executives and local entrepreneurs. Additional sources include screening software (to identify companies producing positive or negative earnings reports and specific financial criteria as well as stocks experiencing sizeable price moves), industry publications, the financial press, news wires, buy-side contacts, and the Internet. In addition, the General Partner believes that having its headquarters based in Silicon Valley provides a unique advantage and opportunity for idea generation, given the exceptionally strong business and trade relationships and trade between the region and Greater China.

After an idea has been generated, the General Partner performs an in-depth investigation and analysis. This process may include interviews with management, customers, suppliers, competitors, industry specialists, and others. The General Partner believes that its idea generation system and extensive investment industry experience provides it with a strategic advantage in amassing vital information, dissecting financial statements, forecasting future operating performance, and assessing market conditions to make insightful and effective market decisions.

After carefully selecting securities that have been filtered through a variety of analytic methods as well as through the General Partner's evaluation process, the General Partner will continue to monitor the impact of industry diversification as well as the potential effect of general macro-economic factors on Fund performance. The risks and/or rewards of each industry group and economic sector will be analyzed in order to avert hidden risks or limited return potential within the portfolio. The percentage of long versus short positions will vary depending on opportunities that become available. The Fund's portfolio will be designed to be flexible, maintaining a risk/reward profile that strives to provide superior long-term investment performance while attempting to guard against unforeseen events and potential risks.

For the Fund's long positions, the General Partner's "bottom-up" fundamental analysis is designed to identify companies that may display some or all of the following characteristics:

- Improving revenue and earnings growth.

- Strong cash flow and/or access to capital.

- Competitive advantage and/or dominant industry position.

- High barriers to entry exist with respect to the company's existing business.

- New, innovative, or revolutionary products.

- Proven, strong management team.

- Short- or intermediate-term "catalysts" to propel market price of stock upwards.

- Undiscovered value/hidden assets on the company's balance sheet.

- Business of company is in out-of-favor industries resulting in low valuation.
- Favorable risk/reward ratio with high probability of success.

- Not well covered by Wall Street analysts.

For the Fund's short positions, the General Partner's "bottom-up" fundamental analysis is designed to identify companies that may display some or all of the following characteristics:

- Deteriorating financial performance and/or condition.

- Balance sheet irregularities and/or questionable accounting practices.

- Decelerating earnings.

- Product cycle dislocations.

- Equity dilution.

- Weak or inept management team.
- Flawed business model.

- Misrepresentations and/or unrealistic projections by management.

- Increasing competition and/or market-share laggard.

- A clear catalyst that is expected to cause the stock price to decline significantly.

Short positions, in general, are not selected solely on an "over valuation" basis.

The Fund's net market exposure may vary significantly depending upon the General Partner's assessment of shifting economic and market conditions as well as particular long and short investment opportunities. The General Partner generally will close out a long or short position if one or more of the following characteristics are present:

- Management fails to execute business plan.

- Security reaches target price or stop loss price.

- Investment thesis plays out.

- Events fail to confirm investment thesis.

- Fundamentals either deteriorate (in the case of a long position) or improve (in the case of a short position), thus changing the risk-reward profile.

As a general principle, the General Partner intends to select equities for investment on the basis of its investment methodology, and without any fixed requirements as to revenues, earnings or other specific fundamentals. Accordingly, the Fund could have positions in issuers of various capitalizations, in positions of limited liquidity and/or positions marked by varying degrees of speculative quality. It is possible that certain of the Fund's portfolio securities may not be widely traded and that the Fund's positions in such securities may be substantial in relation to the public market ("float") for such securities.

In view of the Fund's investment strategy, holding periods for the Fund's core positions may vary

substantially, with anticipated holding periods of core positions of 3 to 12 months, and perhaps longer. The General Partner may trade around core positions on a short-term basis and may assume some positions shorter in duration. In instances where earnings expectations or other investment criteria are not being met, positions may be liquidated. The Fund's portfolio turnover will reflect the foregoing and may exceed 100% annually.

Although the General Partner currently intends to employ the long/short investment process and strategy described above, the Fund will not be limited to that process and strategy. The General Partner will have wide latitude to pursue any particular strategy it deems advisable under the circumstances, without seeking Limited Partner and without restriction other than any applicable regulatory requirements.

### *Investments*

In implementing the Fund's investment strategy, the General Partner expects to invest the majority of the Fund's capital in publicly-traded Hong Kong and China shares (primarily Hong Kong H Shares, Hong Kong Red Chips, Chinese A and B shares, and US listed ADRs of Chinese companies) and the balance in the Taiwanese equity markets.

Although the General Partner expects to focus on publicly-traded equity and equity-related securities of these types, it will have wide latitude to invest in any particular financial instrument it deems advisable under the circumstances, without seeking Limited Partner approval and without restriction other than any applicable regulatory requirements.

For example, the General Partner may invest a significant portion of the Fund's assets in one or more of the following:

- preferred stocks;

- illiquid securities (including privately-placed equity and debt securities of public and private companies);

- fixed-income instruments (including bonds (convertible and non-convertible), bank debt and defaulted debt);

- options, covered and uncovered, and whether singly or in combination with other options or securities positions, including options on specific securities, as well as market index or "market basket" options, options on currencies or other instruments, for speculative purposes, to increase directional exposure, or in order to seek to limit certain risks, primarily general market risks;

- warrants;

- foreign currencies;

- other derivative instruments, including commodities, commodity futures, financial futures and options thereon and forward contracts;

- trade claims; and

- senior and subordinated tranches of asset-backed pools.

The financial instruments in which the Fund may invest may be issued by Chinese or non-

Chinese issuers and may trade overseas and/or in U.S. markets. While the General Partner acknowledges that trading in securities of foreign issuers often involves additional risks (such as those associated with unfavorable changes in exchange rates), it also believes that it may offer opportunities for unusual gains.

In addition, as a defensive strategy, pending the identification of investment opportunities meeting the General Partner's investment methodology, or in other circumstances deemed appropriate by the General Partner, the Fund may invest in a variety of cash equivalents or money market instruments. Accordingly, the Fund may not be "fully invested" at all times.

The Fund may invest in so-called "restricted securities", *i.e.,* securities as to which the public resale is currently restricted under the Securities Act and which are not immediately convertible into freely tradable securities. The General Partner intends to purchase restricted securities where pricing and growth characteristics justify the limited liquidity and which provide the means of achieving eventual marketability, such as registration rights under the Securities Act or the right to convert into marketable securities. There will be no limit as to the percentage of the Fund's assets that may be invested in restricted securities. However, the General Partner currently expects that such percentage will be no greater than 15% of the NAV of the Fund.

The Fund may invest in stocks purchased in initial public offerings ("**IPOs**"), in situations when such companies satisfy the General Partner's investment methodology. Such stocks that appreciate significantly in the immediate aftermarket (so-called "**hot issues**") are subject to investment restrictions imposed by the National Association of Securities Dealers, Inc. (the "**NASD**"). Only Limited Partners which are not "restricted persons", within the meaning of NASD rules, are currently permitted to participate, through an investment in the Fund, in hot issues.

### *Investment Techniques*

Introduction.    The Fund expects to engage in short selling and to use margin borrowings and other leverage techniques to achieve the most efficient use of capital. For example, the Fund may engage in options and other derivatives transactions, typically for hedging of existing long and short positions, but also, in the discretion of the General Partner, as independent profit opportunities. The Fund may also engage in a variety of investment techniques involving arbitrage. In the interest of both preserving capital and taking advantage of profit opportunities, the General Partner will have wide latitude to pursue any particular investment technique it deems advisable under the circumstances, without seeking Limited Partner approval and without restriction other than any applicable regulatory requirements. According, the investment techniques utilized by the Fund will not necessarily be limited to those described below.

There will be no specific limit on the types of positions the Fund may take, the number or extent of its short positions, the amount of leverage it may employ, or the concentration of its investments (by country, sector, industry, capitalization, company, or asset class).

Short Selling.    Short positions may comprise a significant portion of the Fund's portfolio. Selling securities short involves selling securities that the Fund does not own. In order to make delivery to its purchaser, the Fund must borrow securities from a third party lender, such as a broker-dealer. The Fund subsequently returns the borrowed securities to the lender by delivering to the lender securities purchased in the open market. The Fund must generally pledge cash with the lender equal to the sales proceeds of the borrowed securities as well as any additional cash or securities required as collateral under applicable margin regulations. In addition to lending the securities, the lender generally pays the Fund a fee (or rebate of interest) for the use of the Fund's cash.

The Fund will generally realize a profit or a loss as a result of a short sale if the price of the

security decreases between the date of the short sale and the date on which the Fund covers its short position *i.e.*, purchases the security to replace the borrowed security.

The General Partner may employ short selling opportunistically as a part of the Fund's investment strategy, where the General Partner believes the security sold short is likely to decline in price, and in hedging situations, where the short position is intended to wholly or partially offset another position in a related security.    In the case of profit opportunities, the Fund will hold short positions that the General Partner believes, on the basis of its investment methodology, are overvalued and likely to decline in price.

The General Partner may engage in short sales in an approach known as "pairs trading", where the Fund will combine a long position in a particular security with a short position in a similar security in the same or related industry or sector. Pairs trading may be undertaken for speculative and/or hedging purposes and may be weighted toward either the long or short side of the position. The General Partner may also make short sales "against the box", *i.e.*, where the Fund retains a long position in the same security. At any particular time, the Fund's portfolio may be "net long" (i.e., the value of long positions, at cost, will be greater than the net exposure on short positions) or "net short" (net exposure on short positions will be greater than the value of long positions).

It should be noted that short sales in Chinese related securities have additional execution challenges that may not be experienced in U.S. markets.   Certain other risks generally associated with short selling are discussed in §7, "RISK FACTORS – *STRATEGY RISK – Short Selling*."

Leverage.   The Fund is likely to utilize leverage, as the General Partner considers appropriate, with respect to its investment activities. Leverage involves the use of borrowed funds, primarily margin borrowings, to increase the amount of invested capital in the Fund's long or short positions. There is no fixed limitation on the Fund's use or extent of leverage, other than applicable regulatory requirements. As described more fully below in §7, "RISK FACTORS – *STRATEGY RISK – Leverage*," the use of leverage can increase both the proportionate amount of potential gain, as well as of potential loss, relative to the Fund's equity capital. In a typical long position involving margin borrowing, for example, as much as approximately one-half of the Fund's invested funds may be furnished by margin borrowings. If, however, the value of the position declines (or, in the case of a margined short position, the securities sold short increase in value), the securities (or cash) serving as collateral for such margin position may be liquidated, resulting in a loss proportionately greater than would be the case absent such use of leverage.

Options.   The Fund may engage in various types of options transactions, including speculative and hedging positions in options on securities, commodities, indices and other investments, including both put and call options. Hedging activity is designed to reduce the risks relating to market fluctuations in the price of a security held long by the Fund, as well as risks attendant to short selling, and may offset other transactions in the underlying stock or other securities held by the Fund involved in the transaction. Short positions maintained by the Fund may be hedged through the purchase of call options on the securities sold short.   In certain situations, the Fund may purchase put options as an alternative (in whole or in part) to establishing a short position.

The Fund may write or sell options on securities and other instruments, whether or not such options are covered.  An option written by the Fund is "covered" if (in the case of a call option) the Fund owns the security, currency or other instrument underlying the option or has a right to acquire such underlying instrument without additional cash consideration (or for additional cash consideration held in a segregated account) or (in the case of a put option) the Fund has an equivalent short position, or offsetting long put position, in the underlying instrument.

The Fund may also utilize certain market-wide options, such as various types of index or "market

basket" options, in an effort to hedge against certain market-related risks, as the General Partner deems appropriate. Accordingly, the Fund may have positions in a variety of options or similar instruments.

Arbitrage Techniques. The Fund may engage in a variety of investment techniques involving arbitrage. Arbitrage in general is a strategy intended to exploit pricing disparities between two or more securities and includes such broad types as merger arbitrage, classic arbitrage and capital structure arbitrage. Merger, or risk, arbitrage involves securities of two or more companies undergoing a merger, takeover or other business combination or reorganization. In a typical merger arbitrage position, the Fund may assume a long position in the target company and seek to wholly or partially hedge such position by selling short securities of the acquirer. Upon consummation of the merger, the Fund's short position could be covered with the acquirer's securities issued in the transaction. Classic arbitrage involves exploiting price discrepancies between identical or similar securities that trade on different markets. Capital structure arbitrage involves securities of different ranking of the same or similar issuers and includes cross-credit arbitrage, balance sheet arbitrage and convertible arbitrage. In cross-credit arbitrage, simultaneous long and short positions may be established in debt or equity securities of companies in the same or related industries, to take advantage of valuation differences. In balance sheet arbitrage, the Fund will assume simultaneous long and short positions in two securities of different credit standing within an issuer's capital structure. Convertible arbitrage involves simultaneous positions in convertible securities, including securities exchangeable for other securities, and the underlying securities, to exploit price differentials.

Concentration. The core positions of the Fund's investment portfolio may consist of a limited number of companies. Although the General Partner will make investment decisions for the Fund on the basis of its investment methodology, it will not seek to diversify the portfolio by industry area or group, company or otherwise. The General Partner is of the belief that while diversification may reduce investment risk, it may also dilute investment return. Accordingly, there will be no fixed limitations as to the amount of Fund assets that may be invested in a single industry or company. The Fund's investment portfolio may therefore be expected at times to be significantly concentrated, both as to industries and possibly with respect to particular companies as well. In the view of the General Partner, such concentration offers a greater potential for capital appreciation as well as increased risk of loss. Such concentration may also be expected to increase the volatility of the Fund's investment portfolio.

## §4.    EXPENSES; MANAGEMENT FEES AND INCENTIVE ALLOCATIONS

*Expenses*

The Fund will pay such costs and expenses as the General Partner shall reasonably determine to be necessary, appropriate, advisable or convenient to effect the Fund's formation, carry on its business and realize its objective, including without limitation: (i) organizational costs and expenses, and offering costs and expenses incurred in connection with the offer and sale of Interests issued on the date of the Initial Closing; (ii) the costs and expenses incurred in connection with the offer and sale of Interests after the Initial Closing; (iii) Management Fees and Incentive Allocations; (iv) such due diligence, research and portfolio management expenses as the General Partner shall deem appropriate, which may include, but are not limited to, costs of software programs related to investment modeling and screening, costs of research reports, data feeds and databases, news wires and quotation services, periodical subscription fees, fees of outside consultants and experts, and travel-related expenses; (v) transaction costs incurred in connection with the investment and reinvestment of the Fund's assets, including brokerage commissions, dealer mark-ups, mark-downs and spreads, and related clearing and settlement charges; (vi) interest expense on the Fund's borrowings (including margin debt) and expenses associated with short sales; (vii)

insurance and bonding costs and expenses; (viii) direct operating expenses, including bank service fees; legal, accounting, auditing, administrative, compliance, bookkeeping, tax form preparation, custodial and consulting fees, costs and expenses; fees, costs and expenses of third-party service providers that provide such services; printing and mailing costs; government fees; and taxes (including state franchise and similar taxes), if any;   (ix) costs and expenses associated with qualifying to transact business in such jurisdictions as the General Partner may determine; (x) filing and other regulatory fees and expenses; (xi) the Fund's indemnification obligations under the LPA (if any); and (xii) extraordinary expenses (if any). Certain of the Fund's and the General Partner's expenses may be borne or reimbursed by broker-dealers executing transactions for the Fund. See in §5, "BROKERAGE."

The Fund's organizational costs and expenses, together with offering costs and expenses incurred in connection with the offer and sale of Interests issued during the Initial Offering Period, are not expected to exceed $100,000. The Fund will amortize these organizational and offering costs and expenses in equal installments over 60 months, commencing as of the end of the month in which the Initial Offering Period ends, for purposes of determining its NAV. This practice is not in accordance with U.S. generally accepted accounting principles, which would require the Fund to expense its organizational and offering costs immediately, thereby charging them only to those investors who subscribe during the Initial Offering Period.  If material, this practice may result in a qualification of the Fund's annual financial statement by its auditor.

### General Partner's Overhead Expenses

The General Partner is responsible for all salaries, bonuses and employee benefit expenses of its principals and employees who are involved in the management and conduct of the business and affairs of the Fund and in making investment and trading decisions for the Fund.  The General Partner is also responsible for related overhead, including office space and equipment, utilities and other similar items, except as otherwise described above under "*Expenses*" and in §5, "BROKERAGE"

### Management Fees

The Fund ordinarily will debit from each Limited Partner's Capital Account, and pay to the General Partner, a Management Fee in an amount equal to 0.50% of the balance of such Account as of the beginning of each quarter (a 2% annual rate).

The Management Fee is charged against the Capital Account to which it relates and thereby reduces the NAV of such Capital Account.

The Management Fee is charged against a Capital Account regardless of whether such Capital Account increases or decreases in value over time.

The General Partner may agree to a different management fee arrangement in respect of any Capital Account of a Limited Partner, or waive or reduce the Management Fee in respect of any Capital Account of a Limited Partner, in its discretion.  This will not entitle the Limited Partner that holds such Account, or any other Limited Partner, to such a different arrangement, waiver or reduction in respect of any other Capital Account.

### Incentive Allocations

As of the end of each "Incentive Allocation Calculation Period," the Fund ordinarily will debit from the Capital Account of each Limited Partner, and credit to the General Partner's Capital Account, an

Incentive Allocation in an amount equal to 20% of the "Net New Profit" in respect of such Limited Partner's Capital Account at such time.

An "**Incentive Allocation Calculation Period**" for a Capital Account means: (a) the period beginning on the date the Capital Contribution is credited to such Account and ending on the earlier of a capital withdrawal from such Account or the end of the calendar year during which such Capital Contribution is so credited, and (b) subsequently, the period from the end of the immediately previous Incentive Allocation Calculation Period for such Account and ending on the earlier of a capital withdrawal from such Account or the first calendar year-end following the end of the immediately previous Incentive Allocation Period for such Account.

"**Net New Profit**" in respect of a Capital Account as of the end of an Incentive Allocation Calculation Period means the amount by which Net Profit in respect of such Account as of the end of such Incentive Allocation Calculation Period exceeds the "High Water Mark" for such Account as of the end of such Incentive Allocation Calculation Period. "**Net Profit**," in turn, means the sum of all forms of income, including interest and increases (realized or unrealized) in the value of the Fund's portfolio allocated to such Account since the date of its inception through and including the end of the applicable Incentive Allocation Calculation Period, less the sum of all Fund expenses debited from such Account since the date of its inception through and including the end of such Incentive Allocation Calculation Period (exclusive of Incentive Allocations debited from such Account).

The "**High Water Mark**" for a Capital Account as of the end of an Incentive Allocation Calculation Period for such Account means: (a) the highest level of Net Profit in respect of such Account as of the end of any prior Incentive Allocation Calculation Period for such Account, other than an Incentive Allocation Calculation Period for such Account which ended solely as a result of a capital withdrawal made or required to be made from such Account; or (b) $0, if no Incentive Allocation has previously been charged in respect of such Account, subject to adjustment as described below. For purposes of determining the High Water Mark used in calculating subsequent Incentive Allocations in respect of such Account, an Incentive Allocation Calculation Period which ends solely as a result of a capital withdrawal shall not be deemed to constitute the end of an Incentive Allocation Calculation Period as of which a High Water Mark for such Account shall be established.

If a capital withdrawal is made or required to be made from a Capital Account following a decrease in Net Assets charged to such Account that reduces the Net Profit in respect of such Account below the High Water Mark for such Account, the High Water Mark for such Account will be decreased *pro rata* (in the same proportion as the amount of the withdrawal bears to the Net Assets attributable to such Account immediately prior to such withdrawal).

If an Incentive Allocation Calculation Period for a Limited Partner's Capital Account ends as of a date other than the end of a calendar year because such Limited Partner makes or is required to make a capital withdrawal from such Account as of a date other than the end of a calendar year, then: (a) an Incentive Allocation in respect of such account shall be calculated and allocated to the General Partner's Capital Account as of the end of such period as though the end of such period were the end of a calendar year in an amount equal to the product of (x) the Incentive Allocation that would have been charged against such Account as of the end of such period if the end of such period had been the end of a calendar year pursuant to the provisions described above, times (y) a fraction, the numerator of which is the amount of such capital withdrawal and the denominator of which is the Net Assets attributable to such Limited Partner's Capital Account as of the end of such period as estimated in good faith by the General Partner (without reduction for the amount of such withdrawal) (such fraction, the "**Withdrawal Fraction**"); and (b) the High Water Mark shall be adjusted to equal the amount by which any Net Profit allocated to such Capital Account since its inception through the end of such period exceeds the High Water Mark for such

Capital Account as of the end of such period (such High Water Mark, the **"Existing High Water Mark"**) plus an amount equal to the product of (I) the Withdrawal Fraction times (II) the excess of (x) the amount of Net Profit allocated to such Capital Account since its inception through the end of such period over (y) the Existing High Water Mark.

The determination of the Incentive Allocation is binding and conclusive on the Limited Partners.

The General Partner may agree to a different incentive allocation arrangement in respect of any Capital Account of a Limited Partner, or waive or reduce the Incentive Allocation in respect of any Capital Account of a Limited Partner, in its discretion. This will not entitle the Limited Partner that holds such Account, or any other Limited Partner, to such a different arrangement, waiver or reduction in respect of any other Capital Account.

---

## §5.    BROKERAGE

Banc of America Securities LLC, San Francisco, California, a major securities firm that provides prime brokerage services to "hedge" funds (the **"Prime Broker"**), acts as prime broker for the Fund. The Prime Broker will act as clearing firm and principal custodian for the assets of the Fund. The Prime Broker may also execute a portion of the Fund's portfolio transactions and furnish various research and brokerage services to the General Partner. The General Partner will have the right to change its selection of the Fund's prime broker, clearing firm and/or custodian.

In addition to the Prime Broker, the General Partner will select other brokers to execute transactions for the Fund on the basis of, among other factors, amount of commission, quality of execution, quality of service, familiarity with the securities markets and investment techniques employed by the Fund, research and analytic services, clearing and settlement capabilities, the availability of margin or other leverage, block positioning or other special execution capabilities or other services provided to the Fund. In allocating brokerage to the Prime Broker or such other brokers, the commissions the Fund will pay to such brokers will not necessarily represent the lowest commission rates available, but will reflect the General Partner's evaluation of the research and other brokerage related services supplied by such brokers and which benefit the Fund, either alone or together with the other clients of the General Partner or its affiliates.   In each case, the General Partner will make a determination that the amount of any increased commission costs on account of such research or other services is reasonable relative to the value of services so provided.

The General Partner may also allocate brokerage on the basis of the broker's agreement to pay all or part of certain expenses otherwise borne by the Fund, such as its accounting and legal expenses or certain research-related expenses, or by the General Partner such as rent, furnishings, equipment costs, utilities, telecommunications, salaries (other than to the principals of the General Partner), printing and mailing costs, travel expenses, consulting and investigative fees, the costs of research services, reports and conferences, data feeds, software programs and services, and data processing, bookkeeping and portfolio management expenses.  To the extent such allocations result in the payment by such brokers of expenses that would otherwise be borne by the General Partner, the General Partner will realize an economic benefit from such transactions.  The General Partner intends to enter into such allocation arrangements, however, only where it determines that the commission charges are reasonable relative to the amount of expenses paid. In general, any and all brokerage allocations for the General Partner will be subject to principles of best execution and the other allocation policies described above, as well as any restrictions imposed by applicable law.

The research obtained through the Fund's brokerage allocations, whether or not directly useful to it, may be useful to the General Partner in connection with services rendered by the General Partner and its affiliates to the Fund or other private investment funds, accounts or clients managed by the General Partner or its affiliates. Similarly, research obtained by the General Partner or such affiliates for commissions paid to brokers in the course of managing other investment funds, accounts or clients may be useful to the Fund. Since any particular research obtained by the General Partner may be useful to the Fund and such other investment funds, accounts or clients, the General Partner, in considering the reasonableness of brokerage commissions paid by the Fund, will not attempt to allocate the relative costs or benefits of research as between the Fund and other managed investment funds, accounts or clients except in limited circumstances where appropriate.

Section 28(e) of the Exchange Act provides a "safe harbor" to investment managers who use commission dollars of their advisory accounts to obtain investment research, brokerage and other services that provide lawful and appropriate assistance to the manager in performing investment decision-making responsibilities. Conduct outside of the safe harbor afforded by Section 28(e) is subject to the traditional standards of fiduciary duty under state or Federal law. Notwithstanding its good-faith determination that the amount of commissions paid is reasonable in relation to the value of products or services provided or paid for, to the extent that the General Partner determines to use commission dollars to pay for products or services that provide administrative or other non-research assistance to the General Partner or its affiliates, including some of the services described above, such payments will not fall within the safe harbor of Section 28(e) but will be lawful if consistent with such other fiduciary standards applicable to the General Partner. Under Delaware law applicable to partnerships such as the Fund, specific fiduciary standards may be prescribed or modified by agreement of the partners. Each Limited Partner agrees in the LPA to have given full and informed consent to the practices described in this §5 and not to object to such practices or bring any proceeding against the General Partner or it affiliates on the grounds that such practices involve a breach of fiduciary duty on the part of the General Partner or its affiliates.

## §6.    WITHDRAWALS

*Voluntary Withdrawals*

Subject to a one-year "lock-up" commencing on the date a capital contribution is credited to a Limited Partner's Capital Account, a Limited Partner may withdraw all or any part of the balance of such Capital Account as of the last day of any calendar quarter, upon not less than 45 days prior written notice to the General Partner.

A request for withdrawal that would reduce a Limited Partner's aggregate Capital Account balances below the minimum initial investment requirement in effect at the time of such withdrawal will be treated as a request for withdrawal in full, unless the General Partner, in its discretion, determines otherwise.

The General Partner may agree to a different withdrawal arrangement in respect of any Capital Account of a Limited Partner in its discretion. This will not entitle the Limited Partner that holds such Account, or any other Limited Partner, to such a different arrangement in respect of any other Capital Account. The General Partner also has the discretion to grant a Limited Partner the right to withdraw amounts from a Capital Account at a time that differs from, or upon a notice period shorter than, the time and notice period described above. This will not entitle the Limited Partner that holds such Account, or any other Limited Partner, to such a right in respect of any other Capital Account.

*Compulsory Withdrawals*

The General Partner may at any time require any Limited Partner to: (a) withdraw any portion of its Capital Account(s) as of any month-end by giving not less than five days written notification to such Limited Partner; or (b) withdraw as a Limited Partner as of any month-end by giving not less than five days written notification to such Limited Partner. The General Partner shall not be required to give such advance notice to a Limited Partner if: (i) the General Partner reasonably determines that such Limited Partner made a material misrepresentation to the Fund in connection with acquiring its Interest; (ii) a proceeding is commenced or threatened against the Fund or any other Partner arising out of, or relating to, such Limited Partner's investment in the Fund; or (iii) the General Partner reasonably determines that such Limited Partner's continuing ownership of an Interest would either: (A) cause the Fund or the General Partner to violate any requirement, condition or guideline contained in any federal, state or foreign law or in any order, directive, opinion, ruling or regulation of a federal, state or foreign governmental agency or self-regulatory organization, (B) require the Fund or the General Partner to comply with any requirement, condition or guideline contained in any federal, state or foreign law or in any order, directive, opinion, ruling or regulation of a federal, state or foreign governmental agency or self-regulatory organization, to which it is not subject as of the date of the LPA; (C) jeopardize the Fund's continuing classification as a partnership for federal income tax purposes, (D) result in the Fund being treated as a "publicly traded partnership" within the meaning of Section 7704 of the Internal Revenue Code of 1986, as amended (the "**Code**"), and applicable Treasury Regulations; (E) result in any of the assets of the Fund being treated as "plan assets" within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"); (F) necessitate the registration of the Fund as an investment company under the Investment Company Act of 1940, as amended (the "**Investment Company Act**"); or (G) result in the occurrence of any "prohibited transaction" (within the meaning of Section 406 of ERISA or Section 4975(c) of the Code).

*Payments on Withdrawals*

If a Limited Partner requests withdrawal from a Capital Account, or the General Partner requires a Limited Partner to withdraw a specific dollar amount from a Capital Account, and such amount is less than 95% of the balance of such Capital Account (as estimated in good faith by the General Partner), the General Partner will cause the Fund, to the extent reasonably practicable, to distribute the amount permitted or required to be withdrawn within thirty days following the effective date of such withdrawal. If the withdrawal amount is 95% or more of the balance of the Capital Account (as estimated in good faith by the General Partner), the General Partner will cause the Fund, to the extent reasonably practicable, to distribute 90% of the withdrawal amount within 30 days following the effective date of withdrawal and the remainder within thirty days after the next regular determination of the Fund's NAV.

While the Fund expects to distribute cash to Limited Partners in respect of their withdrawals, there can be no assurance that the Fund will have sufficient cash to satisfy withdrawal requests, or that it will be able to liquidate investments at the time of such withdrawal requests at favorable prices. Under the foregoing circumstances or the circumstances described below under "Suspension of Withdrawals and Withdrawal Payments," the Fund may make "in kind" distributions of its portfolio securities, or distributions consisting of a combination of cash and portfolio securities, to satisfy withdrawal requests. To the extent the Fund makes "in kind" distributions, it will allocate such distributions among the holders of the Capital Accounts entitled thereto such that each such holder shall, except for immaterial variances, receive a *pro rata* portion thereof. Securities distributed "in kind" may not be readily marketable or saleable and may have to be held by the Limited Partners who receive them for an indefinite period of time.

The General Partner may establish such reserves for the Fund for: (i) estimated accrued expenses; and (ii) contingent, unknown or unfixed debts, liabilities or obligations of the Fund, in each case as the General Partner may reasonably determine to be advisable, even if such reserves are not required by generally accepted accounting principles. The existence of any such reserve at the time a Limited Partner withdraws or is required to withdraw capital from a Capital Account would reduce the available balance of such Capital Account by the amounts of its *pro rata* share of such reserve. In addition, any such reserve, if and when reversed, will be allocated among the Capital Accounts existing at the time of such reversal, not among the Capital Accounts existing at the time such reserve was established (unless the General Partner determines that it would be more equitable to allocate the reversal among the Capital Accounts existing at the time such reserve was established). As a result, it is possible that a Limited Partner who withdraws the entire balance of a Capital Account at a time when a reserve exists will not receive any amount from such reserve if it should later be reversed.

Under certain limited circumstances, as described in §7 "RISK FACTORS – Fund Structure Risk – *Returns of Distributions*," Limited Partners may be required to return certain distributions to the Fund.

### Suspension of Withdrawals and Withdrawal Payments

The General Partner may suspend withdrawals and/or payments due to Limited Partners in connection with withdrawals for the whole or any part of any period during which the General Partner reasonably determines that: (A) effecting such withdrawals or making such payments would violate the Delaware Revised Uniform Limited Partnership Act or have a material adverse effect on the Limited Partners generally; (B) it is not practicable to accurately ascertain the value of a material portion of the assets of the Fund due to factors such as the closure of or the suspension of trading on any stock exchange or other market on which such assets are usually traded or the break-down in any of the means usually employed by the General Partner in ascertaining such value; or (C) circumstances exist as a result of which it is not reasonably practicable for the Fund to realize on the value of a material portion of its assets. The General Partner may also temporarily suspend withdrawals and/or payments due to Limited Partners in connection with withdrawals in order for the Fund to effect the orderly liquidation of its assets necessary to effect withdrawals.

Withdrawal proceeds will not bear interest from the effective date of the withdrawal to the date of payment, unless the General Partner determines otherwise.

## §7.    RISK FACTORS

**The Fund is still exposed to various risks which include, but are not limited to, the following: (a) General Investment or Market Risk, *i.e.*, the risk of deterioration in an entire market; (b) Strategy Risk, *i.e.*, the risk of deterioration in an entire investment strategy or the failure of investment techniques to work as intended; (c) Institutional Risk, *i.e.*, the risk that the Fund could incur losses due to: (i) the failure of counterparties to perform their contractual commitments to the Fund or (ii) the financial difficulty of brokerage firms, banks or other financial institutions that hold assets of the Fund; (d) Fund Structure Risk, *i.e.*, the special considerations and risks arising from the operation of certain provisions of the LPA; and (e) Operational Risk, *i.e.*, the special considerations and risks arising from the day-to-day management of a pooled investment vehicle like the Fund.**

Certain special considerations and risk factors that fall under these general categories are described below. Others are referred to elsewhere in this Memorandum and will not be repeated here.

Prospective investors should therefore read this entire Memorandum before subscribing for Interests.   In addition, the inclusion of specific special considerations and risk factors in this Memorandum should not be construed to imply they are described in complete detail, or that there are not other special considerations or risk factors that apply to an investment in the Fund.

## *GENERAL INVESTMENT OR MARKET RISK*

All investments in securities and other financial instruments involve substantial risk of volatility (potentially resulting in rapid declines in market prices and significant losses) arising from any number of factors that are beyond the control of the General Partner, such as: changing market sentiment; changes in industrial conditions, competition and technology; changes in inflation, exchange or interest rates; changing domestic or international economic or political conditions or events; changes in tax laws and governmental regulation; and changes in trade, fiscal, monetary or exchange control programs or policies of governments or their agencies (including their central banks).   Changes such as these, as well as innumerable other factors, are often unpredictable and unforeseeable, rendering it difficult or impossible to predict or foresee future market movements.   Unexpected volatility or illiquidity in the markets in which the Fund holds positions could impair its ability to achieve its objectives and cause it to incur losses.

The tragic events of September 11, 2001 had an immediate material and adverse effect on the financial markets in general and investment in securities in particular.   If there are further such events, there are numerous ways in which they could have a substantial negative impact on the Fund, including sharp adverse changes in volatility and liquidity.

Although the General Partner believes that the Fund's investment program should mitigate the risk of loss through a careful selection and monitoring of the Fund's investments, an investment in the Fund is nevertheless subject to loss, including possible loss of the entire amount invested.   No guarantee or representation is made that the Fund's investments will be successful, and investment results may vary substantially over time.

## *STRATEGY RISK*

The General Partner is confident that a portfolio of investments in companies and other entities with significant assets, investments, production facilities, trading or other business interests in China or which derive a significant part of their revenue from China will provide a sound basis for achieving the Fund's principal investment objective of long term capital appreciation.   However, investing in the Fund will involve certain considerations in addition to the risks normally associated with making investments in securities.   These risks include, among others:

### *Certain PRC Political and Economic Considerations*

The economy of China differs from the economies of most countries belonging to the Organization for Economic Cooperation and Development ("**OECD**") in various respects such as its structure, government involvement, level of development, growth rate, capital reinvestment, allocation of resources, rate of inflation and balance of payments.   Since 1949, the economy of China has been a planned economy subject to one-and five-year state plans adopted by the central Chinese Government authorities and implemented, to a large extent, by provincial and local authorities, which set out production and development targets.

Although the majority of productive assets in China are still owned by the government, economic reform policies since 1978 have emphasized decentralization and the utilization of market mechanisms in

25

the development of the Chinese economy. As such, China is in the process of implementing far-reaching economic reforms and it is uncertain whether the impetus for economic reform will continue or prove to be successful. No assurances can be given that economic activity will continue indefinitely to grow at recent rates and that the current Chinese Government will adopt economic policies conducive to sustain economic growth.

The RMB currently is not a freely convertible currency. The State Administration for Foreign Exchange ("**SAFE**"), under the authority of the People's Bank of China ("**PBOC**"), controls the conversion of RMB into foreign currency. Prior to January 1, 1994, RMB could be converted to foreign currency through the Bank of China or other authorized institutions at official rates fixed daily by the SAFE. RMB could also be converted at swap centers open to Chinese enterprises and foreign investment joint stock limited companies, subject to SAFE approval of each foreign currency trade, at exchange rates negotiated by the parties for each transaction. Effective January 1, 1994, a unitary exchange rate system was introduced in China, replacing the dual-rate system previously in effect. In connection with the creation of a unitary exchange rate, the Chinese Government announced the establishment of an inter-bank foreign exchange market, the China Foreign Exchange Trading System of China ("**CFETS**"), and the phasing out of the swap centers. However, the swap centers have been retained as an interim measure.

The value of the RMB is subject to changes in central government policies and to international economic and political developments affecting supply and demand in the CFETS market. The RMB experienced a significant devaluation on January 1, 1994 in connection with the adoption of the new unitary exchange rate. On this date, the official exchange rate for conversion of RMB to US dollars changed from approximately RMB5.8 to US$1.00 to approximately RMB8.7 to US$1.00, representing a devaluation of approximately 50%. Since 1994, the official exchange rate for the conversion of RMB to U.S. dollars has been stable and the RMB has appreciated slightly against the U.S. dollar. However, there can be no assurance that such rate will not become volatile again or that there will be no devaluation of the RMB. The results of Chinese companies in which the Fund invests may be affected by changes in the value of currencies other than the RMB, depending upon the currencies in which such companies' earnings and obligations are denominated.

The legal system in China is in the process of development. There can be no assurance that the Fund will be able to obtain effective enforcement of its rights by legal or arbitration or other proceedings in China.

All foreign portfolio investors are required to obtain an investor's identification number in order to invest in B shares listed in Shanghai and Shenzhen. The application to obtain such an investor identification number is believed to be routine and requires certain information on the identity of the investor to be submitted. While the General Partner is confident that the Fund will be able to obtain such an investor identification number, there can be no assurances that the Fund will be able to obtain such an investor identification number or that the PRC authorities will not revoke the investor identification number granted or otherwise change the licensing requirements for foreign investors in future.

### *Potential Market Volatility and Limited Liquidity*

The Chinese stock markets have a lower market capitalization and at times and over various periods have been more volatile and more illiquid than the stock markets of the United Kingdom, the United States and certain other countries which are members of the OECD. No assurance can be given that such volatility and illiquidity will not occur in the future.

In particular, the Shanghai and Shenzhen stock markets were established in 1990 and 1991,

respectively and should be regarded as developing stock markets. While the General Partner expects the stock markets in China to develop rapidly in terms of the numbers of listed companies, trading volumes and total market capitalization, there can be no assurance that this will be the case. Like many developing stock markets, the Shanghai and Shenzhen stock markets may be subject to periods of high price volatility, illiquidity, settlement problems and changes in government policy or regulation.

### *Currency Risk and Fluctuations*

The Fund's investments will be primarily in securities denominated in currencies other than U.S. dollars. A change in the value of such currencies will result in a corresponding change in the U.S. dollar value of the Fund's assets. In the context of investments made by the Fund on The Stock Exchange of Hong Kong Limited, the Hong Kong Government maintains a currency peg, introduced in 1983, which fixes the Hong Kong dollar to the U.S. dollar at approximately U.S.$1 to HK$7.75. Although the currency peg has remained in existence after the handover of sovereignty of Hong Kong to the PRC, there can be no assurance that it will continue and if it does not continue, of the effect this will have in the international currency markets on the value of the Hong Kong dollar.

### *Corporate Disclosure, Accounting and Regulatory Standards*

Due to the developing nature of the Chinese stock markets and the Chinese economy, the level of regulation and monitoring of the Chinese stock markets and the activities of investors, brokers and other participants may be lower than in many of the more developed markets. However, the China Securities Regulatory Commission ("**CSRC**") has been given the power and duty, *inter alia*, to prohibit fraudulent and unfair trade practices relating to the stock markets and to regulate substantial acquisitions of shares and take-overs of companies. Chinese disclosure, accounting and regulatory standards are in some respects less stringent than standards in certain OECD countries, and there may be less publicly available information about Chinese companies, whether listed or not, than is regularly published by or about companies in such other countries.

The Fund is also likely to invest in securities listed on the Taiwan Stock Exchange (the "**TSE**"). The amount of publicly available information concerning companies listed on the TSE may be less than that typically available in other industrialized countries and rules regarding insider trading, accounting, auditing and financial record-keeping standards may also be less stringent than in other markets.

### *Leverage*

The Fund may use leverage in its investment and trading program, generally through borrowing to purchase financial instruments (*e.g.*, traditional margin purchases) and purchasing inherently leveraged instruments such as financial futures contracts, options, forward contracts and swaps.

The level of interest rates generally, and the rates at which the Fund can borrow, in particular, will affect the Fund's operating results. If the interest expense on the Fund's borrowings – which will fluctuate from time to time depending on market conditions – were to exceed the net return on the portfolio securities purchased with the borrowed funds, the use of leverage would result in a lower rate of return than if leverage were not used.

Moreover, to the extent the Fund purchases securities with borrowed funds, its NAV will tend to increase or decrease at a greater rate than if borrowed funds were not used, and a relatively small price movement in a position could result in immediate and substantial losses. In a given market setting, securities that the General Partner sells short for the Fund may rise in value while the value of the Fund's long positions may decline, resulting in a situation in which leverage compounds the Fund's losses.

The Fund's borrowings typically will be secured by a pledge of its securities and other assets to the brokers who extend credit to the Fund. Under certain circumstances, a lender might demand an increase in the collateral that secures the Fund's obligations and, if the Fund were unable to provide additional collateral, the lender could liquidate assets held in the account to satisfy the Fund's obligations. For example, if assets pledged to a broker to secure the Fund's margin trading activities should decline in value, the Fund could be subject to a margin call, pursuant to which it must either deposit additional funds with the broker or suffer mandatory liquidation of the pledged assets to compensate for the decline in value. In the event of a sudden precipitous drop in the value of the its assets, the Fund might not be able to liquidate sufficient assets quickly enough to meet a margin call. A forced liquidation of the Fund's assets under these circumstances could have extremely adverse consequences for the Fund.

The Fund does not have any commitments from banks or others regarding its future borrowings and there is no assurance that lenders will be willing to make loans to the Fund of the maximum amount permitted by applicable law. The degree of profitability of the Fund may depend in part upon its ability to obtain such loans at prevailing market rates. To the extent that margin rules become more restrictive or the Fund is, for any reason, unable to obtain loans on its securities positions in the amounts it presently anticipates, the Fund's investment results could be adversely affected.

There is no restriction on the amount the General Partner may borrow for the Fund and, at any given time, the Fund's borrowings may be large in relation to its equity capital.

The risks associated with particular types of leveraged instruments are described below under "*Derivatives.*" The Fund may invest a substantial portion of its assets in leveraged instruments from time to time. As a general matter, the prices of leveraged instruments can be highly volatile, and investments in leveraged instruments may, under certain circumstances, result in losses that exceed the amounts invested.

### *Short Selling*

The Fund is authorized and expects to sell securities short. In order to sell a security short, the Fund must borrow the security from a securities lender and deliver it to the buyer. The Fund is then obligated to return the security to the lender at its request (although the Fund remains free to return the security to the lender at any time prior to the lender's request). The Fund ordinarily will fulfill its obligation to return a security previously sold short by acquiring it in the open market.

A short sale for the Fund generally involves a judgment on the General Partner that, subsequent to the sale, the price of the security will fall over time, resulting in profits to the Fund equal to the difference between the net proceeds of the sale and the cost of acquiring the security (or a security exchangeable for or convertible into such security) at a later date to fulfill its obligation to return the security to the lender.

The Fund's principal risk in selling a particular security short is that, contrary to the General Partner's expectation, the price of the security will rise, resulting in a loss to the Fund equal to the difference between the cost of acquiring the security (for return to the lender) and the net proceeds of the short sale. (This risk of loss is theoretically unlimited, since there is theoretically no limit on the price to which the security sold short may rise.)

Another risk is that the Fund may be forced to unwind a short sale at a disadvantageous time for any number of reasons. For example, a lender may call back a stock at a time the market for such stock is illiquid or additional stock is not available to borrow. In addition, some traders may attempt to profit by

making large purchases of a security that has been sold short. These traders hope that, by driving up the price of the security through their purchases, they will induce short sellers to seek to minimize their losses by buying the security in the open market for return to their lenders, thereby driving the price of the security even higher.

Thus, since the borrowed securities sold short must later be replaced by market purchases, any appreciation in the market price of these securities would result in a loss to the extent there was no corresponding gain in the value of the related long positions. There can be no guarantee that both the long and short positions will not decrease in value, perhaps resulting in losses that are greater than would be the case if the Fund were "long only" or "short only."

### *Derivatives*

The prices of derivative instruments can be highly volatile. Price movements of derivative instruments in which the Fund may invest and trade are influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. In addition, governments from time to time intervene, directly and by regulation, in certain markets, particularly those in currencies, financial futures and options. Such intervention often is intended directly to influence prices and may, together with other factors, cause all of such markets to move rapidly in the same direction because of, among other things, interest rate fluctuations.

Uncertainties remain as to how the markets for these instruments will perform during periods of unusual price volatility or instability, market illiquidity or credit distress. Market movements are difficult to predict and financing sources and related interest rates are subject to rapid change. One or more markets may move against the derivatives positions held by the Fund, thereby causing substantial losses. Many of these instruments are not traded on exchanges but rather through an informal network of banks and dealers who have no obligation to make markets in them and can apply essentially discretionary margin and credit requirements (and thus in effect force the Fund to close out its positions).

Futures. In the futures markets, margin deposits typically range between 2% and 15% of the value of the futures contract purchased or sold. Because of these low margin deposits, futures trading is inherently highly leveraged. As a result, a relatively small price movement in a futures contract may result in immediate and substantial losses to the trader. For example, if at the time of purchase 10% of the price of a futures contract is deposited as margin, a 10% decrease in the price of the contract would, if the contract is then closed out, result in a total loss of the margin deposit before any deduction for brokerage commissions. A decrease of more than 10% would result in a loss of more than the total margin deposit.

Futures positions may be illiquid because certain commodity exchanges limit fluctuations in certain futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." Under such limits, during a single trading day no trades may be executed at prices beyond the daily limits. Once the price of a particular futures contract has increased or decreased by an amount equal to the daily limit, positions in that contract can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit. This could prevent the General Partner from promptly liquidating unfavorable positions and subject the Fund to substantial losses. In addition, the General Partner may not be able to execute futures contract trades at favorable prices if little trading in the contracts involved is taking place. It also is possible that an exchange or the US Commodity Futures Trading Commission may suspend trading in a particular contract, order immediate liquidation and settlement of a particular contract, or order that trading in a particular contract be conducted for liquidation only.

Certain commodity exchanges have also established limits, referred to as "position limits," on the

maximum net long or net short positions which any person may hold or control in particular commodity futures contracts. The General Partner may have to modify its investment and trading decisions for the Fund, and the Fund might have to liquidate positions, in order to avoid exceeding such limits. If this should occur, it could adversely affect the Fund's profitability.

Options. There are various risks inherent in options trading. For example, the seller (writer) of a covered call option (*i.e.*, the writer holds the underlying security) assumes the risk of a decline in the market price of the underlying security to a level below the purchase price of the security, less the premium received by the writer for writing the option. The writer of a covered call option also gives up the opportunity for gain on the underlying security above the exercise price of the option. The writer of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying security above the exercise price of the option. The buyer of a call option assumes the risk of losing the premium invested in the option. The seller (writer) of a covered put option (*e.g.*, the writer has a short position in the underlying security) assumes the risk of an increase in the market price of the underlying security above the sales price (in establishing the short position) of the underlying security plus the premium received, and gives up the opportunity for gain on the underlying security below the exercise price of the option less the premium received on the put option. The seller of an uncovered put option assumes the risk of a decline in the market price of the underlying security below the exercise price of the option. The buyer of a put option assumes the risk of losing the premium it paid to purchase the put option.

The options markets have the authority to prohibit the exercise of particular options, which if imposed when trading in the option has also been halted, would lock holders and writers of that option into their positions until one of the two restrictions has been lifted.

Combination Transactions. The General Partner may engage in spreads or other combination options transactions involving the purchase and sale of related options and futures contracts. These transactions are considerably more complex than the purchase or writing of a single option. They involve the risk that executing simultaneously two or more buy or sell orders at the desired prices may be difficult or impossible, the possibility that a loss could be incurred on both sides of a multiple options transaction, and the possibility of significantly increased risk exposure resulting from the hedge against loss inherent in most spread positions being lost as a result of the assignment of an exercise to the short leg of a spread while the long leg remains outstanding. Also, the transaction costs of combination options transactions can be especially significant because separate costs are incurred on each component of the combination.

Straddles. In straddle writing, where the investor writes both a put and a call on the same underlying interest at the same exercise price in exchange for a combined premium on the two writing transactions, the potential risk of loss is unlimited. To the extent the price of the underlying interest is either above or below the exercise price by more than the combined premium, the writer of a straddle will incur a loss when one of the options is exercised. If the writer is assigned an exercise on one option position in the straddle and fails to close out the other position, subsequent fluctuations in the price of the underlying interest could cause the other option to be exercised as well, causing a loss on both writing positions.

Forward Trading. The Fund may invest in forward contracts and options thereon which, unlike futures contracts, are not traded on exchanges and are not standardized; rather banks and dealers act as principals in these markets, negotiating each transaction on an individual basis. Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable. The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration. There have been periods during which certain

participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell. Disruptions can occur in any market in which the Fund trades due to unusually high trading volume, political intervention or other factors. The imposition of controls by governmental authorities might also limit such forward trading to less than that which the General Partner would otherwise recommend, to the possible detriment of the Fund. Market illiquidity or disruption could result in major losses to the Fund.

In the forward markets, margin deposits may be even lower than in other markets or may not be required at all. Such low or non-existent margin deposits are indicative of the fact that any trading in the forward markets typically is accompanied by a high degree of leverage.

### Hedging Transactions

The General Partner may (but is not obligated) utilize derivative instruments to seek to hedge against fluctuations in the relative values of the Fund's portfolio positions as a result of changes in equity market values, interest rates or exchange rates. Hedging against a decline in the value of a portfolio position does not eliminate fluctuations in the value of the position or prevent losses in the value of the position, but establishes other positions designed to gain from those same developments, thus offsetting the decline in the value of the portfolio position. Such hedging transactions also limit the opportunity for gain if the value of the portfolio position should increase. It may not be possible, however, for the Fund to hedge against an interest rate or exchange rate fluctuation that is so generally anticipated that the Fund is not able to enter into a hedging transaction at a price sufficient to protect it from the decline in value of the portfolio position anticipated as a result of such a fluctuation.

The success of the Fund's hedging transactions will be subject to the General Partner's ability to correctly predict movements in and the direction of equity markets, interest rates and currencies. Therefore, while the Fund may enter into such transactions to seek to reduce risk, unanticipated changes in equity market values, interest rates or exchange rates may result in a poorer overall performance for the Fund than if it had not engaged in any such hedging transaction. In addition, the degree of correlation between price movements of the instruments used in a hedging strategy and price movements in the portfolio positions being hedged may vary. Moreover, for a variety of reasons, the General Partner may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged. Such imperfect correlation may prevent the Fund from achieving the intended hedge or expose the Fund to risk of loss. The successful utilization of hedging and risk management transactions requires skills complementary to those needed in the selection of the Fund's portfolio holdings.

### Hedged and Arbitrage Strategies

The use of "hedged" or arbitrage strategies does not necessarily mean these strategies are relatively low risk. Substantial losses may be recognized on hedge or arbitrage positions, and illiquidity and default on one side of a position can effectively result in the position being transformed into an outright speculation. Every hedge or arbitrage strategy involves exposure to some second order risk of the markets, such as the implied volatility in convertible bonds or warrants, the yield spread between similar term government bonds or the price spread between different classes of stock for the same issuer. Further, there are few examples of "pure" hedge or arbitrage strategies. Many such strategies probably employ limited directional strategies which expose them to market risk. Among the risks of arbitrage transactions are that two or more buy or sell orders may not be able to executed simultaneously at the desired prices, resulting in a loss being incurred on both sides of a multiple trade arbitrage transaction. Also, the transaction costs of arbitrage transactions can be especially significant because separate costs are incurred on each component of the combination. Consequently, a substantial favorable price

movement may be required before a profit can be realized.

### Trend Following

The General Partner may use computer pricing models to identify apparently overpriced or underpriced options in relationship to an assumed norm. In addition, analyses of price and other fluctuations over time may be relied upon which utilize charts and computers in order to discern and predict trends. Trading based on such analyses is subject to the risks that options premiums will not increase or decrease as predicted by the analysis, or that trades dictated by the analysis may not be executed in time to take advantage of the price disparities. This latter risk is likely to materialize when numerous market makers use similar analyses, all of which dictate the desirability of executing identical or similar contracts. In the past, there have been periods without identifiable trends and, presumably, such periods will continue to occur. Trading models or analyses that depend upon the forecasting of trends will not be profitable if there are not identifiable trends of the kind that the models or analyses seek to follow. Any factor which would make it more difficult to execute trades in accordance with the models or analyses signals, such as a significant lessening of liquidity in a particular market, would also be detrimental to profitability.

### Below "Investment Grade" Securities

The General Partner may invest in bonds or other fixed income securities, including, "high yield" (and, therefore, high risk) debt securities. These securities may be below "investment grade" and are subject to uncertainties and exposure to adverse business, financial or market conditions which could lead to the issuer's inability to make timely interest and principal payments. The market values of these securities tend to be more sensitive to individual corporate developments and general economic conditions than do higher rated securities.

### Distressed Investing

The Fund may invest in securities and private claims and obligations of entities that are experiencing significant financial or business difficulties. The Fund may lose all or a substantial portion of its investment in such distressed companies or may be required to accept cash or securities with a market value of less than the initial investment. One of the risks of investing in distressed entities is the difficulty of obtaining information as to the true condition of such issuers. Distressed company investments may also be adversely affected by state and federal laws relating to fraudulent conveyances, voidable preferences, lender liability and a court's discretionary power to disallow, subordinate or disenfranchise particular claims. The market prices of such securities are also subject to erratic changes and above-average price volatility, and the spread between the bid and asked prices of such securities may be greater than normally expected.

### Trading in Non-U.S. Companies and Markets

Trading in the securities of non-U.S. companies involves certain considerations not usually associated with trading in securities of U.S. companies, including political and economic considerations, such as greater risks of expropriation and nationalization, confiscatory taxation, the potential difficulty of repatriating funds, general social, political and economic instability and adverse diplomatic developments; the possibility of imposition of withholding or other taxes on dividends, interest, capital gains or other income; the small size of the some markets in foreign countries and the low volume of trading, resulting in potential lack of liquidity and in price volatility; fluctuations in the rate of exchange between currencies and costs associated with currency conversion; and certain government policies that may restrict investment opportunities. In addition, accounting and financial reporting standards that

prevail in foreign countries generally are not equivalent to United States standards and, consequently, less information may be available to investors in companies located in foreign countries than is available to investors in companies located in the United States.

There is also less regulation, generally, of the financial markets in foreign countries than there is in the United States. For example, some foreign exchanges, in contrast to domestic exchanges, are "principals' markets" in which performance is the responsibility only of the individual member with whom the trader has entered into a contract and not of an exchange or clearing corporation. In such a case, an investor is subject to the risk of the inability of, or refusal by, the counterparty to perform with respect to such contracts.

### *Illiquid Investments*

Despite the generally heavy volume of trading in most of the instruments traded by the General Partner, the markets for some of those instruments may have limited liquidity and depth. This lack of depth could be a disadvantage to the Fund, both in the realization of the prices that are quoted and in the execution of orders at desired prices.

### *New Strategies*

Investment strategies used by the General Partner may not have been in existence during periods of major market stress, disruption or decline of the type that may be experienced in the future. As a result, it is not known how these strategies will perform in adverse market conditions.

### *INSTITUTIONAL RISK*

### *Suspensions of Trading*

Securities and futures exchanges typically can suspend or limit trading in any instrument traded on the exchange. A suspension could render it impossible to liquidate positions and thereby expose the Fund, to substantial losses.

### *Failure of Exchanges and Clearinghouses*

The Fund is subject to the risk of the failure of any of the exchanges on which its positions trade or of their clearinghouses.

### *Counterparty Risk*

Some of the markets in which the Fund will invest and trade are over-the-counter or "interdealer" markets. The participants in these markets typically are not subject to the type of strict credit evaluation and regulatory oversight applicable to members of "exchange based" markets, and transactions in these markets typically are not settled through clearinghouses that guarantee the trades of their participants. This results in the risk that a counterparty may not be able to settle a transaction with the Fund in accordance with its terms because of a credit or liquidity problem of the counterparty, thereby exposing the Fund to loss. In addition, in the case of a default by a counterparty, the Fund could become subject to adverse market movements while it attempts to execute a substitute transaction.

"Counterparty risk" is accentuated in the case of contracts having longer maturities, where events may intervene to prevent settlement, or where the Fund has concentrated its transactions with a single or small number of counterparties. The Fund is not restricted from dealing with any particular counterparty.

*Custody Arrangements*

Chinese securities are ultimately held in book entry form in the securities depositories of the stock exchanges in China. Thus, even though the Fund's prime broker is the holder of the assets of the Fund and holds Chinese securities to its order for the Fund's benefit in such securities depositories in China, the Fund is exposed to the operating rules and counterparty risk of the Chinese security depositories in which the individual securities are held.

## FUND STRUCTURE RISK

*Dependence on General Partner and Key Personnel*

The General Partner will make all investment decisions for the Fund. The success of the Fund is critically dependent upon the efforts of Mr. Lin as the managing member of the General Partner. In the event that Mr. Lin ceases to be responsible for the Fund's investments for any reason, the operations of the Fund could be adversely affected. Mr. Lin may have significant business responsibilities in addition to those of the Fund.

*Exculpation and Indemnification*

As described above under §2, "MANAGEMENT," the Fund will broadly exculpate the General Partner and its related persons from certain liabilities to which they might otherwise be subject, and broadly indemnify them against certain losses incurred by them in managing and conducting the business and affairs of the Fund and in making investment decisions for the Fund. It is not expected that the Fund will purchase insurance to cover its indemnification obligations.

*Returns of Distributions*

No Limited Partner, in its capacity as such, will be personally liable for the debts, liabilities or obligations of the Fund, and each Interest, when issued and fully paid for in accordance with the provisions of the related Subscription Agreement, will be fully paid and nonassessable. Each Limited Partner, however, shall be required to return to the Fund amounts previously distributed to it by the Fund, together with reasonable interest on such amounts determined by the General Partner in its reasonable discretion, under certain limited circumstances, such as where: (i) the amount previously distributed was distributed in violation of the Delaware Revised Uniform Limited Partnership Act or was distributed in error due to a miscalculation of the Fund's NAV; (ii) the General Partner determines that a particular liability or expenditure that becomes fixed or is incurred in an accounting period subsequent to the accounting period in which the distribution was made is properly chargeable to such prior accounting period; or (iii) the amount previously distributed is necessary to satisfy such Limited Partner's *pro rata* share of the Fund's obligation to indemnify the General Partner and its related parties pursuant to the terms of the LPA. See Section 5.3 of the LPA for a more complete description of the limited circumstances in which a Limited Partner may be required to return amounts to the Fund.

*Amendment of LPA*

The General Partner may amend the LPA without Limited Partner approval for certain tax and regulatory purposes, but may not effect any such amendment that would modify the limited liability of a Limited Partner, or materially reduce the increases and decreases of the Fund's NAV or the amount of distributions to which such Limited Partner is entitled under the LPA, without the consent of that Limited Partner.

Similarly, the General Partner may amend the LPA without Limited Partner approval for such other purposes as the General Partner may reasonably determine to be necessary, appropriate, advisable or convenient to the management and conduct of the business and affairs of the Fund, provided that, in the reasonable good faith determination of the General Partner, no such amendment has or could reasonably be expected to have a materially adverse effect on the Fund or any Limited Partner.

The General Partner may amend the LPA in a manner that materially adversely affects or could reasonably be expected to have a material adverse effect on the Fund or the Limited Partners generally if the General Partner obtains the Fund's consent to such amendment.    The LPA permits the General to obtain the Fund's consent by way of "negative consent."    Under this procedure, the General Partner would inform Limited Partners of the proposed amendment no later than 30 days prior to the implementation of the amendment, and the amendment would be deemed to be approved if a 67% majority in interest of the Limited Partners who are not affiliated with the General Partner failed to object to such amendment within that time frame.    For this purpose, a Limited Partner who has a right to redeem its entire interest in the Fund prior to the proposed implementation of such amendment would automatically be deemed not to have objected to such amendment.

The General Partner may not amend the LPA in a manner that has or could reasonably be expected to have a material adverse effect on one or more specific Limited Partners without the consent of the affected Limited Partners.

The General Partner may also use the "negative consent" procedure for other purposes, such as obtaining consent to: (i) actions and practices involving actual or potential conflicts between the interests of the General Partner or any of its related parties, on the one hand, and the Fund or the Limited Partners, on the other hand, and (ii) the admission of an additional general partner in situations where the admission of an additional general partner would result in a change in the actual control or management of the Fund.

Except as described above, Limited Partners have no voting or consent rights.    For a more complete description of the manner in which the General Partner may amend the LPA, as well as a more complete description of the "negative consent" procedure, see Sections 3.4(c) and 3.6 and Article X of the LPA.

### Withdrawal and Expulsion of the General Partner

The General Partner may withdraw virtually all of its Capital Account at any time, without notice to the Limited Partners.    The General Partner may withdraw as the general partner of the Fund upon giving not less than ninety (90) days prior written notification to the Limited Partners.    In that case, the General Partner may withdraw the entire balance of its Capital Account.

No Limited Partner or Limited Partners, individually or collectively, have any right, power or authority to remove or expel the General Partner, cause the General Partner to withdraw from the Fund, or appoint a successor general partner in the event of the withdrawal or bankruptcy of the General Partner or otherwise, unless such right, power or authority is conferred on it or them by law.

### Confidentiality

Limited Partners generally will be required to keep confidential all matters relating to the Fund and its business and affairs (including communications from the General Partner.  The exceptions to this general rule of confidentiality are described in Section 8.6 of the LPA.

### Term of the Fund

The Fund will dissolve and commence winding up and business and affairs on December 31, 2050. The General Partner, however, may dissolve the Fund at any time upon giving written notification of such dissolution to the Limited Partners. Upon the dissolution of the Fund, Limited Partners will have no further withdrawal rights, but only the right to receive distributions from the Fund in connection with its winding up. For a complete description of the circumstances giving rise to the dissolution of the Fund and the procedures to be followed in connection with the dissolution and winding up of its business and affairs and the distribution of its assets in connection therewith, see Article XI of the LPA Agreement.

### Possible Master-Feeder Structure

Under the master-feeder structure which may be utilized by the Fund in the future, the Fund will not own its portfolio investments directly but will be a shareholder in a separate investment entity, the Master Fund, managed by the General Partner, which will make all portfolio investments. Equity participation in the Master Fund would be allocated among two, or possibly more, "feeder funds", including the Fund, ratably with their contributed capital. Depending upon the relative size of the investment by each feeder fund in the Master Fund, a single feeder fund (other than the Fund) may be the controlling shareholder of the Master Fund, which control may continue indefinitely, depending upon relative invested capital as between the Fund and such other feeder funds from time to time. In any such instance, the Fund's Limited Partners will have the status of indirect minority shareholders of the Master Fund and will not control the Master Fund.

Capital contributions in, and withdrawals from, the Fund will be dependent upon the Fund's ability to effect parallel transactions with the Master Fund. The management and affairs of the Master Fund will be governed by its board of directors, whose membership may or may not vary from the management of the General Partner. The rights of the Fund as a shareholder of the Master Fund will be generally exercisable by the General Partner and will be governed by the jurisdiction of organization of the Master Fund.

## OPERATIONAL RISK

### Lack of Operating History

The Fund is being established in connection with this offering and has no operating history. The successful past performance of other funds and accounts managed by the General Partner or its affiliates does not necessarily indicate that the Fund will be successful.

### Substantial Fees and Expenses

The Fund is subject to substantial direct and indirect fees, transaction costs and other costs and other expenses, regardless of whether it realizes any profits. Accordingly, the Fund will have to earn substantial trading profits to avoid depletion of its assets due to such costs and expenses.

### Incentive Allocations

The General Partner's Incentive Allocations depend on continuing increases in the Fund's profitability. This creates an incentive for the General Partner to allocate the Fund's assets in a manner that is riskier or more speculative than would otherwise be the case.

Because the Fund will establish a separate Capital Account for each separate capital contribution a Limited Partner makes to the Fund, the determination of whether an Account has experienced Net New

Profits will be made with respect to each Account. If a Limited Partner has more than one Capital Account, it is possible that, depending on when that Limited Partner invested and the timing of the Fund's profits and losses, one Account could experience Net New Profits (and be charged an Incentive Allocation) and another Account's value could simultaneously be under its High Water Mark.

Although the High Water Mark for a Capital Account will carry forward from year to year until exceeded, the General Partner will not be required to "repay" any Incentive Allocation allocated to it in the event such Account subsequently experiences losses.

The Incentive Allocations made to the General Partner will be determined on the basis of the value of the Fund's assets, including value attributable to unrealized appreciation. Thus, Incentive Allocations may be made to the General Partner based on positions that were profitable at the time such fees were assessed but unprofitable when eventually liquidated.

The General Partner will be responsible for determining the value of the Fund's assets for purposes of determining the Management Fees and Incentive Allocations payable or allocable to the General Partner. Although the General Partner will adhere to the valuation principals set forth in Annex B to the LPA, those principals give the General Partner a degree of leeway in determining such value. Accordingly, the General Partner has an incentive to place the highest reasonable value on the Fund's assets.

The General Partner may, after it has provided the Fund with a month-end or quarter-end NAV calculation, later revise the calculation, thus requiring the Fund to adjust its calculation of its own NAV for that period. This could result in the Fund's overpayment or underpayment of investors who withdrew from the Fund as of the end of the period, which could adversely affect remaining investors.

### Absence of Regulation

The Fund is offering Interests to investors pursuant to the exemption from registration under the Securities Act provided by Regulation D. In addition, the Fund will rely on the "exclusion" from the definition of "investment company" for certain "private" investment companies provided by Section 3(c)(1) of the ICA. As a result, Limited Partners will not be afforded the protections that registration under the Securities Act and the Investment Company Act might provide.

The General Partner is registered as an investment adviser with the California Department of Corporations pursuant to the California Corporate Securities Law of 1968, as amended. Such registration, however, does not mean that the State of California has passed upon the value of Interests, made any recommendation as to their purchase, approved or disapproved the offering of Interests or the qualifications of the General Partner or passed upon the adequacy or accuracy of this Memorandum.

### Competition

The General Partner will engage in investment and trading activities which are highly competitive with other investment and trading programs including those of mutual funds and other financial institutions, investment banks, broker/dealers, commercial banks, insurance companies and pensions funds, as well as private investors, all of whom may have investment objectives similar to those of the Fund. These competitors may have substantially greater resources and substantially greater experience than the General Partner.

*Increase in Amount of Assets Under Management*

Depending on the amount of new capital that it manages, the General Partner may experience a major increase in the assets it manages. It is not known what effect, if any, an increase in the amount of assets under management will have on its trading strategies or investment results, but it could impair the ability of its strategies and operations to perform up to historical levels.

*Other Clients of the General Partner*

The General Partner also manages other accounts and may have financial and other incentives to favor such accounts over the Fund. In investing on behalf of other clients, as well as the Fund, the General Partner must allocate its resources, as well as limited market opportunities. Doing so not only could increase the level of competition for the same trades that otherwise might be made for the Fund, including the priorities of order entry, but also could make it difficult or impossible to take or liquidate a particular position at a price indicated by the General Partner's strategy.

## §8.    CONFLICTS OF INTEREST

Because of the General Partner's role as sponsor and organizer of the Fund, the terms of the LPA were not the result of arms-length negotiation between the General Partner, on the one hand, and the Fund, on the other hand.

In addition, the General Partner and its related persons will be subject to significant conflicts of interest in managing the business and affairs of the Fund and in making investment and trading decisions for the Fund. Certain of these conflicts are described elsewhere in this Memorandum and will not be repeated here. Others are described below. While the conflicts described in this Memorandum are fairly typical of "hedge fund" managers, the General Partner wishes to call your attention to them.

The LPA does not require the General Partner to devote its full time or any material portion of its time to the Fund. The General Partner and its related persons are currently involved in, and may in the future become involved in, other business ventures, including other investment funds whose investment objectives, strategies and policies are the same as or similar to those of the Fund. The Fund will not share in the risks or rewards of such other ventures, and such other ventures will compete with the Fund for the time and attention of the General Partner and its related persons and might create additional conflicts of interest, as described below.

The General Partner and its related persons invest and trade and may continue to invest and trade in securities and other financial instruments for the accounts of clients other than the Fund and for their own accounts, even if such securities and other financial instruments are the same as or similar to those in which the Fund invests and trades, and even if such trades compete with, occur ahead of or are opposite those of the Fund. They will not, however, knowingly trade for the accounts of clients other than the Fund or for their own accounts in a manner that is detrimental to the Fund, nor will they seek to profit from their knowledge that the Fund intends to engage in particular transactions.

The General Partner and its related persons will act in a fair and reasonable manner in allocating suitable investment opportunities among their client and proprietary accounts. No assurance can be given, however, that (i) the Fund will participate in all investment opportunities in which other client or proprietary accounts of such persons participate, (ii) particular investment opportunities allocated to client or proprietary accounts other than the Fund will not outperform investment opportunities allocated to the

Fund, or (iii) equality of treatment between the Fund, on the one hand, and other client and proprietary accounts of such persons, on the other hand, will otherwise be assured.

Subject to the considerations set forth above, in investing and trading for client and proprietary accounts other than the Fund, the General Partner and its related persons may make use of information obtained by them in the course of investing and trading for the Fund, and they will have no obligation to compensate the Fund in any respect for their receipt of such information or to account to the Fund for any profits earned from their use of such information.

The trading records of the General Partner and its related persons will not be available for inspection by Limited Partners.

The General Partner or any of its affiliates might receive benefits, such as research services or the referral of prospective investors in the Fund, from the brokerage firms through which the Fund conducts its trading. This may create an incentive for the General Partner to use such brokerage firms. See §5, "BROKERAGE."

The General Partner expects to engage placement agents to market the Fund. If you acquire an Interest through an agent engaged by the General Partner, you should not view any recommendation of such agent as being disinterested, as the agent may be paid for the introduction out of the fees the General Partner receives from the Fund. Also, you should regard such an agent as having an incentive to recommend that you remain an investor in the Fund, since the agent may be paid a portion of the General Partner's fees for all periods during which you remain an investor.

The General Partner has fiduciary duties to the Fund to exercise good faith and fairness in all its dealings with it and will take such duties into account in dealing with all actual and potential conflicts of interest. If a Limited Partner believes that the General Partner has violated its fiduciary duties, it may seek legal relief under applicable law, for itself and other similarly situated Limited Partners or on behalf of the Fund. However, it may be difficult for Limited Partners to obtain relief because of the changing nature of the law in this area, the vagueness of standards defining required conduct, the broad discretion given the General Partner under the LPA, and the exculpatory and indemnification provisions therein.

---

§9.    **CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS**

---

*Introduction*

The following is a summary of the material federal income tax consequences of acquiring, holding and disposing of Interests. It is based upon the Code and the regulations (the "**Regulations**"), rulings, and judicial decisions thereunder as of the date hereof, any of which could be changed at any time (possibly on a retroactive basis). Except as otherwise specifically provided below, this summary is limited to U.S. investors (discussed below), does not purport to deal with persons in special situations (such as financial institutions, insurance companies, regulated investment companies, dealers in commodities and securities and pass through entities), and does not discuss all of the tax consequences that may be relevant to a particular investor, such as state, local, estate or gift taxation. The Fund has not sought a ruling from the IRS or an opinion of legal counsel as to any specific U.S. tax matters. Consequently, no assurance can be given that the tax consequences to the Fund or its investors will continue to be as described herein. Accordingly, you are urged to consult your tax advisers to determine the federal, state, local and foreign income tax consequences of acquiring, holding and disposing of an Interest.

A U.S. investor is a person who is a citizen or a resident alien of the United States, a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) organized under the laws of the United States or any political subdivision thereof, an estate whose income is subject to U.S. federal income tax regardless of its source and a trust if (i) a U.S. court can exercise primary supervision over the trust's administration and one or more U.S. persons are authorized to control all substantial decisions of the trust or (ii) the trust has a valid election in effect under applicable Regulations to be treated as a U.S. person.

### Partnership Status

The Fund intends to be classified as a partnership for federal income tax purposes. The Fund does not intend to be treated as a publicly traded partnership ("**PTP**") taxable as a corporation for federal income tax purposes. In this regard, the General Partner will permit the number of partners in the Fund to exceed 100 only if an exemption to the PTP rules applies.

### Taxation of Investors on Profits and Losses

As a partnership, the Fund generally will not be subject to federal income tax. Rather, you will be required to report your allocable share of the income, gains, losses, deductions and credits of the Fund (as reported to you each year by the Fund) on your federal income tax return for the Fund's taxable year that ends with or within your taxable year. Your allocable share of the Fund's income, gains, losses, deductions, and credits will be determined as provided by the LPA. In years in which the Fund has "taxable income," you will be responsible for paying federal income tax on your allocable share of such income whether or not this income is distributed to you. (As noted above, the General Partner does not intend to make routine distributions of the Fund's income.) In years in which the Fund's losses exceed its income and gains, your share of the Fund's losses may only be taken into account for federal income tax purposes to the extent of your tax basis. For individuals, certain non-corporate taxpayers, and certain closely-held corporations, the ability to take the Fund's losses into account is further restricted to the amount "at risk" in the Fund (generally, the amount of such investor's tax basis less any amounts borrowed to acquire an Interest that you are not personally liable for repaying). The characterization of an item of profit or loss (*e.g.,* as capital gain or ordinary income) is determined at the Fund level. Investors are urged to review Section 4.5 (Tax Allocations) of the LPA.

### Jobs and Growth Tax Relief Reconciliation Act of 2003

On May 28, 2003, the Jobs and Growth Tax Relief Reconciliation Act of 2003 (the "**Act**") was enacted. The Act reduced the maximum marginal tax rate to 35%, the maximum long-term capital gains tax rate to 15%, and the maximum tax rate on "qualified dividend income" to 15%, for individuals and certain non-corporate taxpayers. "Qualified dividend income" is defined under the Act to mean dividends received from domestic corporations and "qualified foreign corporations" if a taxpayer has held the stock for 60 days during the 120-day holding period beginning 60 days before the ex-dividend date (or, in the case of stock having a preference in dividends, 90 days during the 180-day period beginning 90 days before the ex-dividend date). In general, periods in which the taxpayer has diminished his risk of loss with respect to stock by holding options to sell, short selling and other positions do not count toward meeting the holding period requirement. "Qualified foreign corporations" include foreign corporations that are eligible for benefits under a comprehensive tax treaty and foreign corporations the stock of which is readily tradeable on an established securities market in the United States. However, dividends that are received from a foreign corporation that was a foreign investment company, passive foreign investment company, or a foreign personal holding company in either the taxable year of distribution or the preceding taxable year are not "qualified dividend income."

"Qualified dividend income" also does not include dividends on any share of stock to the extent that the taxpayer is under an obligation to make related payments with respect to positions in substantially similar or related property. In the case of brokers and dealers who engage in securities lending transactions, short sales, or similar transactions on behalf of their customers in the normal course of business, the IRS intends to waive penalties associated with the failure to comply with the reporting requirements due to the time period necessary to conform their information reporting systems to the rate reductions under the Act. It is expected that a taxpayer who receives payments in lieu of dividends from these transactions may treat the payments as dividend income to the extent the payments are reported as dividends on Forms 1099-DIV unless the taxpayer knows or has reason to know that the payments are in lieu of dividends rather than actual dividends.

Special rules apply under the Act (i) to losses associated with stock with respect to which a taxpayer has received an "extraordinary dividend" and (ii) in determining a taxpayer's foreign tax credit limitation in the case of qualified dividend income. The reduced tax rates generally apply to taxable years beginning after December 31, 2002, through December 31, 2008.

### Tax Consequences to a Withdrawing Investor

An investor receiving a cash liquidating distribution from the Fund generally will recognize capital gain or loss to the extent of the difference (if any) between the proceeds received by him and his adjusted tax basis in his Interest. The LPA provides that income, gains and certain other items will be allocated to a completely withdrawing investor to the extent his liquidating distribution exceeds his tax basis account. These allocations may result in the withdrawing investor recognizing taxable income, which may include ordinary income and short-term gain, in his last taxable year in the Fund, thereby reducing the amount of long-term capital gain recognized upon his receipt of the proceeds upon withdrawal. In addition, an investor making a partial withdrawal of his Capital Account may have a special allocation of taxable gain, which may accelerate his recognition of income.

### Tax Treatment of Company Investments

The Fund expects to act as a trader or investor, and not as a dealer, who buys and sells securities for its own account. Generally, gains and losses realized by a trader or investor on the sale of securities are capital gains and losses. Thus, subject to the treatment of certain currency exchange gains as ordinary income and certain other transactions described below, the Fund expects that the gains and losses from its securities transactions typically will be treated as long-term or short-term capital gains and capital losses depending upon the length of time the Fund maintains a particular investment position. However, the application of certain rules relating to short sales, so-called "straddle" and "wash sale" transactions, and "Section 1256 contracts" may alter the manner in which the Fund's holding periods for a security are determined or may otherwise affect the characterization and timing of realization of certain gains or losses. Moreover, as a result of acquiring debt obligations with "original issue discount" or "market discount," the Fund may be required to include certain "interest accruals" in income prior to actual receipt or to treat a portion of gain realized on the disposition of a "market discount" obligation as interest income. Income or loss from transactions involving derivative instruments, such as swap transactions, entered into by the Fund also may constitute ordinary income or loss.

Short Sales. Gain or loss from a short sale of property is generally considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset. Except in certain situations, special rules would generally treat the gains on short sales as short-term capital gains. In addition, special rules regarding the recognition of gains or losses on short sales apply when "substantially identical property" is held on behalf of the Fund.

41

Straddles. The IRS may treat certain positions in securities held (directly or indirectly) by an investor and his indirect interest in similar securities held by the Fund as "straddles" for federal income tax purposes. The application of the "straddle" rules in such a case could affect an investor's holding period for the securities involved and may defer the recognition of losses with respect to such securities.

Section 1256 Contracts. The Code generally applies a "mark to market" system of taxing unrealized gains and losses on "Section 1256 Contracts" and otherwise provides for special rules of taxation. A Section 1256 Contract includes certain regulated futures contracts, certain foreign currency forward contracts, and certain options contracts. Under these rules, Section 1256 Contracts held by the Fund (directly or indirectly) at the end of each taxable year of the Fund are treated for federal income tax purposes as if they were sold by the Fund for their fair market value on the last business day of such taxable year. The net gain or loss, if any, resulting from such deemed sales, together with any gain or loss resulting from actual sales of Section 1256 Contracts, must be taken into account by the Fund in computing its taxable income for such year. Capital gains and losses from Section 1256 contracts generally are characterized as short-term capital gains or losses to the extent of 40% thereof and as long-term capital gains or losses to the extent of 60% thereof.

Mixed Straddle Election. The Code allows a taxpayer to elect to offset gains and losses from positions that are part of a "mixed straddle." A "mixed straddle" is any straddle in which one or more but not all positions are Section 1256 Contracts. The Fund may be eligible to elect to establish one or more mixed straddle accounts for certain of its mixed straddle trading positions. At the end of a taxable year, the annual net gains or losses from the mixed straddle account are recognized for tax purposes. The application of the Temporary Regulations' mixed straddle account rules is not entirely clear. Therefore, there is no assurance that a mixed straddle account election made by the Fund will be accepted by the IRS.

Mark-to-Market Election. Section 475(f) of the Code permits traders in securities and traders in commodities to elect to "mark to market" securities or commodities held in connection with their trading business. An electing trader will recognize (as ordinary income) gain or loss on any security or commodity held in connection with such trade or business at the close of a taxable year as if such security or commodity were sold for its fair market value. To the extent the mark-to-market rules apply to a security or commodity, the special rules regarding interest and carrying costs related to straddles, the mark-to-market rules regarding certain Section 1256 contracts (including regulated futures contracts), and the wash sale rules on stock and securities will not apply. Once made, an election may be revoked only with the consent of the IRS.

Currency Fluctuations; Section 988 Gains or Losses. Generally, gains or losses with respect to investments in common stock of foreign issuers will be taxed as capital gains or losses at the time of the disposition of the stock, but gains and losses on the purchase and sale of foreign currency will be treated as ordinary income or loss. Moreover, gains or losses on the sale of debt securities denominated in foreign currency, to the extent attributable to fluctuation in the value of the foreign currency between the date of acquisition of the debt security and the date of disposition, will be treated as ordinary income or loss. The Fund may acquire foreign currency forward contracts, enter into foreign currency futures contracts, and acquire put and call options on foreign currencies. Generally, foreign currency regulated futures contracts and option contracts that qualify as "Section 1256 contracts" will not be subject to ordinary income or loss treatment under Section 988. However, if the Fund acquires futures currency contracts or option contracts that are not Section 1256 Contracts, or any forward currency contracts, any gain or loss realized by the Fund with respect to those instruments will be ordinary, unless (i) the contract is a capital asset in the hands of the Fund and is not a part of a straddle transaction and (ii) the Fund makes an election (by the close of the day the transaction is entered into) to treat the gain or loss

attributable to the contract as capital gain or loss.

Application of Rules for Income and Losses from Passive Activities. The Code restricts the deductibility of losses from a "passive activity" against certain income which is not derived from a passive activity. This restriction applies to individuals, personal service corporations and closely held corporations. The Regulations provide that the activity of trading personal property for the account of the owner of an interest in an activity is not a passive activity. Accordingly, income or loss from the Fund's securities or commodity trading activity should generally not constitute income or loss from a passive activity. Therefore, passive losses from other sources generally could not be deducted against an investor's share of income and gain from the Fund. Losses, if any, from the Fund may be available to offset an investor's taxable income from other sources subject to other limitations such as the at risk rules and the limitation on the use of capital losses or miscellaneous itemized deductions.

Limitation on Deductibility of Interest. For noncorporate taxpayers, Section 163(d) of the Code limits the deduction for "investment interest" (*i.e.,* interest or short sale expenses for "indebtedness incurred or continued to purchase or carry property held for investment") to a taxpayer's "investment income" (generally, net gain and ordinary income derived from investments in the current year). The Fund's investments should be treated as giving rise to investment income for an investor, and the investment interest limitation would apply to a noncorporate investor's share of the interest and short sale expenses attributable to the Fund's operation. Thus, a noncorporate investor may be denied a deduction for all or part of his allocable share of the Fund's interest and short sale expenses unless he has sufficient investment income from all sources including the Fund. The excess of an investor's investment interest over investment income may be carried forward to future years, subject to the same limitation.

Deductibility of Company Investment Expenditures by Noncorporate Investors. Investment expenses (*e.g.,* investment advisory fees) of an individual, trust and estate are deductible only to the extent they exceed 2% of the person's adjusted gross income. In addition, the Code further restricts the ability of an individual with an adjusted gross income in excess of a specified amount to deduct such investment expenses. Moreover, such investment expenses are miscellaneous itemized deductions which are not deductible by a noncorporate taxpayer in calculating his alternative minimum tax ("**AMT**") liability. However, these limitations on deductibility should not apply to a noncorporate investor's share of the Fund's expenses to the extent that the Fund is engaged in a trade or business under the Code. Although the Fund intends to treat the trade or business related expenses as not being subject to the foregoing limitations on deductibility, there can be no assurance the IRS may not treat such items as investment expenses which are subject to the limitations. In addition, the IRS may contend that the Incentive Allocations are fees that are subject to the 2% limitation and to the limitation for use in computing the AMT.

"Phantom Income" From Company Investments. The Fund may investing in foreign companies subject to various "anti-deferral" provisions of the Code (the "Subpart F," "passive foreign investment company," "controlled foreign corporation," and "foreign personal holding company" provisions), which may cause an investor to (i) recognize taxable income before the Fund's receipt of proceeds from such investing, (ii) pay an interest charge on receipts that are deemed to have been deferred or (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term capital gain.

It is also possible that the Fund may invest in entities that will be treated as "controlled foreign corporations" ("**CFCs**") or "foreign personal holding companies" ("**FPHCs**") for U.S. federal tax purposes. If such investments are made, certain U.S. Tax Persons would be required to currently include in income their pro rata share of certain items of the CFC's or FPHC's earnings and profits. Additionally, all or a portion of the gain on such stock may be treated as dividend income, which may be subject to tax